# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

QUALITY EGG, LLC, *et al.*,

              Defendant.

No. C 14-3024-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTIONS PRIOR
TO SENTENCING**

_____

## TABLE OF CONTENTS

**I.    INTRODUCTION**............................................................................ 2

**II.   THE DEFENDANTS' MOTIONS PRIOR TO SENTENCING**................... 5

**III.  FACTUAL BACKGROUND** ............................................................ 7
    **A.   Quality Egg Provided False Information and Documents** ................ 10
    **B.   Quality Egg Bribed a USDA Official** ......................................... 13
    **C.   Quality Egg Changed the "Julian Dates" on Packages of
        Eggs and Sold Misbranded Eggs into Interstate Commerce**.............. 14
    **D.   Quality Egg Failed to Meet FDA Regulatory Standards** ................... 18

**IV.   ISSUES** ...................................................................................... 24

**V.    DISCUSSION**.............................................................................. 24
    **A.   Whether The Sixth Amendment Was Violated By My Factual
        Finding At The Defendants' Sentencing Hearing** ........................... 24
        **1.   Defendants' Arguments** ................................................. 24
        **2.   Prosecutors' Arguments**................................................. 26
        **3.   Analysis** ..................................................................... 28
    **B.   Whether the Eighth Amendment Permits a Sentence of
        Imprisonment for the Defendants' Strict Liability Offenses**.............. 33
        **1.   Defendants' Arguments** ................................................. 33
        **2.   Prosecutors' Arguments**................................................. 34
        **3.   Analysis** ..................................................................... 36

     *C.*     *Whether The Fifth Amendment Permits a Sentence of Imprisonment for the Defendants' Strict Liability Offenses*.............. *48*
          *1.*     *Defendants' Arguments* ................................................ *48*
          *2.*     *Prosecutors' Arguments*............................................... *51*
          *3.*     *Analysis* ................................................................ *53*
*VI.*   **CONCLUSION**........................................................................... *68*

# I.  INTRODUCTION

*Gilead* is a fictional novel based in the small town of Gilead, Iowa.  The main character, Reverend John Ames, is dying from heart complications and, in a Ciceronian fashion,[1] he decides to write a letter to his seven-year-old son with the intention that his son will read that letter after Reverend Ames dies.  The novel is an account of life lessons learned by Reverend Ames as well as daily occurrences with his son, wife, and other family and community members.  In a theoretical sense, the imagery from one scene in *Gilead* aptly incorporates some of the key contents of this case—*i.e.*, chicken eggs, a father and a son, rural Iowa, and a disaster:

---

[1] Marcus Tullius Cicero, an infamous Roman philosopher, statesman, and attorney, directed *De Officiis* (*On Duties* or *On Obligations*), in part, to his son, also named Marcus.  *See* CICERO, ON DUTIES 34 (M.T. Griffin & E.M. Atkins eds., Cambridge University Press 1991).  "It is both genuinely appropriate to Marcus Cicero and also directed at others, particularly young Romans of the governing class," wrote Miriam Griffin in the Introduction.  *Id.*  Cicero's text begins as follows: "Marcus, my son, you have been a pupil of Cratippus' for a year already, and that in Athens."  *Id.* at 109.  Interestingly, the historical context in which Cicero wrote his work placed him in a state of unease, not unlike Reverend Ames's state in *Gilead* based on his health, because of Cicero's "uncertainty and anxiety about the fate of the Roman Republic[.]"  *Id.* at 23.

> My mother took a great deal of pride in her chickens, especially after the old man was gone and her flock was unplundered. Culled judicially, it throve, yielding eggs at a rate that astonished her. But one afternoon a storm came up and a gust of wind hit the henhouse and lifted the roof right off, and hens came flying out, sucked after it, I suppose, and also just acting like hens. My mother and I saw it happen, because when she smelled the rain coming she called me to help her get the wash off the line.
>
> It was a general disaster. . .

Marilynne Robinson, GILEAD 66-67 (2004).

In August 2010, a disaster on a much larger scale than the one described in *Gilead* occurred. At that time, "a storm came up and a gust of wind hit the henhouse," so to speak, when thousands of people across the country were sickened by adulterated eggs sold at restaurants and grocery stores. It was determined that the eggs carried *Salmonella Enteritidis* (SE) bacteria, and the eggs were traced back to an Iowa-based company, Quality Egg, LLC (Quality Egg). That company, for several years prior to 2010, owned and operated egg production and processing facilities in small towns, like the fictional town of Gilead, across Iowa, including: Galt, Clarion, Alden, and Dows.[2] Austin "Jack" DeCoster owned and controlled the activities of Quality Egg. Peter DeCoster, Austin DeCoster's son, was the Chief Operating Officer of Quality Egg. Together, the father-son duo exercised significant control over the operations of the company. After the U.S.

---

[2] Quality Egg also operated under the names Wright County Egg, Environ, and Lund/Wright Company. *See* Austin DeCoster's PSIR at ¶ 6; *see also* Peter DeCoster's PSIR at ¶ 6. Quality Egg also operated two distinct processing facilities under an agreement with Hillandale Farms in Alden, Iowa, and West Union, Iowa. *See* Austin DeCoster's PSIR at ¶ 8; *see also* Peter DeCoster's PSIR at ¶ 8.

Food and Drug Administration (FDA) presented epidemiologic information to Quality Egg, the defendants voluntarily recalled millions of dozens of eggs in 2010.

The two executives of Quality Egg, Austin and Peter DeCoster, were later charged with shipping and selling shell eggs that contained SE across state lines as responsible corporate officers under 21 U.S.C. §§ 331(a) and 333(a)(1).[3] The two defendants pleaded guilty to their crimes on June 3, 2014 (docket nos. 16–1, 17–1), and they appeared before me on April 13, 2015, for sentencing. On June 3, 2014, Austin DeCoster also appeared, on behalf of the defendant organization, and pleaded guilty to three counts of a three-count Information, including Bribery of a Public Official in violation of 18 U.S.C.

---

[3] The "responsible corporate officer" (RCO) doctrine is a creation of the common law. As Brenda S. Hustis and John Y. Gotanda explain, "The RCO doctrine arose from two United States Supreme Court decisions involving prosecutions under the Federal Food, Drug, and Cosmetic Act of 1938 ('FDCA')." Brenda S. Hustin & John Y. Gotanda, *The Responsible Corporate Officer: Designated Felon or Legal Fiction?*, 25 LOY. U. CHI. L.J. 169, 172–73 (1994) (citing *United States v. Park*, 421 U.S. 658 (1975); *United States v. Dotterweich*, 320 U.S. 277 (1943)). The authors summarize the holdings in *Park* and *Dotterweich*, and provide the following: "In short, in Dotterweich and Park, the Supreme Court established the principle that a corporate official with authority and responsibility for supervising subordinates may be held criminally liable—without a showing of affirmative wrongful action or intent—for a subordinate's violation of a public welfare statute that contains no mens rea requirement and carries only misdemeanor penalties. The principle has become known as the RCO doctrine." *Id.* at 176; *see also Park*, 421 U.S. at 673-74 ("The concept of a 'responsible relationship' to, or a 'responsible share' in, a violation of the [FDCA] indeed imports some measure of blameworthiness; but it is equally clear that the Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so."); *Dotterweich*, 320 U.S. at 281 ("[The FDCA] dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.").

§ 201(b)(1) (Count 1); Selling Misbranded Food With Intent to Defraud or Mislead, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) (Count 2); and Selling Adulterated Food, in violation of 21 U.S.C. §§ 331(a) and 333(a)(1) (Count 3). On April 13, 2015, I also sentenced the organization, Quality Egg.

## II.   THE DEFENDANTS' MOTIONS PRIOR TO SENTENCING

A sentencing matter arose from motions filed by the two individual defendants, Austin DeCoster and Peter DeCoster (referred to jointly below as the DeCosters or the defendants), prior to their sentencing hearing. Austin DeCoster filed his Motion That A Sentence Of Incarceration Or Confinement Is Unconstitutional (docket no. 64) on October 6, 2014. A memorandum in support of Austin Decoster's motion was filed two days later (docket no. 67). On October 22, 2014, Peter DeCoster submitted a motion (docket no. 71), which relied on Austin DeCoster's memorandum and adopted the same arguments and constitutional challenges.

The core of the defendants' contention was that for their "strict liability offense, a sentence of incarceration, including intermittent, community, or home confinement, or other restriction on liberty other than probation, would be unconstitutional" on due process grounds. Austin DeCoster's Memorandum at 2–3. This is because the defendants "had no knowledge of the violation and no knowledge of the conduct underlying the offense." *Id.* at 1.

In reply, the prosecutors filed a resistance brief on October 23, 2014 (docket no. 74). The prosecutors requested that I "deny the defendants' motions" and "impose the sentences that [I] find[] appropriate in light of the evidence." Resistance Brief at 2. The prosecutors' argument was two-fold: (1) the defendants knew about the insanitary conditions at Quality Egg, and, therefore, had knowledge that there was an increased risk

of their eggs being adulterated; and (2) even if proof of *mens rea* is absent, a sentence of incarceration would not be unconstitutional based on either the due process clause of the Fifth Amendment or the Eighth Amendment. *Id*. at 4, 6.

The defendants filed a joint reply brief on November 6, 2014 (docket no. 78). That brief repeated arguments from the defendants' initial memorandum and urged that the case law, the Due Process Clause, and the Eighth Amendment,[4] do not permit a sentence of imprisonment or confinement for the defendants' offenses. Defendants' Reply Brief at 4, 7. Additionally, according to the defendants, proving the defendants' alleged relevant "knowledge" of their offenses by a preponderance of the evidence at sentencing, rather than a trial by jury, would be a violation of the Sixth Amendment of the Constitution. *Id*. at 9.

---

[4] Nowhere in the defendants' initial brief, in support of their motion that a sentence of incarceration or confinement is unconstitutional, do they argue that imprisonment would violate the Eighth Amendment. *See* Austin DeCoster's Memorandum at 1–7. Rather, the defendants only made that contention after the prosecutors argued that the defendants incorrectly framed their argument. As the prosecutors put it,

> As an initial matter, although defendants assert that "[a] sentence of incarceration . . . would violate [their] *constitutional right to due process*," [Austin DeCoster's Memorandum at 2] (emphasis added), it is not clear that they have framed their argument in the correct terms. Defendants are not contesting the constitutionality of being subjected to criminal liability in the first instance; they challenge only the *punishment* that may be imposed for their crimes. A defendant's claim that the severity of his penalty is disproportionate to his offense is ordinarily understood to implicate the Eighth Amendment, which prohibits "cruel and unusual punishment." U.S. Const. amend. VIII.

Resistance Brief at 10.

### III.   FACTUAL BACKGROUND

On June 2, 2014, the DeCosters pleaded guilty before United States Magistrate Judge Leonard T. Strand to selling adulterated food into interstate commerce in violation of the FDCA, 21 U.S.C. § 331(a), which is a misdemeanor offense, carrying a possible term of imprisonment of up to one year. *See* 21 U.S.C. § 331(a); *see also* 21 U.S.C. § 333(a)(1).[5] The defendants committed the crimes in their capacities as corporate officers of Quality Egg: Austin DeCoster was the trustee of the DeCoster Revocable Trust, which owned Quality Egg, and Peter DeCoster was the Chief Operating Officer.

According to his plea agreement, Austin DeCoster "exercised substantial control over the operations of Quality Egg and related entities and assets in Iowa." Austin DeCoster's Rule 11 Plea Agreement (docket no. 16–1), ¶ 7. Peter DeCoster "exercised some control over the production and distribution of shell eggs by Quality Egg and related entities and assets in Iowa." Peter DeCoster's Rule 11 Plea Agreement (docket no. 17–1), ¶ 7. The following facts quoted from the parties' Rule 11 plea agreements are undisputed and were stipulated to by the parties:

> Between about the beginning of 2010 and in or about August 2010, Quality Egg introduced and caused to be introduced into interstate commerce food, that is shell eggs, that were adulterated. The shell eggs were adulterated in that they contained a poisonous and deleterious substance, that is,

---

[5] Section 331(a) prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded," and "causing" of the same acts. 21 U.S.C. § 331(a). Section 333(a)(1) provides that "[a]ny person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both." 21 U.S.C. § 333(a)(1).

> *Salmonella Enteriditis*, that may have rendered them injurious
> to health. Quality Egg produced, processed, held, and packed
> the contaminated eggs in Iowa and sold and caused the
> distribution of the eggs to buyers in states other than Iowa.
> At the time Quality Egg sold the contaminated eggs, if the
> contamination of eggs had been known to the defendant[s],
> [they] [were] in [ ] position[s] of sufficient authority at Quality
> Egg to detect, prevent, and correct the sale of the
> contaminated eggs.[6]

Austin DeCoster's Rule 11 Plea Agreement at ¶ 7; Peter DeCoster's Rule 11 Plea
Agreement at ¶ 7.

According to the findings of the CDC, as set forth in the defendants' PSIRs, there
were thousands of consumers sickened by the SE outbreak in 2010. *See* Austin
DeCoster's PSIR at ¶ 59; *see also* Peter DeCoster's PSIR at ¶ 59. In fact, "the CDC
determined that approximately 1,939 reported illnesses and/or cases of salmonellosis
were likely associated with the SE outbreak in 2010."[7] Austin DeCoster's PSIR at ¶ 72;

---

[6] "According to the Centers for Disease Control and Prevention ("CDC"), *Salmonella* is
a group of bacteria that can cause diarrheal illness in humans. They are microscopic
living creatures that pass from the feces of people or animals to other people or other
animals. There are many different kinds of *Salmonella* bacteria." Austin DeCoster's
PSIR at ¶ 11; Peter DeCoster's PSIR at ¶ 11. People infected by *Salmonella* "develop
diarrhea, fever, and abdominal cramps 12 to 72 hours after infection," and the illness
generally persists for "four to seven days[.]" Austin DeCoster's PSIR at ¶ 12; Peter
DeCoster's PSIR at ¶ 12. While some infected persons recover without treatment, some
are hospitalized by severe diarrhea, and in some cases, the *Salmonella* infection can
"spread from the intestines to the blood stream, and then to other body sites, and can
cause death unless the person is treated promptly with antibiotics." Austin DeCoster's
PSIR at ¶ 12; Peter DeCoster's PSIR at ¶ 12.

[7] The statistics are more calamitous than they initially appear. The number of persons
affected by the outbreak in 2010 was presumably a lot higher. Because there were 1,939
reported cases of SE, and for every laboratory-confirmed case, there are 29 cases of SE

Peter DeCoster's PSIR at ¶ 72. Based on the DeCosters' plea agreements, the parties agreed that the DeCosters did not have "knowledge, during the time frame from January 2010 through August 12, 2010, that eggs sold by Quality Egg were, in fact, contaminated with *Salmonella Enteriditis*." Austin DeCoster's Rule 11 Plea Agreement at ¶ 7; Peter DeCoster's Rule 11 Plea Agreement at ¶ 7.

After the SE outbreak was traced back to Quality Egg's facilities, the FDA requested that Quality Egg issue a voluntary recall of hundreds of millions of shell eggs produced at Quality Egg's facilities. *See* Austin DeCoster's PSIR at ¶ 10, 63; *see also* Peter DeCoster's PSIR at ¶ 10, 63. Quality Egg followed the FDA's request. According to the parties' stipulations, other than one occasion in 2009, "prior to July 2010, Quality Egg did not conduct SE tests on eggs or divert eggs from the market based upon the receipt of a positive environmental SE result." Parties' Stip. at ¶ 2; *see also* Austin DeCoster's PSIR at ¶ 25; Peter DeCoster's PSIR at ¶ 25. After Quality Egg's recall, between August 12, 2010 and August 30, 2010, the FDA conducted a regulatory inspection of Quality Egg's facilities in Iowa and observed "egregious unsanitary conditions," including live and dead rodents, beetles, flies, and frogs in the laying areas, feed areas, and conveyer belts, and a room filled with manure. Austin DeCoster's PSIR at ¶ 66; Peter DeCoster's PSIR at ¶ 66.

It is important to note, here, that I adopt every unobjected to portion of the defendants' PSIRs as findings of fact in this case. Because certain unobjected to portions

---

unreported, the CDC estimated that "more than 56,000 persons in the United States may have been sickened by the SE outbreak in 2010." Austin DeCoster's PSIR at ¶ 72 n.14; Peter DeCoster's PSIR at ¶ 72 n.14.

of the defendants' PSIRs are particularly relevant to this Memorandum Opinion and Order,[8] I set them forth below:

### A. Quality Egg Provided False Information and Documents

29.    Between 2007 and 2010, one of Quality Egg's major customers was U.S. Foodservice ("USFoods"). The broker for Quality Egg's USFoods account was Lund Eggs, owned by Joan Lund (now deceased). As a condition for buying eggs produced by Quality Egg, USFoods required that the Quality Egg plants where the USFoods eggs were processed – primarily Quality Egg Plants 3 and 6 – undergo annual food safety audits by an independent auditing firm, one of which was AIB. Each audit consisted of a scheduled two-day plant visit: one day the auditor conducted a physical inspection of the plant; the other day the auditor reviewed the food safety and sanitation-related paperwork that Quality Egg was required to maintain, which included Quality Egg's HACCP Plan. The HACCP Plan itself required Quality Egg to maintain documentation of certain tasks to be performed daily, weekly, or monthly. When the AIB auditor completed his review of the facilities and documentation, he produced two documents: (1) a formal AIB Audit Report that explained his findings and observations, and gave the facility a score; and (2) a USFoods Addendum, which was a checklist of items required specifically by USFoods. The auditor provided these

---

[8] The numbers of the paragraphs that I cite to in the three defendants' PSIRs are listed in numerical order. However, to be clear, paragraphs 23 to 33, 45 to 48, and 66 to 71 are taken from Austin DeCoster's and Peter DeCoster's PSIRs. Paragraphs 53 to 62 are taken from Quality Egg's PSIR. Also, as the reader will soon become aware, I have redacted the names of certain persons, not the DeCosters, from this Memorandum Opinion and Order.

two documents to Joan Lund, who in turn submitted them to USFoods. In order to supply eggs to USFoods, the audited facility had to receive a score of "Superior," which was 900 points or higher.

30. During every AIB audit between 2007 and 2010, Quality Egg and ████████ made significant misrepresentations, including material omissions, to two AIB auditors with regard to Quality Egg's food safety and sanitation practices and procedures. With respect to the documentation required for every audit, ████████ and others at Quality Egg directed the manufacture and falsification of documents required for the audit, with the intent that the auditors and USFoods would rely on the fabricated documents. On the days leading up to each audit, ████████ identified numerous documents that were supposed to have been completed monthly, weekly, or daily that were missing from Quality Egg's files; many of those documents then appeared in the files on the day the auditor was to review them. On the days leading up to an audit, ████████ gave Quality Egg employees blank, signed forms and instructed them to fill in the missing information. Among the forms that were manufactured and completed late at the direction of ████████ and others at Quality Egg were preoperative sanitation reports, daily clean-up forms, pest control reports, daily maintenance reports, and visitor logs.

31. Both through documents and through oral representations, ████████ and Quality Egg misled the AIB auditors about the pest control measures that were in place in the processing plants and layer barns. ████████ and Quality Egg represented to AIB auditors during the annual audits that Quality Egg had a pest control program in place for Plants 3 and 6

11

during the entire time period between 2007 and 2010. In fact, Quality Egg's retention of a pest control company was sporadic over this time period. For various time periods between July 2006 and August 2010, Quality Egg had no outside pest control services to deal with rodents or insects in the processing plants, and had no outside pest control services at all to deal with rodents in the layer barns.

32. ███████ and Quality Egg also misled the AIB auditors about the Salmonella prevention strategies and measures used by Quality Egg for Plants 3 and 6, with the intent that the auditors and USFoods would rely on those misrepresentations. The USFoods Addenda that the AIB auditors completed required Quality Egg's plants to have in place "product testing protocols and appropriate intervention technologies to reduce or limit the amount of Salmonella found in fresh shell eggs," and that such measures be included in Quality Egg's HACCP Plan. For each AIB audit between 2007 and 2010, ███████ and Quality Egg provided the AIB inspector with documents that indicated that Quality Egg performed flock testing to identify and control Salmonella. In fact, no such "flock testing" was ever done. For the August 2009 AIB audits for Plants 3 and 6, ███████ and Quality Egg made the further misrepresentation B reflected in the USFoods Addenda for those audits B that Quality Egg had a Salmonella program in place for the layer and pullet barns. Moreover, ███████ and Quality Egg did not take preventative measures or employ strategies to reduce or limit Salmonella in Quality Egg's table eggs when they received positive results from the sporadic SE environmental testing and necropsies that Quality Egg did perform.

33.     When Quality Egg first started selling eggs to USFoods through Lund Eggs, Quality Egg represented to Lund Eggs that it had a very aggressive Salmonella prevention program that was ahead of the industry. Quality Egg told Lund Eggs that it performed blood tests for Salmonella on pullets and also environmental swab tests. ████████ and Quality Egg represented to Lund Eggs and USFoods during an audit by USFoods that, if its tests came back positive for Salmonella, Quality Egg would divert the eggs. In fact, no eggs were ever diverted, even though ████████ and Quality Egg received numerous positive environmental SE tests for Plants 3 and 6.

. . .

**B.    Quality Egg Bribed a USDA Official**

45.     On more than one occasion in 2010, inspectors of the U.S. Department of Agriculture (USDA) exercised their official authority to retain pallets of shell eggs at Quality Egg's egg production and processing facilities in Wright County, Iowa. Such pallets of eggs were retained for failing to meet minimum quality grade standards promulgated by the USDA. Pursuant to USDA procedures, USDA inspectors must retain or "red tag" pallets of eggs which, upon inspection, fail to meet appropriate standards. Pallets of retained or "red tagged" eggs are legally restricted and cannot be shipped or sold unless such eggs are properly re-processed and released for shipment or sale by appropriate USDA personnel. Specifically, the retained pallets of eggs at Quality Egg's facility contained too great a percentage of restricted eggs under minimum USDA quality grade standards. That is, too many of these restricted eggs qualified as "checks," "dirty eggs," "leakers," or "losses" as defined by 21 U.S.C. § 1033(g).

46. On or about April 12, 2010, ███████ authorized the disbursement of $300 in Quality Egg petty cash to ███████ knowing and intending that the cash would be used by ███████ to bribe a USDA inspector. Specifically, ███████ instructed Quality Egg's Chief Financial Officer to give ███████ $300 from Quality Egg's petty cash fund. ███████ and ███████ provided the bribe to the inspector in an attempt to corruptly influence the inspector with regard to an official act, that is, to exercise his authority to release pallets of retained eggs for sale by Quality Egg without re-processing them as required by law and USDA standards. On at least one additional occasion in 2010, ███████ and ███████ provided a bribe to the same inspector for the same purpose. The inspector is now deceased.

47. In providing the bribes, ███████ and ███████ were each acting within their scope of employment at Quality Egg and were acting with intent to benefit Quality Egg.

48. The prosecutor's investigation has revealed no evidence that, prior to the bribe made on or about April 12, 2010, either [defendant] had knowledge that the bribe was going to occur.

. . .

### C. Quality Egg Changed the "Julian Dates" on Packages of Eggs and Sold Misbranded Eggs into Interstate Commerce

53. In the United States shell egg industry, shell egg producers put dates on cases of eggs to designate the date that the eggs were processed. The dates are typically expressed as a "Julian date." In turn, as is well known in the shell egg industry, shell eggs are

typically processed within 24 hours of the time the eggs are laid.  Processing dates are typically applied to cases of eggs and not necessarily to each individual carton of eggs.  At the relevant times, the States of California and Arizona required that shell eggs be sold within 30 and 24 days of processing; other states had similar laws restricting the sale of older eggs.

54.     Beginning no later than January 1, 2006, and continuing until approximately August 12, 2010, Quality Egg personnel, under the direction and with the approval of ███████, shipped some eggs in interstate commerce to various wholesale customers with deliberately mislabeled processing dates and expiration dates.  In fact, some of the eggs were older than indicated by the dates on the egg cases.  Some of the eggs were also shipped with no labeling so that, in some instances, labeling with inaccurate processing and expiration dates could be sent to wholesalers and affixed to the cases at the destination.[9]

55.     Because Quality Egg produced in excess of one million eggs every day and the market varied up and down frequently, Quality Egg often had a surplus of eggs in storage.  Quality Egg's options were to sell the surplus eggs to a wholesale shell egg customer or to sell them to a breaker facility that bought them for approximately one-half the market price of shell eggs.  Quality Egg's typical practice was to sell the eggs at a reduced price to a wholesale shell egg customer rather than to sell them to a breaker. These surplus eggs had been in storage for periods of time ranging from 14 days to 40 or more days.  ███████ referred to older eggs as "distressed eggs." ███████ also said the only way he would not sell such eggs to a wholesale shell egg

_____

[9] I omitted the footnotes in paragraphs 53 and 54 from Quality Egg's PSIR.

15

customer was if the eggs were moldy. If said eggs were moldy, then ███████ would instruct Quality Egg personnel to sell the eggs to a breaker facility.[10]

56. There were a number of ways that, under the direction and approval of ███████, Quality Egg mislabeled older eggs with newer processing and expiration dates prior to shipping the eggs to customers in California, Arizona, and other states. Sometimes Quality Egg personnel did not put any processing or corresponding expiration dates on the eggs when they were processed. The eggs would be kept in storage for several days and up to several weeks. Then, just prior to shipping the eggs, Quality Egg personnel labeled the eggs with processing dates that were false, in that the dates were more recent than the dates that the eggs had actually been processed, with corresponding false expiration dates. In other instances, Quality Egg personnel relabeled older eggs with processing dates that were false, in that the dates were more recent than the dates that the eggs had actually been processed, with corresponding false expiration dates. Quality Egg personnel did this by removing the original labeling and affixing new, false labeling to the egg cases, and also by placing new, false labeling over existing labeling on the egg cases. In other instances, Quality Egg personnel sent new labeling with processing dates that were false, in that dates were more recent than the dates that the eggs had actually been processed and with corresponding false expiration dates, with the drivers of the trucks in which the eggs were shipped, so the wholesale customer could apply the new labeling

---

[10] I note that there was an objection to paragraph 55; however, based on the defendants' subsequent objections I consider it withdrawn. Even if it is not withdrawn, I overrule the objection, and, in any event, I am permitted to consider this information when analyzing the factors set forth under 18 U.S.C. § 3553(a).

at the destination. In addition, at the request of certain wholesale customers, Quality Egg personnel printed new labeling with processing dates that were false, in that dates were more recent than the dates that the eggs had actually been processed and with corresponding false expiration dates, and sent false labeling to the wholesale customers so that older cases of eggs could be relabeled to falsely indicate more recent dates.

57. Through these mislabeling practices, Quality Egg personnel, including ███████, intended to mislead, at least, state regulators and retail egg customers regarding the age of the eggs. These mislabeling practices had the effect of misleading state regulators and retail egg customers regarding the age of these eggs.

58. In mislabeling eggs with false processing and corresponding expiration dates, ███████ and other Quality Egg personnel were each acting within the scope of their employment by Quality Egg and were acting with intent to benefit Quality Egg.

59. The mislabeling of eggs at Quality Egg with inaccurate dates was a common practice and was well known among several Quality Egg employees. It was an ongoing practice before ███████ became involved in Quality Egg sales in 2002.

60. As a result of the mislabeling of eggs with false processing and corresponding expiration dates, ███████ and other Quality Egg personnel caused an actual, reasonably foreseeable, pecuniary harm to more than 250 retail egg customers in a total amount of more than $400,000 but not more than $1,000,000.[11]

_____

[11] I omitted a footnote in paragraph 60 of Quality Egg's PSIR.

61.    The prosecutor has investigated whether any persons became ill or otherwise sustained bodily injury as a result of ingesting eggs sold with false processing and corresponding expiration dates.    To date, the prosecutor's investigation has not identified any such persons.

62.    To date, the prosecutor's investigation has revealed no evidence that Peter DeCoster and/or [Austin] DeCoster had knowledge of these mislabeling practices.

. . .

### D.   Quality Egg Failed to Meet FDA Regulatory Standards

66.    Between August 12, 2010, and August 30, 2010, the FDA conducted a regulatory inspection of the following Quality Egg facilities: Layers 1, 2, 3, 4, and 6, and the feed mill. Many egregious unsanitary conditions were observed.  Items noted were: live and dead rodents (mice) and frogs found in the laying areas, feed areas, conveyer belts, and outside of the buildings; skeletal remains of a chicken on a conveyer belt; numerous holes in walls and baseboards in the feed and laying buildings; missing vent covers; rodent traps were broken, did not have bait in them, and some traps still had dead rodents in them; manure piled to the rafters in one building, which was below the laying hens; a room was so filled with manure that it pushed the screen out of the door, allowing rodents access to the building; and live and dead beetles and flies throughout the chicken barns.

67.    Based upon the inspection, the FDA issued a "Form 483 Inspectional Observations" report ("483 Report") and subsequently issued a more detailed "Establishment Inspection Report." The following observations were included in the 483 Report:

A.    DeCoster[12] failed to implement and follow its written SE prevention plan (by failing to effectively implement various aspects of its egg bio-security plan related to dogs, cats, rodents and other wild animals, and manure management);

B.    DeCoster failed to take steps to ensure there was no introduction or transfer of SE into or among poultry houses (including, with regard to inadequate doorway accesses, protective clothing, cleaning/sanitization of equipment, uncaged chickens using manure eight feet high to access the laying area, and a door being blocked by excess manure);

C.    DeCoster failed to achieve satisfactory rodent and pest control (as evidenced by the observation of specified numbers of live mice, and numerous live and dead maggots and live and dead flies);

D.    DeCoster failed to adequately document the monitoring of rodents and other pest control measures;

E.    DeCoster failed to adequately document compliance with biosecurity measures;

F.    Regarding the feed mill, wild birds were observed in the storage and milling areas (and nesting material was in the "closed" mixing system, ingredient storage, and truck filling areas), ingredient bins had rusted holes and were otherwise inadequately closed, and outside

---

[12] According to the defendants' PSIRs, the FDA 483 Report used "DeCoster" as a shorthand reference for the company, Quality Egg, not to refer to a specific person. *See* Austin DeCoster's PSIR at ¶ 67 n. 13; *see also* Peter DeCoster's PSIR at ¶ 67 n.13.

grain bins had topside doors/lids open to the environment with pigeons entering and leaving the bins; and

G.    Samples were collected during the inspection that tested positive for SE.

68.    As of October 14, 2010, the FDA had made several determinations regarding SE contamination at Quality Egg facilities and the steps necessary to address the contamination. According to the FDA, Quality Egg's environmental and egg testing and the FDA's environmental and feed testing established that the SE contamination at Quality Egg's facilities was widespread. Given the extremely high level and pervasive nature of the contamination and the conditions identified at Quality Egg's facilities that were not sufficient to prevent the spread of SE, the FDA determined that depopulation of each of Quality Egg's hen houses was the appropriate action to minimize the likelihood of a recurrence of a food borne outbreak. The FDA offered the following reasons for its determination that lesser measures would be insufficient:

- Pervasive Salmonella Enteritidis (SE) contamination throughout the entirety of Wright County Eggs' (WCE) operation. SE was found in 63% (46/73) of house environments and in eggs from 40% (31/77) of houses. Additionally, SE was isolated from the wash water, feed mill, feed samples, feed ingredients, and a pullet house. These data are indicative of widespread SE contamination that is not localized to any one part of WCE's operation, but is instead spread throughout the entirety of the WCE operation.

- The known presence of an additional egg-associated pathogen, Salmonella Heidelberg (SH), at the pullet houses. The younger a bird is, the more susceptible it is to infection. Since this pathogen was present at a time when the pullets were susceptible to colonization, it is possible that these birds, if they are now laying eggs, are producing eggs that contain SH.

- An incidence rate of SE positive eggs that is approximately 39 times higher than the estimate cited in the FDA's egg safety rule as being the current national incidence rate. Based on WCE's egg tests, the FDA calculated that 1 out of every 516 eggs at WCE was positive for SE compared to the expected rate of 1 in 20,000. This data is for the operation as a whole and importantly, all WCE farms have been determined to be producing SE positive eggs.

- The likelihood that current layers in production now have been exposed to SE positive feed. Current layers (Sites 2 and 4) would have been placed at WCE pullet rearing facilities sometime (approximate) between April and May 2010. These birds would have been fed potentially contaminated feed for several months prior to the FDA's identification of SE in the feed. As stated above, younger birds are more susceptible to colonization. Thus, current layers at Sites 2 and 4 may be producing eggs that contain SE.

- The likelihood that houses will be recontaminated. In light of the inter-connectivity of houses in an in-line operation, the fact that WCE houses are connected through a common walkway and biosecurity concerns

revealed during the FDA's inspections, such as the lack of doors to some houses, the FDA is concerned about the possibility of recontamination. Given the pervasive nature of SE at WCE, even if a house environment is presently SE-negative, there is a distinct possibility that it will not remain SE-negative but will become contaminated with SE present elsewhere in WCE's facilities.

- An SE negative environmental test is not always indicative of SE negative eggs. At WCE there are eight houses with SE negative environmental tests that produced eggs that tested positive for SE (Farm 2 House 1; Farm 3 House 1; Farm 4 Houses 1 and 4; and Farm 6 Houses 1, 4, 5, and 8). These observations, coupled with the pervasive nature of SE at WCE's facilities, suggest that environmental negatives in WCE houses at present must be viewed with caution.

- A house with a negative environment and negative egg test still has the potential to produce positive eggs. Because only one – 1,000 egg sample has been taken and because infected hens are known to lay SE positive eggs intermittently, it is very plausible that the full extent of SE contamination of eggs being produced at WCE has not yet been discovered and that the 40% figure mentioned above is an underestimation of the extent of contamination.

- An inefficacious vaccination program in place at the time current layers were being grown out. A total of 54 flocks were vaccinated but 57% (31/54) of houses with vaccinated layers had SE positive environments and 17% (9/54) of houses with vaccinated layers produced eggs that tested

positive for SE. The vaccination program appears to be inefficacious regardless of whether one or two doses were administered.

- While WCE claims to be operating a new and improved vaccination scheme presently, no data has been provided to the FDA which would demonstrate efficacy of that program.

69. In addition, the FDA emphasized that depopulation alone would not be sufficient, but should be done in conjunction with the following "necessary actions":

removal of manure from all sites, cleaning and disinfection of all houses subsequent to manure removal, verification that cleaning and disinfection has rendered facilities free of SE and SH, repair of facilities to prevent ingress by rodents or birds, and resolution of all items described on the FDA Form 483. Such actions should be completed before repopulating any facility with chickens at any stage of maturity. In addition, we also believe you (WCE) must make certain that your (WCE's) feed mill and pullet rearing facilities are free of SE and SH. Once the entirety of WCE operations is free of SE and SH, adequate biosecurity measures must be followed to prevent a reoccurrence.

70. Between August 19, 2010, and August 24, 2010, the FDA conducted a regulatory inspection of Hillandale's West Union (Layer 9) and Alden facilities and its corporate office. It was discovered that Hillandale purchased/obtained all their pullets from Quality Egg. It was also discovered that Hillandale purchased all the feed for their facility in Alden, Iowa, from Quality Egg.

71.	Excessive bird activity was observed at Hillandale's grain storage facility. In addition, grain and other ingredients were stored outside open to the environment, therefore allowing birds and rodents access to the grain and to potentially contaminate it with SE through fecal matter.

Austin DeCoster's PSIR at ¶ 29–33, 45–48, 66–71; Peter DeCoster's PSIR at ¶ 29–33, 45–48, 66–71; Quality Egg's PSIR at ¶ 53–62.

## IV.	ISSUES

There are three primary issues I address in this Memorandum Opinion and Order: (1) Whether, under the Sixth Amendment, it was permissible for me to find at the defendants' sentencing hearing that they had relevant knowledge of the conduct underlying their strict liability offense; (2) Whether, absent proof of *mens rea*, the sanction of imprisonment for their offense would be unconstitutional in violation of the Eighth Amendment's prohibition on cruel and unusual punishment; and  (3) Whether, absent proof of *mens rea*, the sanction of imprisonment for their offense would be unconstitutional in violation of the Due Process Clause of the Fifth Amendment.

## V.	DISCUSSION

### A.	Whether The Sixth Amendment Was Violated By My Factual Finding At The Defendants' Sentencing Hearing

#### 1.	Defendants' Arguments

In their initial brief, the defendants claimed to have "no knowledge of the violation and no knowledge of the conduct underlying the offense" to which they pleaded guilty. Austin DeCoster's Memorandum at 1.  Rather, their plea agreements were based on their roles as "corporate officers" at Quality Egg.  *Id.*  In the absence of *mens rea*, the

defendants argued, imprisonment would be unconstitutional, in violation of the right to due process and the Eighth Amendment's prohibition on cruel and unusual punishment. *See id.* at 3; *see also* Defendants' Reply Brief (docket no. 78), 4.

Early in their reply brief, the defendants took issue with the prosecutors' assertion that their constitutional argument could be avoided if I determined at the defendants' sentencing hearing "that defendants in fact had culpable mental states." Defendants' Reply Brief at 3 (quoting Resistance Brief at 2). Such a finding of fact would, according to the defendants, be a constitutional violation under the Sixth Amendment. This is because, citing to *Alleyne v. United States*, 133 S. Ct. 2151, 2162–63 (2013) and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme Court has "repeatedly held that where a finding of fact would increase the range of penalties to which the defendant may be exposed, the Sixth Amendment requires that fact to be proved to a jury or admitted by the defendant." *Id.* Therefore, the defendants alleged that the issue of whether they, in fact, were involved in the offense is "not open" to me. *Id.* Because the admitted facts prove that the defendants' conviction is only a criminal violation of strict and vicarious liability and the defendants had no *mens rea*, they argued, I "should instead hold that a sentence of imprisonment or confinement would be unconstitutional in this case[.]" *Id.* at 3–4.

Later in their reply brief, the defendants returned and added to their argument that proving the defendants had relevant knowledge of their offenses by a preponderance of the evidence at their sentencing, rather than at a trial by jury, would be a violation of the Sixth Amendment. *See id.* at 9–10. The defendants, again in reliance on *Alleyne*, reiterated that "absent an admission by the defendant, the government must prove *to a jury* 'every fact that [is] a basis for imposing or increasing punishment.'" *Id.* at 9 (quoting *Alleyne*, 133 S. Ct. at 2159). In this case, both defendants signed plea agreements indicating they had no "direct involvement in the sale of the contaminated eggs," and

neither of the defendants, nor any employees at Quality Egg, "had knowledge that the eggs were adulterated with SE." *Id.* at 10. Because the defendants' admissions do not prove that they had knowledge of or involvement in the offense, the defendants argued that "no judicial finding of fact could now preempt the question of whether a prison sentence is constitutionally permissible." *Id.* The defendants continued:

> If the DeCosters' position is correct, and a prison sentence cannot be imposed with a determination that the defendant had personal knowledge of the offense conduct or personal involvement in the offense conduct, then that fact cannot permissibly be determined by a court because it would supply a "basis for imposing or increasing punishment." *Alleyne*, 133 S. Ct. at 2159.

*Id.* Thus, the defendants argued that I must first decide whether the imposition of a term of imprisonment is unconstitutional, here, before I consider the prosecutors' claims as to the defendants' *mens rea* at sentencing.

### 2. Prosecutors' Arguments

Contrary to the defendants' assertions, the prosecutors argued that the defendants "were in no ways 'wholly innocent and unknowing' . . . about the conduct to which they pled guilty." Resistance Brief at 2. The prosecutors referred to information in the defendants' PSIRs, and the defendants' objections to their PSIRs, to further the prosecutors' point. For instance, the defendants' PSIRs suggest that the defendants knew of SE contamination at Quality Egg between January and August 2010 because of "necropsies that found SE in the organs of laying hens and positive environmental tests for SE."[13] *Id.* at 4–5 (citing Austin DeCoster's PSIR at ¶ 16–22; Peter DeCoster's PSIR at ¶ 16–22).

---

[13] A "necropsy" is an autopsy performed on an animal.

In addition, the prosecutors argued that the defendants' objections (and lack thereof) to their PSIRs prove that the defendants knew about the "preventative and ameliorative measures recommended to address the company's SE and pest control problem." *Id.* at 5. This is because they were aware of the recommendations by Dr. Charles Hofacre and Dr. Maxcy P. Nolan, III,[14] which were designed to prevent SE contamination, and did not follow all of their recommendations at Quality Egg's Iowa facilities. The defendants' "familiarity" with the procedures employed by Austin DeCoster's Maine egg farms is also "telling" in that "those experiences show that following and enforcing stringent preventative and remedial measures may effectively control SE." *Id.* at 6. Finally, the defendants "do not contest" that "multiple SE environmental tests performed in Quality Egg barns and layer hen necropsies tested positive for SE," yet shell eggs produced in those environments were sold to consumers and not diverted, and Quality Egg performed no testing of such eggs "until late July 2010, when an FDA egg safety rule took effect[.]" *Id.* (citing Austin DeCoster's Sealed Objection to PSIR (docket no. 55), ¶¶ 8, 21; Peter DeCoster's Sealed Objection to PSIR (docket no. 56), ¶ 4). In other words, according to the prosecutors, the defendants' claims that they had no knowledge of the SE contamination are negated by their own submissions to the Court.

Lastly, the prosecutors indicated that they were "prepared to present evidence" at the defendants' sentencing hearing to bolster their claim that the defendants knew of the conditions, which "increased the likelihood of *Salmonella* contamination and

---

[14] The parties stipulated that "neither Dr. Charles Hofacre nor Dr. Maxcy Nolan has a basis to testify that Quality Egg fully and effectively implemented all of Dr. Hofacre's and Dr. Nolan's recommendations." Parties' Stip. ¶ 1. However, the parties also stipulated that "a number of recommendations were implemented, but that the measures implemented were not effective in stopping the outbreak of *salmonella* that occurred at Quality Egg." *Id.*

proliferation." *Id.* at 5. However, no additional evidence was presented because the scope of the contested issues was narrowed by the parties' stipulations. Based on the defendants' PSIRs and objections, the prosecutors argued in their briefs and at sentencing, it is clear that the defendants knew about the insanitary conditions at Quality Egg in Iowa and the lack of a proper response to that problem in order to minimize and prevent SE contamination. *Id.* Therefore, the prosecutors made the case that the defendants' motions are based on a "fundamentally flawed premise" because they, indeed, "knew about the conditions that caused the introduction of adulterated eggs into interstate commerce[.]" *Id.* at 6.

### 3.    *Analysis*

Relying primarily on *Alleyne*, 133 S. Ct. at 2159, and *Apprendi*, 530 U.S. at 466, the defendants argued that if I found, as a matter of fact, that the defendants had relevant knowledge of their strict liability crimes, the Sixth Amendment would be violated. This is because that "finding of fact *would increase the range of penalties to which the defendant[s] may be exposed*," and "the Sixth Amendment requires that fact to be proved to a jury or admitted by the defendant."[15] Defendant's Reply Brief at 3 (emphasis added). At the sentencing, I found the defendants' reliance on *Alleyne* and *Apprendi* misplaced. My finding on this issue only requires a brief explanation before I proceed to considering the defendants' constitutional challenges.

In *Alleyne*, a defendant was convicted of robbery affecting commerce and the use of a firearm during and in relation to a crime of violence. *Alleyne*, 133 S. Ct. at 2156. At the defendant's sentencing, the judge, instead of a jury, found brandishing, which increased the mandatory minimum sentence to which the defendant was subjected from

---

[15] "The Sixth Amendment provides that those 'accused' of a 'crime' have the right to a trial 'by an impartial jury.'" *Alleyne*, 133 S. Ct. at 2156.

five years to life in prison into seven years to life in prison. *Id.* at 2156, 2160. In finding

that the defendant's Sixth Amendment rights were violated in *Alleyne*, the Supreme Court

held that "[f]acts that increase the mandatory minimum sentence are . . . elements and

must be submitted to the jury and found beyond a reasonable doubt." *Id.* at 2158. In

reaching that holding, the Supreme Court reasoned that "[t]he touchstone for determining

whether a fact must be found by a jury beyond a reasonable doubt is *whether the fact*

*constitutes an 'element' or 'ingredient' of the charged offense.*" *Id.* (quoting *United*

*States v. O'Brien*, 560 U.S. 218 (2010); *Apprendi*, 530 U.S. at 483 n.10) (emphasis

added). Elsewhere in that opinion, the Supreme Court reiterated that "the essential Sixth

Amendment inquiry is whether a fact is an element of the crime." *Id.* at 2162. The

Supreme Court further explained that, in *Apprendi* (a prior decision),[16] the Court decided

that "a fact is by definition an element of the offense and must be submitted to the jury *if*

*it increases the punishment above what is otherwise legally prescribed.*" *Id.* at 2158

---

[16] In *Apprendi*, the defendant fired several .22-caliber bullets into an African American family's home. *Apprendi*, 530 U.S. at 469. The family recently moved into what was previously an all-white neighborhood. *Id.* The defendant pleaded guilty to two counts of second-degree possession of a firearm for an unlawful purpose, and one count of third-degree offense of unlawful possession of an antipersonnel bomb. *Id.* at 469–70. The trial judge accepted the defendant's guilty pleas, and also found, by a preponderance of the evidence, that the defendant committed the offense with a biased purpose and purpose to intimidate. *Id.* at 470–71. Accordingly, the trial judge "held that the hate crime enhancement applied." *Id.* at 471. In reviewing the trial judge's decision and the New Jersey statutory scheme at issue, the Supreme Court found that the defendant's sentence was unconstitutionally enhanced because the trial judge made a finding that the defendant committed his crime with a purpose to intimidate his victims based on their race, by a preponderance of evidence, which increased the defendant's statutory maximum term of imprisonment. *Id.* at 471, 491–92, 497. In reaching that decision, the Supreme Court reasoned, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

(citing *Apprendi*, 530 U.S. at 483) (emphasis added). Later in the opinion for *Alleyne*, the Supreme Court clearly articulated what its holding did not entail—namely, *Alleyne* "does not mean that any fact that influences judicial discretion must be found by a jury." *Id.* at 2163. Rather, the Supreme Court continued: "We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." *Id.*; *see also United States v. Higgins*, No. 2:09-cr-403-4, 2011 WL 6088576, at *1, *10 (E.D. Pa Dec. 7, 2011) (defendant pleaded guilty, as a responsible corporate officer, to introducing adulterated and misbranded medical devices into interstate commerce, "in violation of 21 U.S.C. §§ 331(a) and 331(a)(1)," but that "guilty plea does not cabin or circumscribe the Court's consideration of relevant facts at sentencing[.]").

Unlike in *Alleyne* and *Apprendi*, my factual finding that the defendants had relevant knowledge of their strict liability crimes—that is, knowledge of the insanitary conditions at Quality Egg, and the increased risk that their processing plants were contaminated with SE, does not constitute an element of their offense, or "increase[] the punishment above what is otherwise legally prescribed." *Alleyne*, 133 S.Ct. at 2158 (citing *Apprendi*, 530 U.S. at 483 n.10). Thus, based on the Supreme Court's precedent, cited to by the defendants, it is unnecessary that this factual issue be submitted to the jury. *Id.* Rather, the defendants pleaded guilty to violating 21 U.S.C. § 331(a), which has a statutory maximum penalty of "imprisonment for not more than one year or fined not more than $1,000, or both." *See* 21 U.S.C. § 331(a); *see also* 21 U.S.C. 333(a)(1) ("Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both."). Nor were the defendants unaware of the floor (or mandatory minimum sentence) and ceiling (or mandatory maximum

sentence) of their sentencing ranges based on their plea agreements.[17]  Also, unlike in *Alleyne* and *Apprendi*, the floor and the ceiling, respectively, of the defendants' statutorily authorized sentencing ranges were never impacted by my factual findings.  The sentencing guideline range, based upon a total offense level of 4, and a criminal history category of I, remained at zero months to six months in prison.  *See* Austin DeCoster's PSIR at ¶ 127; *see also* Peter DeCoster's PSIR at ¶ 127.  Therefore, the defendants erred in asserting that *Alleyne* and *Apprendi* are applicable to this case.

In addition, as indicated in the defendants' plea agreements, both defendants agreed to be "sentenced based on facts to be found by the sentencing judge *by a preponderance of the evidence and agree facts essential to the punishment need not be (1) charged in the Indictment or Information; (2) proven to a jury; or (3) proven beyond a reasonable doubt*."  Austin DeCoster's Rule 11 Plea Agreement at ¶ 8 (emphasis added); Peter DeCoster's Rule 11 Plea Agreement at ¶ 8 (emphasis added).  However, despite what is provided in their plea agreements, and, therefore, agreed to by the defendants, the defendants demanded a higher standard of persuasion on this issue in their reply brief.  Inconsistent with their plea agreements, the defendants argued in their reply

---

[17] As the prosecutors rightly pointed out, according to paragraphs three and four of the defendants' plea agreements, both defendants "understood the maximum statutory penalties for their crimes," including imprisonment of up to one year and probation. Resistance Brief at 4; *see also* Austin DeCoster's Rule 11 Plea Agreement at ¶ 3–4; Peter DeCoster's Rule 11 Plea Agreement at ¶ 3–4.  Both defendants' base offense levels are 6, and those offense levels were not enhanced as a consequence of my finding that the defendants had knowledge of the insanitary conditions at Quality Egg and the increased risk that their shell eggs were contaminated with SE.  *See* Austin DeCoster's PSIR at ¶ 85; *see also* Peter DeCoster's PSIR at ¶ 85.  Their offense levels were only decreased by 2 points based on their acceptance of responsibility.  *See* Austin DeCoster's PSIR at ¶ 92; *see also* Peter DeCoster's PSIR at ¶ 92.

brief that the prosecutors' proposal to prove their prior knowledge of their offenses to me, by a preponderance of the evidence, would violate their Sixth Amendment rights. *See* Reply Brief at 9–10. Thus, alternatively, I find that the defendants clearly waived in their respective plea agreements their belated assertion of an *Alleyne-Apprendi* issue. Based on a correct reading of *Alleyne* and *Apprendi*, the defendants' plea agreements, and the evidence presented by the prosecutors at the defendants' sentencing hearing, I disagree with the defendants' claim that a Sixth Amendment violation occurred by not submitting the factual issue of whether the defendants had relevant knowledge of their strict liability offenses to a jury.

During oral arguments at the DeCosters' sentencing their counsel further refined their Sixth Amendment argument. The defendants' argument was that if it was unconstitutional to impose any incarceration for the offense of conviction, because that would violate due process and the Eighth Amendment where no actual knowledge was established, then it would also violate the Sixth Amendment. I pointed out that was a silly argument because, if they won on the due process or Eighth Amendment claims, I could not impose incarceration, rendering their *Alleyne-Apprendi* argument moot. If they did not win on the due process and Eighth Amendment arguments, there was no *Alleyne-Apprendi* issue because the sentencing range, either statutorily or by the Guidelines, was not increased by any judicial fact-finding.

For argument's sake, even if I agree with the defendants that they had no relevant knowledge of their criminal conduct, I am still well within my discretion to impose a sentence of imprisonment for the defendants' violations of 21 U.S.C. § 331(a) for the reasons discussed below.

### B. Whether the Eighth Amendment Permits a Sentence of Imprisonment for the Defendants' Strict Liability Offenses

#### 1. Defendants' Arguments

The defendants' reply brief asserted that when courts consider whether a defendant's sentence is "grossly disproportionate" to the defendant's crime, and thus, in violation of the Eighth Amendment, courts consider "'the gravity of the offense and the harshness of the penalty,' as well [sic] the sentences imposed for similar offenses by judges within the jurisdiction and across the country.'" Defendants' Reply Brief at 7. Applying that standard, the defendants argued that a prison sentence or confinement "would be disproportionate" to the defendants' crime "because this, a strict vicarious liability crime, is the most minor offense known to the law." *Id.* at 8.

The defendants further contended that their crime "is a pure status offense—a criminal violation based upon the fact that *someone else* subordinate to the defendant broke the law." *Id.* Because someone else violated the law, with no criminal intent, when a defendant is charged under a strict vicarious liability theory, courts have traditionally warned that jailing a defendant on that basis, as here, would be "unjustifiable." *Id.* Although such case law is grounded on the Due Process Clause, "the basic principle" set forth in those cases also applies to the Eighth Amendment: "Imprisonment for a person who *did not commit the crime* would indeed be 'grossly disproportionate,' and would therefore violate the Eighth Amendment, just at it would violate the Due Process Clause." *Id.* at 8–9 (quoting *Graham v. Florida*, 560 U.S. 48, 60 (2010)). The defendants advanced their argument by relying on a recent district court decision: "That is why a district judge ruled in a relatively recent FDCA case that 'prison sentences are not appropriate' where there is an 'absence of government proof of

knowledge by the individual defendants of the wrongdoing.'" *Id.* at 9 (quoting *United States v. Purdue Frederick Co.*, 495 F.Supp.2d 569, 576 (W.D. Va. 2007)).

The defendants also disagreed with the prosecutors that imprisonment is justified for deterrence purposes. The defendants argued that "it would not serve any rational deterrence purpose to impose a prison sentence on a corporate officer who had *nothing to do with the underlying offense* and who is not charged with any degree of fault." *Id.* This is because such a "rule of liability" would enable courts to sentence business executives to terms of imprisonment where such business executives did "everything in their power to prevent the offense from occurring." *Id.* The defendants categorized the prosecutors' deterrence theory as "irrational." *Id.* The prosecutors' theory, the defendants contended, is "wholly insufficient" to serve as justification for imprisoning the defendants as their links to the crime committed are their statuses at Quality Egg. *Id.*

### 2. Prosecutors' Arguments

The prosecutors' resistance brief focused on refuting the defendants' general contention that the Constitution "forbids 'sentence[s] of incarceration . . . or other restriction[s] on liberty other than probation' for any 'strict liability offense.'" Resistance Brief at 10 (citing Austin DeCoster's Memorandum at 2). The prosecutors asserted that the defendants' claim, that punishment of incarceration would be unconstitutional, implicates the Eighth Amendment, not the due process clause as the defendants asserted. *Id.* at 10–11. The prosecutors continued by quoting *Ewing v. California*, 538 U.S. 11, 23 (2003), a Supreme Court case discussing the Eighth Amendment's standard: "The Eighth Amendment does not require strict proportionality between crime and sentence. It forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 11.

Citing *Graham*, the prosecutors added that, in "consider[ing] whether certain sentencing practices are categorically disproportionate as applied to certain classes of

offenders or offenses," Resistance Brief at 11, the Supreme Court analyzes "'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 560 U.S. at 61 (quoting *Roger v. Simmons*, 543 U.S. 551, 572 (2005)). The Supreme Court will also be guided by "'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,'" and the Court analyzes "whether the challenged sentencing practice serves legitimate penological goals." *Id.* at 61, 67 (citations omitted). According to the prosecutors, the maximum statutory term under 21 U.S.C. § 333(a)(1) of one-year imprisonment fits within the limits established by the Eighth Amendment. Resistance Brief at 12.

In addition, there is no case law, the prosecutors contended, that "construes the Eighth Amendment, or any other constitutional provision, to impose a per se constitutional bar to imprisonment for strict-liability offenses." *Id.* Rather, the FDCA's one-year prison sentence furthers the penological goals and congressional efforts to deter the introduction of unsafe foods and drugs into the economy. *Id.* at 13. To bolster their argument, the prosecutors provided a thorough overview of relevant case law "upholding sentences of imprisonment for strict-liability offenses[.]" *Id.* The prosecutors discussed the facts of relevant federal district court cases in which the defendants were convicted of FDCA violations and sentenced to prison, even though they lacked knowledge of the wrongdoing.[18] *Id.* at 14–15. The prosecutors noted that custodial sentences have also

---

[18] For example, the prosecutors cited to and analyzed four "particularly relevant" cases involving four executives of Synthes Corporation, who received prison sentences from five to nine months, after being convicted of strict liability misdemeanors under the FDCA because the corporation conducted illegal clinical trials of a bone cement. *See*

been imposed in strict-liability offense cases outside the context of food and drug laws. *See id.* at 16.

### 3.    *Analysis*

The defendants have failed to convince me that even a sentence of the statutory maximum of one year in prison is "grossly disproportionate" to their offense, and therefore, in violation of the Eighth Amendment. *See* 21 U.S.C. § 333(a)(1); *see also Ewing*, 538 U.S. at 23. The Eighth Circuit Court of Appeals has clearly articulated the standard to apply when determining whether a sentence is "grossly disproportionate" to a defendant's offense:

> To determine whether a sentence is grossly disproportionate, we examine "'the gravity of the offense compared to the harshness of the penalty.'" [*United States v. Paton*, 535 F.3d F.3d 829, 837 (8th Cir. 2008) (quoting *Ewing*, 538 U.S. at 28)]. In weighing these matters, we consider the "harm caused or threatened to the victim or to society, and the culpability and degree of the defendant's involvement."

Resistance Brief at 14 (citing *United States v. Bohner*, No. 2:09-cr-403–5 (E.D. Pa. Dec. 13, 2011); *Higgins*, 2011 WL 6088576; *United States v. Huggins*, No. 2:09-cr-403–3, 2011 WL 6180623 (E.D. Pa. Nov. 22, 2011); *United States v. Walsh*, No. 2:09-cr-403–6 (E.D. Pa. Nov. 21, 2011)). The prosecutors also discussed *United States v. Hermelin*, No. 4:11-cr-85 (E.D. Mo. Mar. 11, 2011), a case involving a Chief Executive Officer of KV Pharmaceuticals, who was sentenced to thirty, later reduced to seventeen, days in prison for his company's sale of misbranded morphine sulfate tablets. *Id.* The prosecutors also referenced several recent and past district court cases in which defendants, convicted of FDCA misdemeanors, were sentenced to prison or confinement. *See id.* at 15 (citing *United States v. Sen*, No. 2:13-cr-56 (E.D. Tenn. June 14, 2014); *United States v. Eric Jensen*, No. 13-cr-01138M-01 (D. Colo. May 13, 2014); *United States v. Ryan Jensen*, No. 13-cr-01138M-02 (D. Colo. May 13, 2014); *United States v. Osborn*, No. 3:12-CR-047-M(01) (N.D. Tex. Oct. 18, 2012); *United States v. Haga*, 821 F.2d 1036, 1038 n.2 (5th Cir. 1987); *United States v. Kocmond*, 200 F.2d 370, 374 (7th Cir. 1953); *United States v. Greenbaum*, 138 F.2d 437, 440 (3d Cir. 1943); *United States v. Coleman*, 370 F. Supp. 2d 661, 663 (S.D. Ohio 2005)).

> [*United States v. Wiest*, 596 F.3d 906, 911–12 (8th Cir.
> 2010)]. We also consider a defendant's history of felony
> recidivism, if there is one. *Paton*, 535 F.3d at 837 (citing
> *Ewing*, 538 U.S. at 29, 123 S.Ct. 1179).

*United States v. Lee*, 625 F.3d 1030, 1037 (8th Cir. 2010). Prior to articulating the above standard, the Eighth Circuit Court of Appeals explained that "it is 'exceedingly rare' for a noncapital sentence to violate the Eighth Amendment." *Id.* Also, as the prosecutors rightly asserted, in analyzing if a sentencing practice is categorically disproportionate as applied to an entire class of offenders, the Supreme Court considers several factors. *See Graham*, 560 U.S. at 61. It looks to "'legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue," "controlling precedents," "the Court's own understanding and interpretation of the Eighth Amendment's test, history, meaning, and purpose," and if the challenged practice "serves legitimate penological goals." *Id.* a 61, 67.

In this case, the DeCosters' contaminated eggs caused harm to thousands of consumers. Those consumers were sickened, and some of the consumers' injuries were severe.[19] Both defendants were involved in the crimes committed: Austin DeCoster was

---

[19] One of the victim's fathers provided a statement at the defendants' sentencing hearing. He traveled from Dallas, Texas, to Sioux City, Iowa, to tell the tragic story of his son. His son was poisoned by SE after consuming eggs produced at Quality Egg, and he was placed in the intensive care unit of a children's medical hospital for eight days. While at the hospital, the son received an extremely strong dose of IV antibiotics, which was necessary to save his life, and that treatment was followed by six weeks of oral antibiotics. Consequently, the victim is required to have his young teeth capped in stainless steel. The father discussed the enormous psychological trauma on his son because of the stainless steel crowns on all his teeth. I simply cannot imagine the unbelievable psychological impact on an eight-year-old child of having a mouthful of stainless steel, much like the fictional assassin, Jaws, in the James Bond movies.

"the person ultimately responsible for the operations of Quality Egg and the various egg facilities in Iowa associated with Quality Egg" and Peter DeCoster was "one of the persons responsible for running the operations of Quality Egg and the various egg facilities in Iowa associated with Quality Egg." *See* Austin DeCoster's Rule 11 Plea Agreement at ¶ 7; *see also* Peter DeCoster's Rule 11 Plea Agreement at ¶ 7. This was not the first time that Austin DeCoster appeared before me for sentencing.[20] Thus, based on the harm caused, the defendants' involvement in the crimes, and Austin DeCoster's criminal history, the sentence of one year in prison is *not* "grossly disproportionate" to the defendants' crimes. *See Ewing*, 538 U.S. at 30–31 ("We hold that [the defendant's] sentence of 25 years to life in prison, imposed for the offense of felony grand theft under the three strikes law, is not grossly disproportionate and therefore does not violate the Eighth Amendment's prohibition on cruel and unusual punishments."); *United States v. Vanhorn*, 740 F.3d 1166, 1170 (8th Cir. 2014) ("Because nothing in the record indicates that the sentence [(one within the statutory range of not less than 15 years nor more than

---

[20] Austin DeCoster was sentenced to two counts in September of 2003 of Continuing Employment of Unauthorized Aliens. Austin DeCoster's PSIR at ¶ 96. Austin DeCoster was sentenced to 5 years of probation on each count and ordered to pay a fine ($3,000.00 on each count), special assessment ($10.00 on each count), and restitution ($875,000.00). *Id.* In addition, in July of 2003, Austin DeCoster's prosecution was deferred for five years on his charge for Conspiracy to Conceal, Harbor, or Shield From Detection Through Employment and Attempt to Conceal, Harbor, or Shield From Detection Illegal Aliens. Austin DeCoster's PSIR at ¶ 102. Austin DeCoster received five years of supervision on that charge. *Id.* By contrast, Peter DeCoster did not appear before me in 2003 for sentencing. Peter was only charged with Conspiracy to Conceal Harbor or Shield From Detection Through Employment and Attempt to Conceal, Harbor, or Shield From Detection Illegal Aliens. Peter DeCoster's PSIR at ¶ 101. However, Peter DeCoster's prosecution was deferred for five years via a pretrial diversion program, and he received five years of supervision. Peter DeCoster's PSIR at ¶ 101.

30 years)] is grossly disproportionate to his crime, [the defendant's] sentence does not violate the Eighth Amendment.").

In addition, as the prosecutors pointed out in their resistance brief, the Eighth Circuit Court of Appeals has explained that it has "never held a sentence within the statutory range to violate the Eighth Amendment." *See* Resistance Brief at 12; *see also Vanhorn*, 740 F.3d at 1170 (citing *United States v. Nadeau*, 639 F.3d 453, 456 (8th Cir. 2011), in turn citing *United States v. Collins*, 340 F.3d 672, 680 (8th Cir. 2003)). Here, any prison sentence of one year or less fits within the statutory range of punishment provided by 21 U.S.C. § 333(a)(1). See 21 U.S.C. § 333(a)(1). Therefore, I remain unconvinced that the defendants' sentences are unconstitutional under the Eighth Amendment where their sentences fall within the statutory range established by Congress under 21 U.S.C. § 333(a)(1) and the sentencing guideline range of zero to six months, and based on the sentencing factors under 18 U.S.C. § 3553(a) discussed at the defendants' sentencing hearing.

*Purdue Frederick Co.*, a case relied upon by the defendants, is inapplicable. In *Purdue Frederick Co.*, the District Court for the Western District of Virginia accepted the pleas of three corporate officers, who pleaded guilty to the misdemeanor charge of misbranding a prescription opioid pain medication, OxyContin, in violation of the FDCA. *Purdue Frederick Co.*, 495 F.Supp.2d at 570. The government agreed to sentences for the individual defendants without any imprisonment after the defendants "agreed to pay a total of $34.5 million to the Virginia Medicaid Fraud Unit's Program Income Fund." *Id.* at 573. The government conceded that "a sentence of incarceration under the federal sentencing guidelines would be unusual based on the facts of the case." *Id.* at 576. The defendants stressed "their lack of prior criminal record, their strong commitment to civic and charitable endeavors, as well as their other positive personal attributes." *Id.* The district court acknowledged the "potential damage by the misbranding," which, "was

substantial," and did not minimize the danger to the public because of the defendants' crime. *Id.* However, in reaching its decision not to impose prison time, the district court reasoned that "while the question is a close one, in the absence of government proof of knowledge by the individual defendants of the wrongdoing, prison sentences are not appropriate." *Id.* at 576.

Unlike the plea agreements in *Purdue Frederick Co.*, which explicitly "provide[d] for no incarceration for the individual defendants," the plea agreements in this case do not provide for no incarceration for either defendant. *Purdue Frederick Co.*, 495 F.Supp.2d at 576. Rather, in the prosecutors' resistance brief, here, they argued for "sentences that the Court determines to be appropriate, including sentences of prison or other confinement if the Court finds such custodial sentences to be warranted." Resistance Brief at 20. Paragraphs three and four of the defendants' plea agreements provide that the defendants understand that the maximum penalties for their crimes include "not more than 1 year imprisonment without the possibility of parole or a term of probation of not more than 5 years[.]" Austin DeCoster's Rule 11 Plea Agreement at ¶ 3–4; Peter DeCoster's Rule 11 Plea Agreement at ¶ 3–4.

In addition, in the prosecutors' resistance brief, the prosecutors argued that the defendants had knowledge of the significant presence of SE in the laying hens and their environments at Quality Egg in Iowa between January and August 2010. For example, in their resistance brief, the prosecutors highlighted that the defendants' submissions to the Court proved their knowledge of the SE contamination at Quality Egg's facilities. This is because their objections "reflect their knowledge of the preventative and ameliorative measures recommended to address the company's SE and pest control problems." Resistance Brief at 5.

The prosecutors also argued in their briefs and at the defendants' sentencing hearing that Quality Egg in Iowa did *not* follow the same SE prevention and remediation

practices as those implemented at Quality Egg's Maine facilities. Even after SE was detected in Quality Egg's Iowa facilities, the defendants failed to follow the methods used at their Maine plants to resolve that problem, such as depopulating, cleaning, and retesting the barns. The matter was only addressed after the 2010 SE outbreak took place. Together, I was persuaded that the defendants had knowledge of the increased risk of SE in the processing plants, and did not minimize SE contamination in their plants, despite having knowledge of how to effectively deal with SE contamination. *See* Austin DeCoster's PSIR at ¶ 16–22; *see also* Peter DeCoster's PSIR at ¶ 16–22.

Also, distinct from the defendants in *Purdue Frederick Co.*, Austin DeCoster has a prior criminal record. *Cf. Purdue Frederick Co.*, 495 F.Supp.2d at 576. Austin DeCoster was fined $14,000 for falsifying drivers' logs in 1976 in the district of Maine. *See* Austin DeCoster's PSIR at ¶ 95. In 2003, Austin DeCoster was sentenced by me to concurrent terms of five years of probation on two counts of Continuing Employment of Unauthorized Aliens, fined $3,000 on each count, and ordered to pay a $10 special assessment on each count and restitution in the amount of $875,000, which reflects the seriousness of the crime. *See id.* at ¶ 96. As indicated in his Information, Austin DeCoster's convictions were based on his "aid[ing] and abet[ting] in the pattern and practice of continuing to employ certain aliens, after knowing that the aliens were not authorized to work in such employment in the United States" at his egg production business in north central Iowa. *Id.*

By contrast, the prosecutors' four "particularly relevant" cases, including *Bohner*, No. 2:09-cr-403–5; *Higgins*, 2011 WL 6088576; *Huggins*, 2011 WL 6180623; and *Walsh*, No. 2:09-cr-403–6, involved the prosecutions of four senior executives of Synthes, a major medical-device maker, for conducting illegal clinical trials of a bone cement. All of the senior executives were sentenced to prison, and their prison terms ranged from five to nine months. Those cases, unlike *Purdue Frederick Co.*, are

markedly similar to the facts presented here. After two of the four defendants brought motions seeking to modify their sentences, the District Court for the Eastern District of Pennsylvania wrote memorandum opinions for those two cases to explain the court's rationale for its sentencing decisions.[21] One of the court's two memorandum opinions, which addressed the sentencing of Thomas Higgins, was relied upon by the prosecutors in their resistance brief, and was instructive in resolving the present issue before me.

In *Higgins*, the defendant was the former President of Synthes Spine Division and Senior Vice President of Global Strategy, Synthes. *Higgins*, 2011 WL 6088576 at *1. The defendant pleaded guilty "as a responsible corporate officer to the introduction into interstate commerce of adulterated and misbranded medical devices . . . in violation of 21 U.S.C. §§ 331(a) and 331(a)(1)." *Id.* In pleading guilty, the defendant maintained that "he did not know at the time that his conduct was illegal and he did not intend to violate the law," and because he did not have such knowledge, the defendant asserted that he "[could not] be imprisoned."[22] *Id.* at *9. The district court disagreed. It reasoned, "Defendant is mistaken that his plea of guilty to a strict liability offense ensures a sentence of probation commensurate with less blameworthy conduct." *Id.* at *9. The

[21] *See, e.g.*, *Higgins*, 2011 WL 6088576, at *13–*14; *see also Huggins*, 2011 WL 6180623, at *13–*14.

[22] The District Court for the Eastern District of Pennsylvania determined that Higgins "knew" the bone cement "was potentially dangerous"; he "knew, or should have known," that the planned development of the cement was "potentially suspect, and caution and strict adherence to regulatory procedure was required"; and he "knew or should have known" the bone cement needed "further testing before the product could be safely used on humans." *Higgins*, 2011 WL 6088576, at *4. Three people died during clinical tests of Synthes. *Id.* at *9. However, as the prosecutors, in this case, rightly pointed out in their resistance brief, the district court in *Higgins* "emphasized that criminal liability under the FDCA required no [proof of knowledge of wrongdoing]." Resistance Brief at 14; *see also Higgins*, 2011 WL 6088576, at *13–*14.

district court highlighted the defendants' "pattern of deception with the FDA," and that the "decision-makers ignored such clear warnings of the potentially fatal nature of the product for such an extended period." *Id.* at *10. The defendant also argued that "it was error to impose a term of imprisonment for a strict liability crime, 'thus rendering the underlying conviction and sentence unconstitutional.'" *Id.* at *13 (citation omitted). The district court rejected that argument. In doing so, it noted, "[u]nder *Park*, a conviction based on strict liability for the offense in this case is permissible." *Id.* (citing *Park*, 421 U.S. at 673; *Dotterweich*, 320 U.S. at 280–81). The court sentenced the defendant to prison for nine months, or "within the statutorily prescribed maximum 'for not more than one year,'" following which it noted that "[d]isappointed hopes for probation do not constitute a constitutional infirmity in the sentence imposed." *Id.* at *14; *see also* 21 U.S.C. § 333(a).

*Higgins* bolsters my decision that there is not an Eighth Amendment violation for imposing a sentence of imprisonment for violating the specific provisions of the FDCA at issue. The defendants, like the corporate officer in *Higgins*, pleaded guilty to strict liability offenses, but maintained their lack of knowledge and intention of the alleged criminal conduct. Also, as in *Higgins*, evidence was presented that the defendants "knew, or should have known," of the risks posed by the insanitary conditions at Quality Egg in Iowa, "knew, or should have known" that additional testing needed to be performed before the suspected shell eggs were distributed to consumers, and "knew, or should have known" of the proper remedial and preventative measures to reduce the presence of SE. *See Higgins*, 2011 WL 6088676, at *4.

From early 2006 to 2010, for example, the defendants "were generally aware of the positive SE test results as they were received," and the "positive [SE] test results continued, and increased in frequency, into the fall of 2010" when the recall began in August. *See* Austin DeCoster's PSIR at ¶ 16–17, 19; *see also* Peter DeCoster's PSIR at

¶ 16–17, 19; Parties' Stip. at ¶ 7. Prior to July 2010,[23] despite the receipt of positive SE test results, Quality Egg did not test or divert eggs from the market. Parties' Stip. at ¶ 2; *see also* Austin DeCoster's PSIR at ¶ 63; Peter DeCoster's PSIR at ¶ 63. Quality Egg's decisions to ignore the SE test results; failure to comply with important food safety standards and practices, such as USDA regulations; and knowledge of deception and bribery of USDA inspectors by Quality Egg's personnel,[24] is analogous to the defendant's

---

[23] The parties stipulated that "until the adoption of the Egg Safety Rule in July 2010, there was no legal or regulatory requirement" to conduct SE tests. Parties' Stip. at ¶ 2

[24] The defendants' PSIRs provide that on more than one occasion in 2010, Quality Egg's personnel paid cash bribes to a USDA inspector to unlawfully release eggs that had been retained or "red tagged" for failing to meet minimum quality grade standards without re-processing the eggs as required by law and USDA standards. *See* Austin DeCoster's PSIR at ¶ 45–48; *see also* Peter DeCoster's PSIR at ¶ 45–48. The parties also stipulated to the following regarding the bribes:

> ██████████ would testify that he told Peter DeCoster about the first bribe after it occurred, and would testify that Peter DeCoster responded by telling him never to do it again. The parties stipulate that ████████ would testify that he recalls ████████ telling him that ████████ had told [Austin] DeCoster that ████████ had "taken care of" some eggs that had been retained. The parties further stipulate that ████████ would testify that, at some point soon after this conversation between ████████ and [Austin] DeCoster, [Austin] DeCoster stated to ████████, "Way to get those eggs out the door."

Parties' Stip. ¶ 11. In the next paragraph, the parties stipulated to the following: "████████ would testify that, about three days after he gave ████████ cash to use for the second bribe, he overhead Peter DeCoster saying to ████████, 'Be careful about what you are doing. This is a federal offense.'" Parties' Stip. ¶ 12. The prosecutors indicated that, in view of the conflicting evidence and credibility considerations, they

conduct in *Higgins*. Nothing in the record indicates that the individual defendants had actual knowledge that the eggs sold by Quality Egg were infected with SE, and Austin DeCoster disagrees that he knew the USDA quality grade requirements were being violated.

However, the record supports the inference that the individual defendants created a work environment where employees not only felt comfortable disregarding regulations and bribing USDA officials, but may have even felt pressure to do so. Because the offending parties were never disciplined for their actions, according to the record, it does appear that their conduct was condoned. In addition, the parties stipulated that a Quality Egg manager "would testify that [Austin] DeCoster instructed him" that Quality Egg should not divert more than "1-2% of the eggs based upon 'checks.'" Parties' Stip. ¶ 9; *see also* Austin DeCoster's PSIR at ¶ 42; Peter DeCoster's PSIR at ¶ 42.

The record is also replete with evidence regarding Quality Egg's and the defendants' misrepresentations regarding its food safety and sanitation practices and procedures and independent audits, such as defendant Peter DeCoster's inaccurate statements about a Flock Testing Policy and a Safe Quality Food Institute Program to Walmart in 2008.[25] *See* Parties' Stip. ¶¶ 5–6; *see also* Austin DeCoster's PSIR at ¶ 28; Peter DeCoster's PSIR at ¶ 28. The prosecutors argued that Peter DeCoster knew or should have known certain portions of his presentation were false. *See* Parties' Stip. ¶¶ 5–6; *see also* Peter DeCoster's PSIR at ¶ 24. At the defendants' sentencing, I agreed

---

would not ask me to find that either Austin or Peter DeCoster knew of the bribes at any particular time.

[25] At the defendants' sentencing, the prosecutors did not ask me to find that Austin DeCoster read any version of the Walmart presentation. *See* Austin DeCoster's PSIR at ¶ 23–24. Thus, the prosecutors did not prove that Austin DeCoster was aware of the false statements provided in the presentation to Walmart.

with the prosecutors that, based on the evidence, Peter DeCoster delivered a presentation to Walmart that consisted of inaccurate information regarding Quality Egg's food safety and sanitation practices.

In addition, between 2007 and 2010, Quality Egg provided false information to its auditors, AIB, as to safety and sanitation procedures employed at the company, and even manufactured and falsified documents with the intent that USFoods and AIB would rely on such fabricated documents. *See* Austin DeCoster's PSIR at ¶ 29–33; *see also* Peter DeCoster's PSIR at ¶ 29–33. Quality Egg personnel also bribed a USDA official, twice, in order to sell a higher percentage of eggs, even though the eggs did not meet USDA standards. *See* Austin DeCoster's PSIR at ¶ 45–48; *see also* Peter DeCoster's PSIR at ¶ 45–48. Quality Egg changed the packing dates of their eggs, which misled state regulators and retail egg customers, and sold misbranded eggs into interstate commerce. *See* Quality Egg's PSIR at ¶ 53–62. Finally, Quality Egg failed to meet FDA regulatory standards, and following the SE outbreak, FDA officials visited Quality Egg's Iowa facilities and described the insanitary conditions observed there as "egregious." *See* Austin DeCoster's PSIR at ¶ 66–71; *see also* Peter DeCoster's PSIR at ¶ 66–71. In sum, the public's interest in health and well-being based on the production and sale of safe foods must outweigh the "demanding, and perhaps onerous" tasks placed on those who "voluntarily assume positions of authority," such as the DeCosters, and enter regulated industries with a profit motive being their driving force. *See Park*, 421 U.S. at 671 ("The requirements of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them.").

While the defendants' violations of 21 U.S.C. § 331 required no proof of knowledge in order impose the statutorily permitted term of imprisonment, I refer to the above conduct to distinguish this case from a mere unaware corporate executive, and explain why a probationary sentence is inappropriate under the circumstances presented. *See Higgins*, 2011 WL 6088576, at *10 ("Unlike *Park*, this matter does not involve holding an unaware corporate executive accountable for vermin in a warehouse."). The factual similarities between this case and *Higgins*, and the dissimilarities between this case and *Purdue Frederick Co.*, support my decision to impose a prison sentence here.

Further buttressing my finding is the philosophical justification underlying the defendants' punishment, *i.e.*, deterring other corporate officers from similar criminal conduct, which is also relevant to my analysis of the 18 U.S.C. § 3553(a) factors. Agreeing with the prosecutors, I find that the imposition of a prison term, one established by Congress under 21 U.S.C. § 333(a)(1), will protect the public from additional crimes that the defendants may commit in their individual capacities (*i.e.*, specific deterrence). *See* 18 U.S.C. § 3553(a)(2)(C) ("to protect the public from further crimes of the defendant[s]"). Given the defendants' careless oversight and repeated violations of safety standards, there is an increased likelihood that these offenses, or offenses like these, could happen again. The punishment will also serve to effectively deter against the marketing of unsafe foods and widespread harm to public health by similarly situated corporate officials and other executives in the industry (*i.e.*, general deterrence).[26] *See* 18 U.S.C. § 3553(a)(2)(B) ("to afford adequate deterrence to criminal conduct"); *see also* Resistance Brief at 13; *Graham*, 560 U.S. at 67 ("In this inquiry the Court also

---

[26] *See* Patrick O'Leary, *Credible Deterrence: FDA and the Park Doctrine In The 21st Century*, 68 FOOD & DRUG L.J. 137, 176 (2013) ("Most importantly, the credible threat of individual prosecution is a uniquely salient deterrent in an industry where the cost of misconduct can too often be measured in human lives.").

considers whether the challenged sentencing practice serves legitimate penological goals.") (citations omitted); *Park*, 421 U.S. at 673 ("Congress has seen fit to enforce the accountability of responsible corporate agents dealing with products which may affect the health of consumers by penal sanctions cast in rigorous terms, and the obligation of the courts is to give them effect so long as they do not violate the Constitution.") The sanction I imposed "reflect[s] the seriousness of the offense," it serves "to promote respect for the law" by like corporate officials, and it is a "just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

In light of the above, I decided to give effect to the penal sanction provided under 21 U.S.C. § 333(a)(1), and I found that the defendants' sentence is not cruel and unusual punishment in violation of the Eighth Amendment. I turn now to explain why the defendants' sentences also do not violate their due process rights under the Fifth Amendment.

### C. Whether The Fifth Amendment Permits a Sentence of Imprisonment for the Defendants' Strict Liability Offenses

#### 1. Defendants' Arguments

The defendants contended that to sentence them to prison, or otherwise restrict their liberty (aside from probation), would violate their constitutional rights under the Due Process Clause of the Fifth Amendment. Austin DeCoster's Memorandum at 3. This is because "[t]he government may not deprive a person of his liberty based on an offense that is both strict and vicarious in its character, because that would allow a person to be jailed solely because others, acting without criminal intent, committed a violation of the law." Defendants' Reply Brief at 5. The defendants characterized their claim as a "traditional due process challenge," and noted that the highest courts in Minnesota, Georgia, and Pennsylvania ruled that "due process principles forbid imprisonment as a

punishment for a strict vicarious liability offense." *Id.* The defendants also asserted that other state supreme courts, including Iowa's Supreme Court in *Iowa City v. Nolan*, 239 N.W.2d 102, 104–05 (Iowa 1976), have indicated "they would reach the same conclusion." Id.

In addition, the defendants asserted that the Supreme Court "has held that penalties imposed [for strict liability offenses] must be 'small' and not give rise to 'grave damage to an offender's reputation.'" Austin DeCoster's Memorandum at 3–4 (citing *Staples v. United States*, 511 U.S. 600, 616–17 (1994); *Morissette v. United States*, 342 U.S. 246, 256 (1952)). For example, the Supreme Court upheld the constitutionality of the FDCA offense and the "light" penalties imposed in *Park*, 421 U.S. at 666 and *Dotterweich*, 320 U.S. at 281. Citing to *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960), the defendants contended that the Eighth Circuit Court of Appeals adopted the same approach as the Supreme Court, holding that "for the elimination of an intent requirement not to offend due process, it must be the case that 'the penalty is relatively small' and the 'conviction does not gravely besmirch.'" *Id.* Harking back to an opinion by Judge Benjamin N. Cardozo in *People v. Sheffield Farms-Slawson-Decker Co.*, 121 N.E. 474, 477 (N.Y. 1918), the defendants contended that in cases where strict and vicarious liability exist, courts are inclined to impose fines as the maximum punishment. Defendants' Reply Brief at 1–2. Thus, because a term of imprisonment is not a "small penalty," the defendants requested "a fine and/or term of probation." Austin DeCoster's Memorandum at 3.

The defendants reiterated that the prosecutors failed to account for any factually similar case law: the prosecutors have "not identified a single case, in any court, in which an American judge has imposed a sentence of incarceration or confinement in a situation like this one, where criminal liability is both strict and vicarious, i.e., where (1) the conviction does not rest on any admission or jury determination that anyone acted with

criminal knowledge or intent, and (2) the conviction likewise does not rest on any admission or jury determination that the defendant himself committed any relevant act." Defendants' Reply Brief at 1. Instead, the defendants argued that the prosecutors only cite a "raft of ordinary strict-liability cases," in which a defendant "at least personally committed the unlawful act." *Id.* That case law does not "consider[] or address[] whether incarceration or confinement would also be permissible if the defendant were merely vicariously liable for the strict-liability offense committed by someone else." Id. at 6–7. The defendants go so far as to argue that no case law exists to support the prosecutors' position that "the Due Process Clause permits defendants to be deprived of their liberty because someone in the company that they lead has committed a strict-liability offense." *Id.* at 7; *see also* Austin DeCoster's Memorandum at 1–2.

According to the defendants, the prosecutors "devote[] scant attention" to the defendants' alleged due process violation argument. Reply Brief at 5 (citing Resistance Brief at 7–8). Instead of confronting the prosecutors' arguments, and the case law cited by the prosecutors on pages 16 through 20 of the prosecutors' resistance brief, which are targeted at refuting the defendants' due process challenge, the defendants created a straw man argument.[27] In doing so, the defendants focused their attention on distinguishing *Park* from the facts of this case. The defendants contended that the "question whether a term of imprisonment or confinement could be imposed in a strict vicarious liability case simply was not at issue in *Park*." *Id.* The defendants continued on this line of argument by asserting that *Staples*, 511 U.S. at 616, confirms Park's limited scope. *Id.* at 6.

---

[27] Here is the defendants' argument: "The government devotes scant attention to defendants' due process argument, essentially arguing that the Supreme Court's decision in *United States v. Park*, 421 U.S. 658 (1975), has already approved imprisonment as a punishment for strict vicarious liability offenses under the FDCA. *See* [Resistance Brief at 7–8]. That suggestion lacks all foundation." Defendants' Reply Brief at 5.

There, the Supreme Court "approvingly" referred to Judge Cardozo's opinion in *Sheffield Farms* and "suggested that 'imprisonment' would not be 'compatible with the reduced culpability for such regulatory offenses.'" *Id.* (citing *Staples*, 511 U.S. at 617). "The Court would not have made that statement if *Park* had held that prison sentences are permissible in all FDCA cases," the defendants wrote. *Id.* Thus, the defendants argued that I should adhere to the "longstanding tradition, dating back at least as far as Judge Cardozo's time," and reject a prison sentence in this context. *Id.* at 7.

### 2. *Prosecutors' Arguments*

Despite the prosecutors' belief that the Fifth Amendment's Due Process Clause does not control in this case, they directly addressed and rebutted the defendants' contentions that their constitutional challenge arises under that clause. *See* Resistance Brief at 7–10, 16–20. "The necessary predicate for a substantive due process claim is the deprivation of a fundamental right that is objectively, deeply rooted in this Nation's history and tradition, or an executive abuse of power . . . which shocks the conscience." *Id.* at 16–17 (internal quotation marks and citations omitted). According to the prosecutors, the defendants failed to show that the imposition of a custodial sentence equals a due process violation under these standards. History has proven otherwise, the prosecutors argued: "[T]he FDCA and other strict-liability statutes have long been punishable with prison sentences, and there is a long history of defendants going to prison for those crimes." *Id.* at 17. Therefore, the prosecutors contended, the defendants' due process arguments are meritless.

The defendants were incorrect, the prosecutors argued, in asserting that "courts construe crimes as strict-liability offenses only where 'the penalty is relatively small.'" *Id.* at 18 (citing Austin DeCoster's Memorandum at 4). While the principle from the *Holdridge* case, relied on by the defendants, is one of statutory interpretation, not a constitutional limitation, even if that principle did apply in constitutional terms, here, the

sanction of one-year in prison would fit within the "relatively small" category. *Id.* The prosecutors advanced their argument by noting that a person who violates the FDCA faces a sanction of imprisonment "for not more than one year," a fine, or both. *Id.* (quoting 21 U.S.C. § 333(a)(1)). That sanction, the prosecutors argued, is the "'short jail sentence[],'" which both the Supreme Court and the Eighth Circuit Court of Appeals consider "compatible with a presumption of legislative intent to create a strict-liability, public-welfare offense." *Id.* 18–19 (citing *Staples*, 511 U.S. at 616; *United States v. Flum*, 518 F.2d 39, 42 (8th Cir. 1975)). The prosecutors pointed out that the defendants' claims are also refuted by "the longstanding precedent upholding the constitutionality of strict-liability statutes imposing much greater penalties." *Id.* at 19 (citations omitted).

Additionally, the defendants' general assertion that "'strict liability criminal offenses' are a matter of 'constitutional uncertainty,'" fails. *Id.* at 17 (citing Austin DeCoster's Memorandum at 3). That argument conflicts with precedent of the Supreme Court providing that a person punished for violating the law, without *mens rea*, does *not* constitute a due process violation. *Id.* at 18–19 (citing *United States v. Balint*, 258 U.S. 250, 252 (1922)). Earlier in their resistance brief, the prosecutors cited to several Supreme Court decisions, asserting that the Court has "repeatedly" determined that, even absent proof of *mens rea*, "criminal penalties may be imposed for violations of the FDCA." *Id.* at 7 (citing *Park*, 421 U.S. at 671–73; *Dotterweich*, 320 U.S. at 281; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964); *Smith v. California*, 361 U.S. 147, 152 (1959); *Morissette*, 342 U.S. at 254–56). Citing to *United States v. Hiland*, 909 F.2d 1114, 1127–28 (8th Cir. 1990), the prosecutors noted that the Eighth Circuit Court of Appeals reached the same holding in regard to the relevant statutory provisions of the FDCA as the Supreme Court. *Id.* at 7–8. In the Supreme Court cases relied upon by the prosecutors, the Court did not suggest that the strict-liability misdemeanor offense established by the FDCA was unconstitutional. *Id.* at 8. Rather,

the prosecutors noted, "the Court has explained that '[t]here is no specific constitutional inhibition against making the distributors of food the strictest censors of their merchandise.'" *Id.* (citing *Smith*, 361 U.S. at 152). Nor has the Supreme Court "ever suggested" that a statutorily permitted prison sentence "could not constitutionally be imposed." *Id.* "To the contrary, the Court has noted the prospect of imprisonment without further analysis." *Id.* (citing *Park*, 421 U.S. at 666).

Finally, the prosecutors also advanced their argument by discussing the Supreme Court's recognition of the "legitimate and important purposes" served by the imposition of strict liability for FDCA violations. *Id.* The prosecutors focused on three purposes. First, "the strict-liability standard plainly advances the federal government's efforts to protect public health and safety." *Id.* Second, quoting passages from *Dotterweich*, 320 U.S. at 284–85, and *Park*, 421 U.S. at 672, the prosecutors contended that the DeCosters, as responsible corporate officers, "have a much greater ability than consumers themselves to discover, correct, or prevent adulteration or other violative conditions." *Id.* at 9. Third, if a strict-liability standard did not exist when violations of the FDCA occurred, responsible corporate officers, such as the DeCosters, "would have an added, and perverse, incentive to insulate themselves from information that might reveal a violation of the law." *Id.* at 10. By contrast, the strict-liability standard serves as a necessary impetus for corporate officers to investigate and alleviate possible problems of adulteration when they have general or specific knowledge about such problems. *Id.*

### 3.    *Analysis*

The defendants are incorrect in arguing that a sentence of incarceration would violate their due process rights under the Fifth Amendment. In making their claim, the defendants asserted that non-binding authority from the state supreme courts of Minnesota, Georgia, and Pennsylvania have ruled that "due process principles forbid imprisonment as a punishment for a strict vicarious liability offense." Defendants' Reply

Brief at 5. The defendants then referred to *Iowa City v. Nolan*, 239 N.W. 2d at 104–05, arguing that Iowa's highest court indicated it "would reach the same conclusion." *Id.* I disagree.[28] Focusing my attention on *Nolan*, 239 N.W.2d at 104–05, I find that the defendants misconstrued the holding of that case as Iowa's Supreme Court did not rule on that particular issue.[29]

---

[28] Like the defendants' citation to *Nolan*, their citations to the highest state courts' decisions in *State v. Guminga*, 395 N.W.2d 344 (Minn. 1986), *Davis v. City of Peachtree City*, 251 Ga. 219 (Ga. 1983), and *Com. v. Koczwara*, 397 Pa. 575 (Pa. 1959), are inapposite. *See* Reply Brief at 2, 5. *Guminga*, *Davis*, and *Koczwara* are cases in which state supreme courts determined it was unconstitutional on due process grounds for defendants to be held vicariously liable and imprisoned for different state and municipal liquor law violations. *See Guminga*, 395 N.W.2d at 345–46, 349; *see also Davis*, 251 Ga. at 704; *Koczwara*, 397 Pa. at 830–31. The cases cited to by the defendants are distinguishable. *Guminga* and *Koczwara* were decided under the state constitutions of Minnesota and Pennsylvania, respectively. In *Guminga*, the Minnesota Supreme Court "specifically and exclusively decide[d] the question under the provisions of the Minnesota Constitution herein cited." *Guminga*, 395 N.W.2d at 349. In *Koczwara*, the Supreme Court of Pennsylvania explained, "Such sentence of imprisonment in a case where liability is imposed vicariously cannot be sanctioned by this Court consistently with the law of the land clause of Section 9, Article I of the Constitution of the Commonwealth of Pennsylvania." *Koczwara*, 397 Pa. at 585. *Davis* is distinguishable as it takes a fairly extreme, absolute position that no criminal penalties can be imposed, even if the penalty is limited to a fine: "Although some commentators and courts have found that vicarious criminal liability does not violate due process in misdemeanor cases which involve as punishment only a slight fine and not imprisonment, we decline to so hold." *Davis*, 251 Ga. at 704 (citations omitted).

[29] When I pressed one of the defense attorneys at the defendants' sentencing hearing on this issue he referred me to a parenthetical cited in the defendants' brief which indicates that Iowa's Supreme Court in *Nolan* decided that whether a violator of the strict-liability offense of illegally parking his vehicle "may be subject to imprisonment is not before us now." Reply Brief at 2 (quoting *Nolan*, 239 N.W.2d at 102). However, three pages later in the same brief, the defendants suggest that the high court of Iowa has indicated that it would "reach the same conclusion" as the highest courts in Minnesota, Georgia,

In *Nolan*, the defendant was charged with "over a dozen vehicle parking violations under three separate Iowa City ordinances," and after an appeal, he was found guilty and fined twenty dollars. *Nolan*, 239 N.W.3d at 102. The defendant's defense consisted of a challenge to the constitutionality of these ordinances, which "impose[d] a form of strict or vicarious liability upon the registered owner of an illegally parked vehicle." *Id.* at 103. Iowa's Supreme Court found that defense unconvincing. In doing so, the court noted that "[i]t is upon the *constitutional validity* of this vicarious liability that our decision in this appeal must rest." *Id.* (emphasis added).

The highest court of Iowa explained that the United States Supreme Court in a series of cases, including *Morissette*, 342 U.S. 246, "carved out an exception to the general criminal due process considerations in the area of public welfare offenses." *Id.* at 104. A few paragraphs later, Iowa's Supreme Court continued: "Not only may public welfare legislation dispense with a mens rea or scienter requirement, it may, and frequently does, impose a vicarious 'criminal' liability for the acts of another." *Id.* Iowa's Supreme Court held that based on the rationale of the case law discussed in the opinion, "a registered owner may be vicariously liable for his illegally parked vehicle and subject to punishment pursuant to a public welfare regulation. *Whether he may be subjected to imprisonment is not before us now.*" *Id.* at 105 (emphasis added).[30] Thus,

_____

and Pennsylvania, who "held that due process principles forbid imprisonment as a punishment for a strict vicarious liability offense." *Id.* at 5 (citing *Guminga*, 395 N.W.2d at 346; *Davis*, 304 S.E.2d at 704; *Koczwara*, 155 A.2d at 830).

[30] After that holding, Iowa's Supreme Court invites the reader to compare the language of the statute involved in *Park*, 421 U.S. at 666 n.10, with Justice Cardozo's language in *Sheffield Farms*, 225 N.Y. at 32–33, and the holding in *Koczwara*, 397 Pa. at 586. In *Park*, the statutory sections addressed in footnote 10 are 21 U.S.C. §§ 333(a) and (b), which provide for fines and/or imprisonment of a defendant convicted of violating the

in *Nolan*, the highest court of Iowa is actually silent on the matter of imprisonment, and it does not even foreshadow a possible ruling.

In addition, analogous to the defendant in *Higgins*, 2011 WL 6088576, at *13, who was sentenced to nine months in prison and no constitutional violation was found, the defendants, here, argued that their convictions, as responsible corporate officers for a strict liability offense under the FDCA, are unconstitutional unless the penalties imposed are "small" and a conviction does not cause "grave damage to an offender's reputation." Austin DeCoster's Memorandum at 3–4 (citations omitted). The defendants, in this case, grounded their arguments on two Supreme Court cases, *i.e.*, *Park*, 421 U.S. at 666, and *Dotterweich*, 320 U.S. at 277, where the Supreme Court upheld the constitutionality of the FDCA offense and affirmed a fine of $250, and a fine of $500 and a 60-day probation, respectively. *See id.* at 4. The defendants also relied on a decision of the Eighth Circuit Court of Appeals, *i.e.*, *Holdridge*, 282 F.2d at 310, which allegedly "adopted" the same approach as the Supreme Court.[31] *Id.* at 4. Later, in their reply brief, the defendants repeatedly cited Justice Cardozo's opinion in *Sheffield*

---

FDCA. In *Sheffield Farms*, Judge Cardozo explained, "[I]n sustaining the power to fine we are not to be understood as sustaining to a like length the power to imprison. We leave that question open." *Sheffield Farms*, 225 N.Y. at 32–33. In *Koczwara*, the Supreme Court of Pennsylvania held that "the punishment of imprisonment deprives the defendant of due process of law under these facts," but left "intact the five hundred dollar fine imposed by Judge Hoban under the subsequent offense section." *Koczawara*, 397 Pa. at 586.

[31] It is unclear from the defendants' brief whether the defendants argued that the Eighth Circuit Court of Appeals adopted the approach of Justice Stewart in his dissenting opinion in *Park*, which the defendants egregiously misrepresented, or the approach of the majority's opinion in *Park*, 421 U.S. at 666, and *Dotterweich*, 320 U.S. at 277. *See* Austin DeCoster's Memorandum at 4.

*Farms*, 121 N.E. at 477. *See* Defendants' Reply Brief at 1–4. After analyzing the case law relied on by the defendants, I am further compelled to reject their due process challenge.

In *Park*, the defendant, the president and chief executive officer of a large national food store chain, Acme Markets, Inc., was convicted of causing adulteration of food. This was because the food was exposed to rodent contamination at Acme's warehouse, which had traveled in interstate commerce and held for sale. *Park*, 421 U.S. at 660. The Supreme Court granted certiorari to determine "whether the jury instructions in the prosecution of [the defendant corporate officer] under § 301(k) of the [FDCA] were appropriate under [Dotterweich, 320 U.S. at 277]."[32] *Id.* at 660. In finding that the jury instructions were appropriate, the Supreme Court clarified the standard of liability of corporate officers under the FDCA as construed in *Dotterweich*. Id. at 667. The Supreme Court wrote,

> The rationale of the interpretation given the Act in *Dotterweich*, as holding criminally accountable the persons whose failure to exercise the authority and supervisory responsibility reposed in them by the business organization resulted in the violation complained of, has been confirmed in our subsequent cases. Thus, the Court has reaffirmed the proposition that "the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors." [*Smith*, 361 U.S. at 152]. In order to make "distributors of food the strictest censors of their merchandise," ibid., the Act punishes "neglect where the law requires care, or inaction where it imposes a duty."

---

[32] *See* O'Leary, *supra* note 26, at 142, for a clear explanation of the evolution of the jurisprudence from *Dotterweich* to *Park*. O'Leary notes, "That FDA still has a strict-liability criminal charge at its disposal today is the product of nearly seven decades of often contentious historical development, beginning with *Dotterweich* in 1943, and taking its present shape in *Park* in 1975." *Id.*

[*Morissette*, 342 U.S. at 255]. "The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Id.*, at 256, 72 S.Ct., at 246. *Cf.* Hughes, Criminal Omissions, 67 Yale L.J. 590 (1958).

. . .

The requirements of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them. *Cf.* Wasserstrom, Strict Liability in the Criminal Law, 12 Stan.L.Rev. 731, 741-745 (1960). The Act does not, as we observed in *Dotterweich*, make criminal liability turn on "awareness of some wrongdoing" or "conscious fraud."

*Id.* at 671. The dissenting opinion of Justice Potter Stewart in Park, which the defendants relied on in their initial brief,[33] agrees with the majority's standard of liability for

---

[33] The defendants argued, "The penalties in [*Park* and *Dotterweich*] were 'light,' recognized Justice Stewart in dissent, but the imposition of 'imprisonment for a year' for a strict liability offense would be 'wholly alien to fundamental principles of our law.'" Austin DeCoster's Memorandum at 4 (citing *Park*, 421 U.S. at 682–83) (Stewart, J., dissenting). In reply, the prosecutors correctly asserted that the Supreme Court has "noted the prospect of imprisonment without further analysis," and the defendants "mischaracterize Justice Stewart's dissent in *Park*." Resistance Brief at 8. The prosecutors wrote, "It was the trial court's 'tautolog[ical]' jury instructions that Justice Stewart viewed as 'wholly alien' to fundamental principles, [*Park*, 421 U.S. at 680–82], not the prospect of imprisonment for food and drug offenses." *Id.* (citing *Park*, 421 U.S.

corporate executives under the FDCA, and indicates that under the FDCA *"even a first conviction can result in imprisonment for a year*, and a subsequent offense is a felony carrying a punishment of up to three years in prison." *Park*, 421 U.S. at 678, 682–83 (Stewart, J., dissenting) (emphasis added). Therefore, although *Park* does not directly concern the imposition of a term of imprisonment for a corporate official who violated the FDCA, the Supreme Court upholds the constitutionality of the FDCA and does *not* find that the prospect of a year in prison for violating the FDCA is unconstitutional.[34]

*Holdridge*, another case relied on by the defendants, which arises out of the Eighth Circuit, also does not advance the defendants' constitutional due process claim. The Eighth Circuit Court of Appeals noted that the Supreme Court, in *Morissette*, 342 U.S. at 246,[35] observed "that there is a class of criminal offenses, theretofore recognized and

---

at 678). I agree with the prosecutors' interpretation of Justice Stewart's dissent. The defendants' interpretation of Justice Stewart's dissenting opinion is baseless.

[34] Relatedly, the District Court for the Eastern District of Pennsylvania in *Higgins* already underscored the weaknesses in the defendants' position, in part for relying on *Park* and *Dotterweich*. Citing to *Park* and *Dotterweich*, the district court explained, "Under *Park*, a conviction based on strict liability for the offense in this case [of violating the FDCA] is permissible." *Higgins*, 2011 WL 6088576, at *14 ((citing *Park*, 421 U.S. at 673 ("The Act does not . . . make criminal liability turn on 'awareness of some wrongdoing' . . . ."); [*Dotterweich*, 320 U.S. at 280–81] (In the interest of the "larger good" of keeping impure and adulterated food and drugs out of the channels of commerce, the statute "dispenses with the conventional requirement for criminal conduct-awareness of some wrongdoing.")) The district court noted that the defendant presented no "reason to question the constitutionality of *Park* as applied to the circumstances presented here." *Id.* at *14. Neither have the defendants in this case.

[35] It is worth noting that, in *Higgins*, the defendant, citing to *Morissette*, 342 U.S. at 256, contended, like the defendants here, that "his conviction as a responsible corporate officer for a strict liability offense is 'constitutionally permissible only where the penalties are 'relatively small' and conviction does not cause 'grave damage to an offender's

approved by [the Supreme Court], where motive or criminal intent is not a factor in the crime." *Holdridge*, 282 F.2d at 309. Cases that involve the prosecution of food and drug acts, as here, for instance, serve as ready examples of "this kind of legislation." *Id.* Quoting the Supreme Court, the Eighth Circuit Court of Appeals highlighted that the penalties for those who violate such laws "commonly are relatively small, and conviction does not [sic] grave damage to an offender's reputation." *Id.* at 310 (quoting *Morissette*, 342 U.S. at 256). That "interpretation" of federal criminal statutes that lack a motive or

_____

reputation.'" *Higgins*, 2011 WL 6088576 at *13. However, in sentencing the defendant to nine months in prison for his violation of the FDCA, the District Court for the Eastern District of Pennsylvania distinguished *Morissette* from *Higgins*:

> *Morissette* decided "quite a different question" concerning the constitutional parameters of a conviction for conversion of government property without proof of intent. 342 U.S. at 248. *Morissette* did not decide the constitutional boundaries of strict liability crimes proscribed by statutes and regulations directed to health and welfare concerns. *Id.* at 248, 253–54. Defendant does not explain why *Morissette* should be applied to the circumstances presented here. Nor does *Higgins* provide a reason to depart from the teachings of *Park*, which held that the FDCA "imposes the highest standard of care and permits conviction of responsible corporate officials who, in light of this standard of care, have the power to prevent or correct violations of its provisions." 421 U.S. at 676 (1975) (decided after *Morissette*).

*Id.* Similar to the defendant in *Higgins*, the defendants, here, have not articulated why *Morissette* is applicable. Additionally, *Holdridge*, unlike this case, concerned the prosecution of defendants for violating a statute that prohibited the re-entry onto a military reservation after having been removed and ordered not to re-enter; it did not regard strict liability offenses aimed at health and welfare concerns. *See Holdridge*, 282 F.2d at 304; *see also Higgins*, 2011 WL 6088576 at *13.

criminal intent, as the prosecutors rightly pointed out in their resistance brief, does not necessarily equate to a "constitutional limitation." Resistance Brief at 18.

Even if it is assumed, *arguendo*, that *Holdridge* provides a "constitutional limitation" on the penalties imposed for strict-liability offenses under the FDCA,[36] the prosecutors are right in asserting that the punishment imposed under 21 U.S.C. § 333(a) is considered a "relatively small" penalty as it is a "short jail sentence[]." *Id.*; *see also Staples*, 511 U.S. at 616 (noting that "the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary," and referred to a fine of up to $200, or six months in jail, or both, in one case as an example of a "light penalty"); *see also Flum*, 518 F.2d at 42 (finding that the statutory penalty for

---

[36] If one leaves aside the factual distinctions between this case and *Holdridge,* one could reasonably make that argument based on a proposition in *Holdridge*, which the Eighth Circuit Court of Appeals derived from the case law:

> From these cases emerges the proposition that where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element in [sic] then not violative of the due process clause. *Shevlin-Carpenter Co. v. State of Minnesota*, 218 U.S. 57, 69-70, 30 S.Ct. 663, 54 L.Ed. 930; [*Balint*, 258 U.S. at 252]; *Williams v. State of North Carolina*, 325 U.S. 226, 238, 65 S.Ct. 1092, 89 L.Ed. 1577.

*Holdridge*, 282 F.2d at 310.

carrying a weapon onto an airplane, which was a strict-liability offense, carried with it "a maximum fine of $1000 or imprisonment for not more than one year, or both," which made the "offense a misdemeanor," and "is thus 'relatively small.'"). Therefore, compared to other cases, the penalty I imposed of a three-month term of imprisonment is "relatively small," and the conviction of this offense does not "gravely besmirch" either defendant. *Holdridge*, 282 F.2d at 310.

Further bolstering the prosecutors' position is their alternative argument that the Eighth Circuit Court of Appeals has upheld the constitutionality of strict-liability statutes, and found no Fifth Amendment due process violation, where the penalty imposed was far beyond a one-year term of imprisonment. *See, e.g.*, *United States v. Wilcox*, 487 F.3d 1163, 1168–69 (8th Cir. 2007) (affirmed defendant's sentence of 110 months in prison for the crime of sexual abuse of a minor, and rejected defendant's claim that statutory provisions and jury instructions were unconstitutional, in violation of his due process rights, for not requiring knowledge that the victim was underage).

Lastly, the defendants *repeatedly* pressed *Sheffield Farms* upon me and requested that I adhere to a "longstanding tradition" begun by Judge Cardozo,[37] and not impose a term of imprisonment.[38] Defendants' Reply Brief at 2–3, 5–8. In *Sheffield Farms*, the

---

[37] The "longstanding tradition," according to the defendants, is "of judicial opinions warning that our Constitution does not permit prison sentences to be imposed in this circumstance." Defendants' Reply Brief at 7.

[38] Through my own research, I discovered that there are two versions of the opinion for *Sheffield Farms*: a New York Official Reports version and the National Reporter System version. Because I have encountered inconsistencies between the two versions, I will include parallel citations to both opinions. However, I will only quote the language that appears in the official version.

defendant, a corporation, was convicted of violating section 162 of the Labor Law.[39]
*Sheffield Farms*, 225 N.Y. at 27, 121 N.E. at 475. The issue addressed in the opinion
was whether there was "any evidence of guilt." *Id.* In affirming the lower court's
judgment, Judge Cardozo wrote that "there is some evidence of the defendant's
negligence in failing for six months to discover and prevent the employment of this child;
that the omission to discover and prevent was a sufferance of the work; and that for the
resulting violation of the statute, *a fine was properly imposed*." *Id.* at 33, 121 N.E. at
477 (emphasis added).

In their reply brief, the defendants argued that "[n]early a century ago, Judge
Cardozo cautioned that his court's acceptance of the government's 'power to fine' for
regulatory offenses should 'not be understood as sustaining to a like length the power to
imprison,' and he expressed strong doubt that 'life or liberty may be forfeited without
tinge of personal fault through the acts or omissions of others.'" Reply Brief at 2 (citing
*Sheffield Farms*, 121 N.E. at 477). In making these claims, the defendants
misrepresented Judge Cardozo's opinion. I quote from the full pertinent portion of the
opinion cited to by the defendants to highlight the defendants' misrepresentations:

> In these and like cases, the duty to make reparation to the state
> for the wrongs of one's servants, when the reparation does

---

[39] That section provided the following: "No child under the age of fourteen years shall
be employed or permitted to work in or in connection with any mercantile * * *
establishment specified in the preceding section." *Sheffield Farms*, 225 N.W. at 27, 121
N.E. at 475. Judge Cardozo explained that a first-time violation of that law is punishable
"by a fine of not less than twenty nor more than fifty dollars (Penal Law, sec. 1275)."
*Id.* However, he continued: "Heavier fines *and even imprisonment may follow a
repetition of the offense* (Penal Law, sec. 1275)." *Id.* (emphasis added). Thus, unlike
penalties for violations of 21 U.S.C. § 331, which are contained in 21 U.S.C. § 333(a)(1),
imprisonment did not follow for a first-time violation of the statute at issue in *Sheffield
Farms* based on the Penal Law, which attached the penalty. At the time *Sheffield* was
written in 1918, imprisonment could follow in New York if the offense was repeated.

not go beyond the payment of a moderate fine, is a reasonable regulation of the right to do business by proxy. That right is not strictly absolute any more than any other. In such matters, differences of degree are vital ([*Ten. House Dept. v. McDevitt,* 215 N. Y. 160**,** 169]; *International Harvester Co. v. Kentucky,* 234 U. S. 216, 223). Even a fine may be immoderate (*Standard Oil Co. of Indiana v. Missouri*, 224 U. S. 270, 286; *Waters-Pierce Oil Co. v. Texas*, 212 U. S. 86, 111). But in sustaining the power to fine, we are not to be understood as sustaining to a like length the power to imprison. *We leave that question open.* That there may be reasonable regulation of a right is no argument in favor of regulations that are extravagant. Exceptional principles apply to callings of such a nature that one may be excluded from them altogether. Of these it may be true that by engaging in them at all, one accepts the accompanying conditions (*Miller v. Strahl*, 239 U. S. 426; *People v. Rosenheimer*, 209 N. Y. 115; *People v. Roby*, 52 Mich. 577). We speak rather of callings pursued of common right, where restrictions must be reasonable (*People v. Beakes Dairy Co.*, 222 N. Y. 416, 427). *This case does not require us to decide that life or liberty may be forfeited without tinge of personal fault through the acts or omissions of others* (*Comm. v. Stevens*, 153 Mass. 421, 424, 425; *Comm. v. Morgan*, 107 Mass. 199, 203; *Comm. v. Riley*, 196 Mass. 60, 62; *Mousell Bros. v. London & N. W. Ry. Co.*, 1917, 2 K. B. 836, 843, 844; [*The Queen v. Tolson,* L. R. 23 Q. B. D. 168, 185]). The statute is not void as a whole though some of its penalties may be excessive. The good is to be severed from the bad. The valid penalties remain.

*Sheffield Farms*, 225 N.Y. at 33, 121 N.E. 477 (emphasis added). When one reads the parts of Judge Cardozo's opinion cited to by the defendants in context, it becomes clear to the reader that Judge Cardozo left open or unresolved the matters referred to by the

defendants.[40]  Therefore, the defendants appear to have mistakenly, or perhaps inadvertently, edited language from *Sheffield Farms*.  The defendants' misrepresentations of Judge Cardozo's opinion in *Sheffield Farms*, coupled with their misrepresentation of *Nolan* and mischaracterization of Justice Stewart's dissenting opinion in *Park*, undermine their arguments.  Ultimately, I find defendants' claims that the due process clause of the

---

[40] The beginning sentences of Judge Frederick E. Crane's concurring opinion fortify my interpretation of Judge Cardozo's majority opinion that he did not address the issue of imprisonment.  *Sheffield,* 225 N.Y. at 35 (Crane, J., concurring).  In Judge Crane's words, "I concur in the opinion of Judge CARDOZO, but I do not think that we should leave the question of punishment by imprisonment open for further discussion.  The matter is here, in my judgment, for determination."  Unlike Judge Cardozo, Judge Crane made his position on this issue clear:

> I recognize that this is the law regarding many police regulations and statutes creating minor offenses, and that there is a distinction between acts mala prohibita and mala in se, but I do not believe that the Legislature is unlimited in its power to make acts mala prohibita with the result that an employer can be imprisoned for the acts of his servant. [*People ex rel. Cossey v. Grout*, 179 N. Y. 417, 433 (N.Y. 1904)].  Nearly all the cases upon this subject have been those fixing a penalty to be recovered either in a civil or a criminal proceeding.  Others have been prosecutions for a misdemeanor such as in this case resulting in a fine.  To this extent I concede that the employer is liable irrespective of his knowledge or negligence, but when an employer may be prosecuted as for a crime to which there is affixed a penalty of imprisonment for an act which he in no way can prevent, we are stretching the law regarding acts mala prohibita beyond its legal limitation. [*Chicago, B. & Q. Ry. v. United States*, 220 U. S. 559 (N.Y. 1911)].

*Id.*

Fifth Amendment does not permit a sentence of imprisonment for violating the strict liability offense under the present circumstances unpersuasive.[41]

In general, the Supreme Court has permitted the punishment of persons for violating strict liability offenses. Contrary to the defendants' arguments, strict liability offenses are *not* a "matter of 'constitutional uncertainty'" nor does the punishment for committing such an offense constitute a due process violation. *See Balint*, 258 U.S. at 252 ("It has been objected that punishment of a person for an act in violation of law when ignorant of the facts making it so, is *an absence of due process of law*. But that objection is considered and overruled in *Shevlin-Carpenter Co. v. Minnesota*, 218 U. S. 57, 69, 70, 30 Sup. Ct. 663, 666 (54 L. Ed. 930), in which it was held that in the prohibition or punishment of particular acts, the state may in the maintenance of a public policy provide *'that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance.'* Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of mala in se.") (emphasis added).

More specifically, as the prosecutors rightly pointed out in their resistance brief, Resistance Brief at 7, the Supreme Court has permitted the imposition of criminal punishments for violations of the FDCA absent mens rea. *See, e.g.*, *Park*, 421 U.S. at 671–73 ("[The FDCA] does not, as we observed in *Dotterweich*, make criminal liability

---

[41] The prosecutors referenced the one Supreme Court decision in which the high court invalidated a strict-liability offense on due process grounds where the defendants lacked knowledge of a city ordinance's felon registration requirement. *See* Resistance Brief at 17–18; *see also Lambert v. California*, 355 U.S. 225, 228 (1957). Here, neither defendant argued that they lacked knowledge of the FDCA regulatory scheme, or cited case law to refute the prosecutors' claim that the Supreme Court has invalidated another strict-liability offense, or that the logic of *Lambert* has been extended to other like cases.

turn on 'awareness of some wrongdoing' or 'conscious fraud'"); *Dotterweich*, 320 U.S. at 281 ("[The FDCA] dispenses with the conventional requirement for criminal conduct— awareness of some wrongdoing."); *Wiesenfeld Warehouse Co.*, 376 U.S. at 91 ("It is settled law in the area of food and drug regulation that a guilty intent is not always a prerequisite to the imposition of criminal sanctions."); *Smith*, 361 U.S. at 152 ("[F]ood and drug legislation" is a "principal example" of a penal statute that "dispense[s] with any element of knowledge on the part of the person charged"); *Morissette*, 342 U.S. at 256 ("[L]egislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element."). Taking guidance from the Supreme Court, the Eighth Circuit Court of Appeals has similarly applied the statutory provisions of the FDCA. *See, e.g.*, *Hiland*, 909 F.2d at 1127–28 (finding that "[u]nder § 333(a)(1), neither knowledge nor intent is required for a misdemeanor violation" (citing *Park*, 421 U.S. at 668–73)). To date, the Supreme Court has not invalidated the FDCA, or ruled that the penalties authorized by 21 U.S.C. § 333(a)(1) for the strict liability misdemeanor offense under 21 U.S.C. § 331(a) are unconstitutional on due process grounds. Thus, upon my review of the case law and the relevant provisions of the FDCA, which clearly provided for criminal prosecution and up to one year of imprisonment for the crimes the defendants committed, I am unpersuaded by the defendants' due process challenge. *See* 21 U.S.C. §§ 331(a), 333(a)(1).

## VI.    CONCLUSION

For the reasons discussed above, I denied the defendants' motions at their sentencing hearing on April 13, 2015.  For the reasons given at the sentencing hearing, I imposed a sentence of three months imprisonment for each of the DeCosters.

**IT IS SO ORDERED.**

**DATED** this 14th day of April, 2015.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA