IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.                           No. CR14-3024

QUALITY EGG, LLC (d/b/a Wright
County Egg and Environ), AUSTIN
DECOSTER (a/k/a Jack DeCoster), and
PETER DECOSTER,               TRANSCRIPT OF
                                 SENTENCING

        Defendants.
_____/

       The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, April 13, 2015, commencing at 9 a.m.

APPEARANCES

For the Plaintiff:          PETER E. DEEGAN, JR., ESQ.
                            Assistant United States Attorney
                            111 7th Avenue Southeast
                            Cedar Rapids, IA 52401

                            LISA K. HSIAO, ESQ.
                            CHRISTOPHER E. PARISI, ESQ.
                            US Department of Justice
                            Consumer Protection Branch
                            Suite 6400-S
                            450 Fifth Street Northwest
                            Washington, DC 20001

For the Defendants          THOMAS C. GREEN, ESQ.
Quality Egg and             MARK D. HOPSON, ESQ.
Austin DeCoster             FRANK R. VOLPE, ESQ.
                            Sidley Austin
                            1501 K Street Northwest
                            Washington, DC 20005

For the Defendant           STUART J. DORNAN, ESQ.
Peter DeCoster:             Dornan, Lustgarten & Troia
                            Suite 232
                            1403 Farnam Street
                            Omaha, NE  68102

Also present:               Stacy Sturdevant, U.S. Probation
                            Doug Czepa
                            Todd Bucci

Reported by:                Shelly Semmler, RMR, CRR
                            320 Sixth Street
                            Sioux City, IA  51101
                            (712) 233-3846

1        THE COURT:  Thank you.  Please be seated.  Good

2   morning.

3        THE CLERK:  This is Case Number 14CR3024, United

4   States of America versus Quality Egg, LLC; Austin DeCoster; and

5   Peter DeCoster.  Counsel, please state your appearances.

6        MR. DEEGAN:  Thank you.  Your Honor, Peter Deegan on

7   behalf of the government.  I'm joined by Lisa Hsiao and

8   Christopher Parisi from the consumer protection division of the

9   Department of Justice.

10        THE COURT:  Good morning.  Thank you.

11        MR. GREEN:  Good morning, Your Honor.  Tom Green on

12   behalf of Quality Egg and Jack DeCoster.  I'm joined by Mark

13   Hopson and Frank Volpe, partners in Sidley Austin.

14        THE COURT:  Good morning, counsel.

15        MR. DORNAN:  Morning, Your Honor.  Stu Dornan on

16   behalf of Mr. Peter Deegan (sic) who is present.

17        THE COURT:  Mr. Dornan, you feel a little bit alone

18   all by yourself there?

19        MR. DORNAN:  I --

20        THE COURT:  You're used to working solo.

21        MR. DORNAN:  I am, Judge.  I'm used to being up

22   against it.

23        THE COURT:  Okay.  We have a lot of things to cover.

24   So before we get to the -- normally at this point I go over the

25   guideline calculations, but we have some things to do before

1   that.  So why don't we make sure everybody's exhibits are

2   admitted.  So, Mr. Deegan, why don't we start with the

3   government.

4        MR. DEEGAN:  Thank you, Your Honor.  So the government

5   will offer what we previously provided to the Court and counsel,

6   Exhibits 1 through 6 as well as 8 and 8A, and I'll just -- I'll

7   go through and explain what we have here.

8                          *   *   *   *

9        (Exhibits 1 through 6, 8, and 8A were offered.)

10                         *   *   *   *

11       THE COURT:  That's fine.  Thank you.

12       MR. DEEGAN:  Exhibit 1 is a stipulation of the

13  parties.  Exhibit 2 is an expert report from Dr. Davison.

14  Exhibit 3 is what we're referring to as the bound Wal-Mart

15  presentation, and I've actually provided to the Court this

16  morning the original bound presentation that the government

17  received via subpoena from Defendant Quality Egg, LLC.

18       Number 4 is the -- what we call the Crawford Wal-Mart

19  presentation.  Number 5 are some notes from Mr. Crawford from

20  the Wal-Mart meeting.  Number 6 is a May 14, 2010, e-mail with a

21  spreadsheet regarding salmonella testing.  We had previously

22  marked Number 7 which was the claim of Harvest Insurance

23  Company.  The government does not intend to offer that.  That

24  claim, I got written confirmation from Harvest they're

25  withdrawing that claim.

1          Number 8 is a detailed restitution list.  That has

2    some addresses and policy numbers in it, et cetera, so we're

3    offering that under seal.

4          8A is a redacted version of Number 8.  And that we are

5    offering not under seal.  I believe the copy I forwarded to the

6    Court incorrectly said that we were going to offer it under

7    seal.  It had the little "under seal" sticker on it.  That was

8    in error.  I've taken that one off the copy I provided the Court

9    this morning.

10          THE COURT:  And then who submitted the Crawford grand

11    jury testimony?  Was that one of the defendants?

12          MR. DORNAN:  I did, Judge.

13          THE COURT:  Okay.  So the only one that you're

14    offering under seal is 8?

15          MR. DEEGAN:  That's correct, Your Honor.

16          THE COURT:  Okay.  Do the defendants have any

17    objection to any of the government's exhibits?

18          MR. GREEN:  No objections for Quality Egg or Jack

19    DeCoster.

20          THE COURT:  Okay, Mr. Green.  Thank you.

21          MR. DORNAN:  No, Your Honor.  No objections.

22          THE COURT:  Okay.  Then Government's Exhibits 1

23    through 8A including 8 but Number 7 is withdrawn are admitted.

24    Exhibit 8 is admitted under seal.

25                              *   *   *   *

1    (Government Exhibits 1 through 6, 8, and 8A were

2    admitted.)

3                    *    *    *    *

4    THE COURT:  I just wanted to state on the record kind

5    of what happened with regard to Exhibit 8.  Exhibit 8 is a list

6    of individuals who have sought restitution in the case.  And

7    Exhibit 8 contains identifying information including insurance

8    policy numbers.  And the government requested and I think the

9    parties have requested -- nobody resisted.  The government asked

10   to submit that under seal.  I responded by e-mail saying that I

11   thought it was okay to seal 8 but that it would be more

12   appropriate to have a redacted version for public view that

13   included information but took out the personal identifying

14   information.  And everybody agreed to that as I recall by

15   e-mail.

16   And Mr. Deegan took the lead -- actually I had

17   suggested some redactions, and I forgot about a couple of

18   things.  Mr. Deegan then said, well, maybe we should redact

19   this.  I ultimately decided what should be redacted, what should

20   not be redacted, but I felt very strongly that while some of the

21   information was important to redact because it revealed personal

22   identifying information that the public was entitled to some of

23   the information, so I ultimately made the decision.

24   The government executed my decision by creating

25   Government's Exhibit 8A which is the public version of 8 which

1   is under seal.  Anybody want to make any additional record on

2   the redacted restitution Exhibits 8 and 8A?

3            MR. DEEGAN:  Nothing from the government, Your Honor.

4            THE COURT:  Okay.  Anything from either defendant?

5            MR. GREEN:  Nothing, Your Honor.

6            MR. DORNAN:  No, Your Honor.

7            THE COURT:  Okay.  Why don't we move to defense

8   exhibits.  We can start with Quality Egg, the corporation.

9            MR. GREEN:  Your Honor, please, we have tendered

10  Exhibits A through J for admission in evidence.  There is a list

11  of these exhibits which I can either submit to the Court or I

12  can read them into the record.

13                    *   *   *   *

14           (Exhibits A through J were offered.)

15                    *   *   *   *

16           THE COURT:  Why don't you just go ahead and read them

17  into the record if you would be so kind, Mr. Green.

18           MR. GREEN:  I will, Your Honor.  Exhibit A is the

19  declaration of Charles L. Hofacre as is Exhibit B.  Hofacre is

20  an expert in poultry disease.

21           Exhibit C is the declaration of Maxcy P. Nolan, an

22  expert in rodent control and rodent control measures.

23           Exhibit D is the opinion in United States v. Higgins,

24  H-i-g-g-i-n-s, out of the Eastern District of Pennsylvania dated

25  December 7 of the year 2011.

1          Exhibit E is a transcript of sentencing in the same

2    case.

3          F is a transcript of plea and sentencing in the case

4    of United States v. Hermelin, H-e-r-m-e-l-i-n, out of the

5    Eastern District of Mississippi (sic) in March of 2011.

6          Exhibit G consists of the final reports on DeCoster

7    Farms by the Iowa Veterinary Diagnostic Laboratory from Iowa

8    State University dated in August of 2010.

9          The three final exhibits, Your Honor, are letters.

10   Exhibit H is a letter from Dr. Charles Harding from Awake

11   America Ministries to Your Honor.

12         Exhibit I is a letter from Richard Martin,

13   Missionaries in the Philippines, to Your Honor.

14         And J is a letter from Dr. Kevin Wynne, Missionaries

15   to Mexico, that was written to Jack DeCoster which we are also

16   tendering to the Court.  That concludes the list of exhibits.

17         THE COURT:  Thank you, Mr. Green.  Anybody have any

18   objections to -- well, that would be both Quality Egg and Jack

19   DeCoster's exhibits, Austin DeCoster's.

20         MR. GREEN:  Yes, sir.

21         THE COURT:  Thank you.  Any objection?

22         MR. DORNAN:  No objection, Your Honor.

23         THE COURT:  Any objection from the government?

24         MR. DEEGAN:  No objection.

25         THE COURT:  Okay.  All of those exhibits identified by

1    Mr. Green are admitted.

2                        *   *   *   *

3            (Defendant Exhibits A through J were admitted.)

4                        *   *   *   *

5            THE COURT:  Are you requesting, Mr. Green -- I just

6    don't recall -- that any of those exhibits be submitted under

7    seal?

8            MR. GREEN:  No, sir.

9            THE COURT:  Okay.  Thank you.  Then all of those

10   exhibits are admitted.  None of those are under seal.

11           Mr. Dornan.

12           MR. DORNAN:  Thank you, Your Honor.  We have 13

13   exhibits, Judge.

14           MR. GREEN:  Would Your Honor indulge me just for a

15   moment?

16           THE COURT:  Yes.

17           MR. GREEN:  I made a -- I left off Exhibit K -- I'm

18   sorry; it was on the last page here --which is a letter from

19   Dr. Steve Christner, Calvary Baptist Church, to Your Honor under

20   date of April 8 of this year.

21           THE COURT:  Yes.

22           MR. GREEN:  Sorry, sir.

23           THE COURT:  Thank you.  Exhibit K is admitted.

24                        *   *   *   *

25           (Exhibit K was admitted.)

```
1                              *   *   *   *

2              THE COURT:  I assume there's no objection.

3              MR. DEEGAN:  No objection.

4              THE COURT:  No objection, Mr. Dornan, to K?

5              MR. DORNAN:  No objection.

6              THE COURT:  Thank you.

7              MR. DORNAN:  Thank you.  For Peter DeCoster, Judge, we
```

have 13 exhibits.  The first exhibit would be a lab report done

by Professional Group Services in 2009 concerning the testing of

Salmonella.

          The second exhibit is a Fed Ex delivery receipt.  This

has to do with the Wal-Mart presentation in 2008.

          The third is a letter from Patsy Larson which is a --

who's an employee of Quality Egg and is submitted in support of

Peter.

          The next one is Chad DeCoster, letter in support of

Peter, his son.

          Kevin Wynne is another letter in support of Peter as

Number 5.

          Exhibit 6 is Patricia DeCoster.  That's Mr. DeCoster's

mom.

          Number 7 is Heather Blau.  That's another letter in

support of Peter.

          Number 8 is Jerry Crawford, another letter in support

of Peter.

1          Number 9 is Richard Martin.  Mr. Martin's a missionary

2    that Mr. DeCoster has done extensive work with around the world.

3          Exhibit 10 is a letter from Mike Nail, also supporting

4    letter.

5          Number 11 is a supporting letter from David Johnson.

6          Number 12 is the pretrial diversion agreement that was

7    entered into between the government and Mr. DeCoster a number of

8    years ago.

9          And Number 13 is the grand jury testimony of

10   Mr. Crawford.  I would ask that that be filed under seal, Judge,

11   because it is grand jury testimony.  This was in relation to a

12   contested issue concerning SQF certification.

13         THE COURT:  Okay.  Thank you.  Any objection to any of

14   Peter DeCoster's exhibits by the government?

15         MR. DEEGAN:  None from the government, Your Honor.

16         THE COURT:  By the other defendants?

17         MR. GREEN:  No, sir.

18         THE COURT:  Okay.  Thank you.  All of Peter DeCoster's

19   exhibits are admitted.  Exhibit 13 which is the grand jury

20   testimony of Lawyer Jerry Crawford is admitted under seal

21   because it's grand jury testimony.

22                     *   *   *   *

23         (Exhibits 1 through 13 were admitted.)

24                     *   *   *   *

25         THE COURT:  Now, does anybody plan on calling any

1    witnesses?

2           MR. DEEGAN:  None for the government, Your Honor.

3           MR. GREEN:  None for Quality Egg or Jack DeCoster,

4    Your Honor.

5           THE COURT:  Okay.  Thank you, Mr. Green.

6           MR. DORNAN:  No, Your Honor.

7           THE COURT:  Okay.  And that's in large part due to the

8    fact the parties spent considerable time in entering into a

9    stipulation.

10          MR. DORNAN:  That's correct, Your Honor.

11          THE COURT:  Because we went from I think saying a

12   five-day misdemeanor sentencing was probably not going to be

13   enough time to having no witnesses, so that's how cases go

14   sometimes.

15          When would you -- do we have at least one victim

16   that's present?  And I'll ask if there are more, but is there at

17   least one victim present?

18          MR. DEEGAN:  Yes.  We have one victim representative,

19   the father of a victim.

20          THE COURT:  Yes.

21          MR. DEEGAN:  And that is the only victim

22   representative or victim that we have that we expect to be

23   addressing the Court today.

24          THE COURT:  Okay.  And we can do -- we'll do that for

25   all three sentencings I think, but we'll do that a little bit

1    later if that's okay unless -- do I need to accommodate the

2    victim's travel schedule? We can do it first thing if you'd

3    like or . . .

4         MR. DEEGAN: No, Your Honor. In fact, I think later

5    would be preferable to the father.

6         THE COURT: Okay. Okay. Does anybody have any

7    objection if we kind of do the sentencings combined except at

8    the very end when it's time for me to impose sentence we'll do

9    them one at a time, take up the allocution? I'm going to give

10    the corporation a right to allocution. They may or may not want

11    to take advantage of it. I don't think they're entitled to it,

12    but out of an abundance of caution, I'm going to do that. We'll

13    take all the allocutions, and then I'll just go individually and

14    impose the three sentences.

15         MR. DORNAN: That's acceptable to me, Your Honor.

16         THE COURT: Any objection, Mr. Deegan?

17         MR. DEEGAN: No objection from the government.

18         THE COURT: Mr. Green?

19         MR. GREEN: No objection, Your Honor.

20         THE COURT: Okay. Well, you're all so agreeable.

21         Okay. Let's go through the presentence reports just

22    to put on the record -- we'll start first with the corporation,

23    Quality Egg. Count 1 carries a probation period of one to five

24    years; Count 2, one to five years; Count 3, zero to five years;

25    and the guideline provisions for the probation are the same as

1  the statutory provisions.

2          The fine, Count 1 is a half a million dollars,

3  statutory provision; Count 2, six thousand seven hundred and

4  forty-five dollars six hundred and -- I'm sorry, $6,745,683.20.

5  Count 3 is $200,000.  The guideline provision for Counts 1 and 2

6  are 4,800,000 to $7,245,683.20.  There is no guideline

7  calculation for Count 3.  It's just the statutory provision.

8          Mr. Green, do you agree with those guideline

9  calculations for the defendant corporation Quality Egg, LLC?

10          MR. GREEN:  Yes, I do, Your Honor.

11          THE COURT:  Okay.  And does the government agree with

12  those calculations?

13          MR. DEEGAN:  Yes, Your Honor.

14          THE COURT:  Okay.  Let's move to Austin Jack DeCoster.

15  The total offense level is 4, criminal history category 1,

16  imprisonment range of 0 to 1 years by statute with the total

17  offense level 4, criminal history category 1.  The United States

18  advisory guideline calculation is 0 to 6 months.  Supervised

19  release is 0 to 1 year.  Should that be imposed, probation, if I

20  impose that, is 0 to 5 years for the statutory provision, 0 to 3

21  years for the guideline provision.  The fine range is a thousand

22  dollars statu -- I'm sorry, $100,000 statutory maximum and a 250

23  to $5,000 guideline range.  Mr. Green, do you agree with those

24  calculations?

25          MR. GREEN:  We do, Your Honor.

1          THE COURT:  Okay.  Thank you.  And are those accurate,

2     Mr. Deegan?

3          MR. DEEGAN:  Yes, Your Honor.

4          THE COURT:  Thank you.

5          Turning to Peter DeCoster, they're charged

6     identically, so all of those -- all of the calculations that I

7     just indicated would be identical.  Isn't that correct?

8          MR. DORNAN:  That's right, Your Honor.

9          THE COURT:  And do you agree with those calculations?

10         MR. DORNAN:  I do, Your Honor.

11         THE COURT:  Okay.  Have each of the defense lawyers

12    had a full, fair, and complete opportunity to review the

13    presentence report with their respective client in your case,

14    Mr. Dornan, clients in the case of Mr. Green?

15         MR. DORNAN:  I have, Your Honor.

16         THE COURT:  And Mr. Green?

17         MR. GREEN:  Yes, sir.

18         THE COURT:  And with regard to the corporation, I

19    assume you reviewed that presentence report and the potential

20    sentences with Austin Jack DeCoster.

21         MR. GREEN:  Yes, sir.

22         THE COURT:  Because he's the corporate representative

23    for purposes of sentencing the corporation.

24         MR. GREEN:  Yes, Your Honor.

25         THE COURT:  Okay.  Thank you.  Here's what I'd like to

1  do now, but if the parties have a different agenda, I don't want

2  to leave anything out.  But I thought we'd turn to the

3  constitutional issue on whether or not imprisonment is a

4  constitutionally permissible penalty in light of the motion and

5  the briefing filed by the individual defendants.  It was

6  actually filed by Austin Jack DeCoster, but then Mr. Dornan

7  joined in it in one of his pleadings.  Anybody have a problem

8  taking that up now?

9        MR. DEEGAN:  No, Your Honor.  And for the government,

10  I've asked my counsel Chris Parisi to address that issue with

11  the Court to the extent it needs to be addressed.

12        THE COURT:  Okay.  Thank you.  Why don't we start with

13  you, Mr. Green.

14        MR. GREEN:  Actually, Your Honor, if you will,

15  Mr. Hopson will address that.

16        THE COURT:  Okay.  Thank you.

17        MR. HOPSON:  Good morning, Your Honor.

18        THE COURT:  Good morning, Mr. Hopson.

19        MR. HOPSON:  May it please the Court.  The briefing on

20  this has been pretty extensive.  We probed not only the case law

21  but other district court sentencing hearings.  I'd like to do

22  two things.

23        THE COURT:  And some state courts too.

24        MR. HOPSON:  And some state courts too.  I'd like to

25  do two things.  I'd like to kind of trace the doctrine very

1   briefly and then talk about what there is in terms of precedent

2   for a pure responsible corporate officer offense because this is

3   not just strict liability.  That term strict liability gets

4   thrown around.  It has to do with scienter.  And some of those

5   scienter offenses involve conduct that would put somebody on

6   notice that something's wrong like possession of hand grenades

7   or taking a weapon through airport security.

8          But the pure status offense really traces back to

9   1918, and it's actually Justice Cardozo who writes for the New

10  York Supreme Court -- New York Court of Appeals at that point

11  and says that the due process clause limits the power of the

12  legislature, not the court, but limits the power of the

13  legislature to take liberty without personal fault through the

14  acts or omissions of others.

15         When these defendants plead guilty to the responsible

16  corporate officer offense at issue here, they are taking

17  responsibility for the acts of others.  There is no personal

18  conduct on their part at issue, and there is no scienter or

19  intent on their part at issue.  There's no knowledge.

20         That case has been echoed in at least a half a dozen

21  other state highest courts that we cite at page 2 to 3 of our

22  reply brief.

23         It's also been cited very favorably in numerous

24  Supreme Court decisions.  I think the best reasoned is Staples.

25  Staples, of course, involved the question of whether someone had

1 to know that the gun that they produced was an automatic weapon

2 in order to be liable for the offense.  And admittedly, Your

3 Honor, that's a statutory interpretation question.

4 But the Supreme Court in Staples in 1994 looked to the

5 due process line of cases to inform that and to interpret the

6 statute to require that scienter because failure to do so would

7 give rise to a grave constitutional concern.  And the court in

8 particular cites not only the case we just talked about,

9 Sheffield Farms, Justice Cardozo, but cites other authorities

10 and says imprisonment would not be compatible with the reduced

11 culpability for such regulatory offenses.  These so-called

12 public interest offenses, Your Honor, again, are very different

13 than what is traditionally referred to as strict liability.

14 Staples also relied on the Supreme Court's decision in

15 Morissette which involved someone who perhaps inadvertently took

16 property off of government lands.  And the court there said that

17 it would uphold and that it had upheld -- citing all the way

18 back to Dotterweich and Park which are the origin of the

19 responsible corporate officer doctrine, said it had upheld those

20 cases in the past because, quote, the penalties are relatively

21 small and conviction does no grave damage to an offender's

22 reputation.  That is what Justice Blackmun was writing about in

23 1960 for the Eighth Circuit in the case we cite in which he goes

24 through the analysis of strict liability laws.

25 Again, I won't dwell on this at length.  But he

1   says -- and it is, I should say, a due process analysis, not an

2   Eighth Amendment analysis but a due process analysis.  Then

3   Judge Blackmun said the due process clause would not be violated

4   by a lack of showing of scienter in that case because he says

5   the due process clause is not implicated, quote, where the

6   penalty is relatively small and where the conviction does not

7   gravely besmirch.

8           Now, I cannot cite you a case, Your Honor, that

9   specifically holds on point as a precedent that sentencing to

10  any term of incarceration for a RCO offense is unconstitutional.

11  But the law and the line of cases here is quite powerful.  And

12  the courts do rely on these due process clause principles either

13  to avoid raising the constitutional issue by requiring a showing

14  of scienter as in Morissette or Staples or to avoid

15  incarceration.  And that's the second point that I would like to

16  turn to now.

17          We tried not only to scour the reported case law but

18  to look at what other district courts had done.  And at the end

19  of the day we found two cases, two -- two groups of cases

20  because one involves multiple defendants where district courts

21  such as yourself have sentenced someone to some restriction on

22  liberty based upon a responsible corporate officer offense.

23          One of those is the Hermelin case which is Exhibit

24  12F.  And because we're relying on a transcript, we submitted it

25  to you as an exhibit.  The government in its opposition argues

1    that it's a little ambiguous what the court is relying on at the

2    sentencing, and I agree with them.  It is a little ambiguous.

3    But if you read the whole transcript, Mr. Hermelin who was

4    sentenced ultimately to 17 days said -- had the following thing

5    said to him by the judge:  He said, quote, but what I see when I

6    see Mr. Hermelin is greed, abuse of power, recklessness.  This

7    is at page 41 of the transcript.  He had this company, this

8    great company, with 1,700 employees and then was alerted that he

9    was sending pills all over the country that were almost twice

10   the strength of what they should have been.

11          That was a case, Your Honor, in which Morphine pills

12   were adulterated and mislabelled and shipped in interstate

13   commerce.  There was a sentence there under a pure RCO.  But

14   we've looked at the pleadings.  The constitutional issue we've

15   raised with you today, Your Honor, was not before Hermelin.  So

16   I think we can put that aside.

17          The harder line of cases are the cases involving this

18   company Synthes which both sides write to you about.  And I want

19   to be very brief, but I just want to be clear about what the

20   judge -- and in this case it was Judge Davis in the Eastern

21   District of Pennsylvania -- found in those cases because what

22   the judge found in those cases, Your Honor, is not present here.

23   There's an unpublished opinion that we have submitted to you as

24   Exhibit 12D.  And again, this involved avoiding FDA clinical

25   research requirements.  They put the drug out without going

1    through clinical tests.  It was an injectable medical device for

2    spinal cord injuries that resulted in some deaths.

3          The court said -- and this again is at page 8 -- the

4    court well understands and respects historical sentencing

5    practices for responsible corporate officers under the Park

6    doctrine.  We agree with the sentences previously imposed on the

7    conduct before those courts.  This case stands alone.  Unlike

8    Park, this matter does not involve holding an unaware corporate

9    executive accountable for vermin in a warehouse.  And then the

10    court goes on to say Higgins' case stands apart from other Park

11    doctrine cases because the criminal conduct at issue is his own.

12    It was not, like this case, purely vicarious.

13          And finally in Exhibit 12E, the court in the

14    sentencing of another Synthes executive, Mr. Michael Huggins,

15    says the following at page 73.  The judge talks about all the

16    case law and the argument that is made to him about the due

17    process clause.  And he says, But you need to understand that

18    the reason why I do what I'm about to do is not because you're

19    the responsible corporate official who is standing up and taking

20    the burden for things that happened on his watch that he could

21    have had the power to stop that he didn't stop.  That's the

22    typical case.  That's the instance where those events -- where

23    most people have previously been sentenced.  This is more.

24    You're being punished because of decisions you personally made

25    and participated in because this whole course of events went

 1  from the day it was conceived from the top down.

 2          This is, Your Honor, in the words of Judge Davis, the

 3  typical case.  The only conduct pled to is the three paragraphs

 4  in the defendants' plea agreement.  There is no claim that they

 5  had knowledge.  There is no claim that their employees had

 6  knowledge.  There is no conduct that is admitted to.  It is

 7  purely at the end of the day as far as I know a unique provision

 8  in the U.S. criminal code that penalized status.  And we submit,

 9  Your Honor, that given the precedents before you, given the

10  record before you, the due process clause does impose

11  limitations on doing anything that would impair these

12  defendants' liberty given the record before the Court.

13          Any questions, Your Honor?

14          THE COURT:  I do.  Let's start with the Nolan case

15  from the Iowa Supreme Court that you cited in your brief.

16          MR. HOPSON:  Yes.

17          THE COURT:  Are you familiar with the Nolan case?

18          MR. HOPSON:  I am, Your Honor.

19          THE COURT:  Have you actually read it?

20          MR. HOPSON:  I think I did, Your Honor, at some point.

21          THE COURT:  Or did some associate read it and write

22  the brief?

23          MR. HOPSON:  No, I read everything that --

24          THE COURT:  Because it doesn't stand for what you s --

25  claim it stands for.  Matter of fact, they reserve the issue.

1     MR. HOPSON:  They did.  And we don't say it's a

2  holding.  We say it's upholding the conviction of the $20 fine

3  but reserving and emphasizing that the violator may be subject

4  to imprisonment is not before us.  So we put the point that it's

5  not before the court in the parenthetical when we cited the

6  case.

7     THE COURT:  So what's the purpose of citing the case?

8     MR. HOPSON:  Because the court is reserving the issue.

9  It's a see also cite that says the court reserved that issue,

10  and presumably the court reserved the issue because it believes

11  there's a different question there if imprisonment was before

12  the court.

13     THE COURT:  What about the -- okay.  Let me ask you

14  about the -- let's see -- the Minnesota case -- no, Koczwara,

15  the Pennsylvania case.

16     MR. HOPSON:  Right.  Again, that's another case, Your

17  Honor, where we're making clear that what the holding is is

18  upholding the fine but reserving judgment on the separate issue

19  under the due process clause.  As I said to you when I stood up

20  to make this argument, Your Honor, there's not a lot of cases

21  directly on point.

22     THE COURT:  No, I understand that.

23     MR. HOPSON:  This is kind of a rare beast.

24     THE COURT:  Under which due process clause?

25     MR. HOPSON:  Under the state's due process clause in

1    that case.  But I don't think that Minnesota due process clause

2    as far as the liberty provisions go is different than the

3    federal clause.

4          And I should emphasize too, I mean, we didn't make

5    this as clear as we should have.  This is not a question of

6    substantive due process.  The courts that are addressing this

7    seem to be addressing it as procedural due process and limits on

8    what the legislature can do in the circumstances in which

9    there's a deprivation of liberty.

10          There are a lot of cases, Your Honor, that fly under

11   the rubric of strict liability.  And a lot of them are cited in

12   the government's brief, and some of them are cited in ours.  But

13   they're distinguishable because they involve individual conduct.

14   Even some of the Food, Drug, and Cosmetic Act cases that we

15   argue about between the opposition and reply involve things like

16   a defendant who has an RCO defense but pleads to another count

17   of aiding and abetting.  And, of course, we all know if there's

18   an aiding and abetting count, by definition there's scienter.

19          The cases that are closest as I talked to is what

20   Judge Davis wrestled with in the Synthes cases, the Higgins and

21   Huggins.  I was not -- I'm not able to tell you what the conduct

22   at issue was there, Your Honor, because the plea agreements

23   remain under seal.  We couldn't get to them.  So I don't know

24   what the defendants agreed to in those cases.

25          But when you add it all up, I do believe that the

1 question squarely presented to you really is a novel one because

2 the conduct before you is so limited.  There are only three

3 paragraphs in the statement of facts that these defendants

4 agreed to, and those paragraphs specifically say we are

5 responsible corporate officers, that's all.

6 　　　　　THE COURT:  But it goes beyond the plea agreement,

7 though, because -- which is something I had wished I had raised

8 earlier, and maybe you're not the lawyer to raise it with.  But,

9 you know, you filed a series -- when I say you, Quality Egg and

10 Austin DeCoster took the lead on filing objections.  You filed

11 extensive objections.  And then in document 89 that was filed,

12 you withdrew all of the prior objections as I understood 89 and

13 made very, very specific objections so that the vast majority of

14 the numerous paragraphs in the presentence report in my view are

15 unobjected to.

16 　　　　　So you can talk about the limited three paragraphs in

17 the plea agreement.  But we're talking about probably 30 or 40

18 paragraphs in the presentence report, and I know there are some

19 objections largely along the lines of knowledge of the

20 individual defendants.

21 　　　　　MR. HOPSON:  Right.

22 　　　　　THE COURT:  But there's a lot of -- there's a lot of

23 conduct by corporate employees that these two individual

24 defendants were over where there's no objection.

25 　　　　　MR. HOPSON:  I have two responses to that if you'll

1  allow it, Your Honor.

2       THE COURT:  Okay.  Yes.

3       MR. HOPSON:  One is a factual response.  The

4  withdrawing and the narrowing was part of the process of working

5  with Mr. Deegan and the government's lawyers to try to narrow

6  the issues.  As you pointed out when you took the bench, this

7  started with a pretty wide-ranging factual dispute.  Almost

8  everything has been resolved through stipulations which the

9  Court made reference to and Mr. Deegan's e-mail of last Tuesday

10 in which he doesn't contest certain things where the lack --

11      THE COURT:  Stipulation, yeah.

12      MR. HOPSON:  Yeah, there's a little bit of the facts

13 are in equipoise.  Mr. Green is going to address the couple of

14 things that are still hanging out there, but there's a legal

15 response I'd like to make too.

16      If for purposes of argument you accept that the due

17 process clause puts a ceiling on incarceration and that ceiling

18 is zero, then Booker and Apprendi and the whole line of cases

19 striking down the guidelines and making them advisory would come

20 into play.  And those cases say a court cannot rely on facts not

21 found by a jury nor accepted, agreed to, stipulated to by the

22 defendant to enhance a sentence.

23      So if we are right about the due process clause and we

24 look at it through that lens, we don't think those other facts

25 are relevant.

1          THE COURT:  I think that's a frivolous argument.  For

2    starters, you've waived your Apprendi argument by virtue of your

3    plea agreement.  You indicated in the plea agreement that I

4    could decide facts by a preponderance of the evidence.  That's

5    what your plea agreement says.  To me it's a clear waiver of the

6    Alleyne/Apprendi line of cases.

7          Secondly, if you're right about the constitutional

8    issue on due process that I can't incarcerate somebody, that

9    renders moot your Apprendi argument because I can't incarcerate

10   somebody as a matter of due process or the Eighth Amendment.

11   You never even reach the Apprendi issue.

12         But the real reason why I think you're wrong on

13   Apprendi -- I think you're wrong for all of those reasons -- is

14   because it doesn't raise the statutory sentence or the guideline

15   sentence.

16         MR. HOPSON:  Right.

17         THE COURT:  It doesn't increase it.

18         MR. HOPSON:  Let me -- let me respond to that, Your

19   Honor.

20         THE COURT:  Yeah.

21         MR. HOPSON:  Obviously in a traditional guidelines

22   setting, the Court has the authority without regard to Apprendi

23   and Booker and that whole line of cases to sentence within a

24   range; okay?

25         With respect to what we agreed to in the plea, we

1   preserved our due process argument specifically in the plea

2   agreement. And as you said --

3       THE COURT: You didn't preserve your Apprendi and

4   Alleyne argument because you didn't even make it till after you

5   filed your reply brief.

6       MR. HOPSON: Well, maybe we're -- maybe this is

7   semantics at some level. I guess what I'm saying is if we're

8   right about the due process and it really does impose those

9   limits for this offense, then none of that really matters.

10      THE COURT: Exactly, which is why your Apprendi

11   argument is nonsense because if you're right on the due process

12   clause, you can't turn around and then say, well, gee, there's

13   an Apprendi issue because you couldn't have given incarceration

14   unless the jury made that finding of fact. But if the jury made

15   that finding of fact which is all Alleyne and Apprendi say, I

16   still couldn't impose incarceration because the due process

17   clause bars it. So you can't use that argument to then

18   bootstrap the reverse in an Apprendi argument. It's silly.

19      MR. HOPSON: Well, I went down the wrong path here,

20   Your Honor. I think we do both agree without my remarks

21   misleading you that if the due process argument is right --

22      THE COURT: End of story.

23      MR. HOPSON: -- end of story, the other conduct

24   doesn't matter.

25      THE COURT: But you really think you can use that to

1    bootstrap an Alleyne and Apprendi argument?

2            MR. HOPSON:  I think that Apprendi and Booker stand

3    for the proposition that a sentence cannot be enhanced beyond

4    the sentence that could be imposed for the conduct agreed to

5    without either a jury finding or an agreed-upon statement of

6    facts.  I think that's the broader principle there.  Whether you

7    say that that baseline, as you do, is the statutory baseline or

8    you say, as I do, it's the constitutional baseline, I think

9    we're both getting to the same result, and I think maybe the way

10   I framed my argument has led to this colloquy that probably

11   doesn't matter very much at the end of the day.

12           THE COURT:  Well, let's get back to your plea

13   agreement and why you didn't waive any Apprendi or Alleyne

14   argument.

15           MR. HOPSON:  I think, Your Honor, it's put -- bound up

16   as you pointed in the due process argument which we didn't

17   waive.  We specifically reserved the right to address the

18   constitutional limits on sentencing as a matter of due process

19   in the plea agreements.

20           THE COURT:  But here's what you agreed to in the plea

21   agreement.  Both defendants agreed to be sentenced based on

22   facts to be found by the sentencing judge by a preponderance of

23   the evidence, and agreed facts essential to the punishment need

24   not be charged in the indictment or information, two, proven by

25   a jury, or, three, proven beyond a reasonable doubt.  That's all

1  a quote.  That's from Austin DeCoster's plea agreement,

2  paragraph 8, and Peter DeCoster's plea agreement, paragraph 8.

3       So I'm having a hard time understanding how that

4  doesn't waive at least an Alleyne/Apprendi issue.

5       MR. HOPSON:  I don't think it matters whether it

6  waives that specific issue if the due process argument is in

7  play which is probably a better way of saying what I'm trying to

8  say.  If the due process cl -- go ahead.  You have a question.

9       THE COURT:  Well, you're right if I agree with you on

10 the due process argument.

11      MR. HOPSON:  Right.

12      THE COURT:  But what if I don't?

13      MR. HOPSON:  If you don't agree with me on --

14      THE COURT:  Then you could still have an

15 Apprendi/Alleyne argument it seems to me.

16      MR. HOPSON:  We don't, Your Honor.

17      THE COURT:  But you don't.

18      MR. HOPSON:  As we said -- and I think it's quite

19 clear in our opening brief here -- if we're not -- if there is

20 no due process limitation which I think would be extraordinary

21 given the status offense, then we're in the same rules of

22 guideline sentencing that every other defendant is in.  It's

23 only the due process clause that makes this particular unique

24 offense in the criminal code different.

25      THE COURT:  Okay.  Thank you.  Anything else you'd

 1  like to add?

 2          MR. HOPSON:  No.  Thank you, Your Honor.

 3          MR. GREEN:  I'm wondering if you would allow me the

 4  extraordinary privilege of just adding a few couple --

 5          THE COURT:  I would.  Normally I have World Federation

 6  of Wrestling tag team rules.  Well, I have the opposite.  You

 7  can't tag off.  And I didn't see you hit his hand as you were

 8  going up there.  But I'll waive the tag team rule for purposes

 9  of this case.

10          MR. GREEN:  That's --

11          THE COURT:  You've come a long way.  You've all put in

12  a tremendous amount of work on this.  I'll tell you this.  I've

13  sentenced 4,500 plus defendants in 4 different jurisdictions

14  over 20 years.  I've had a -- my longest sentencing has lasted 7

15  days, 50 some contested witnesses.  I've put in more time on

16  these sentencings than I have in any other couple sentencings

17  combined.

18          So you can take all the time necessary.  It's an

19  important matter.

20          MR. GREEN:  Thank you, Your Honor.  And we all -- I

21  know I speak for the government as well.  We all appreciate the

22  effort that you've put into this matter.

23          The one point I want to make is that there may be a

24  problem emerging that I'm -- I see here from conflating these

25  three sentencings.  And that, you know, is activated a little

1    bit by Mr. Hopson's final remarks.

2           When you look at the sentencing configuration for my

3    client Austin DeCoster, for example, we're into an analysis of

4    what is really related conduct because the plea agreement cabins

5    exactly what -- the conduct that is at the core of that

6    transaction.

7           Now, the government -- the government in its kind of

8    initial approach to this case, in its initial filings and its

9    memorandum of the offense and so forth, elaborated on a range of

10   incidents and activity and conduct which they impliedly if not

11   explicitly believe qualifies as related conduct.

12          It may indeed qualify as related conduct when it comes

13   to sentencing the corporation.  But two points.  It doesn't fall

14   into the classic definition of related conduct under the

15   guidelines when you look at Jack DeCoster.  That classic

16   configuration is that related conduct is conduct which is

17   relevant to sentencing, and it's limited to conduct which the

18   defendant himself committed, aided, abetted, counselled,

19   commanded, induced, procured, or willfully caused.

20          Now, through this winnowing process that Mr. Hopson

21   also mentioned, virtually every one of those satellites of other

22   conduct that he articulated and identified initially in his --

23   in his opening description of this case have been in practical

24   terms stipulated away either explicitly in the stipulations or

25   by further concessions from the government in the now famous

1    e-mail of April 6 if I have the date right.

2            So while you're absolutely right about your

3    prerogatives and what the Court may do if it sees fit, I have no

4    quarrel with that whatsoever.  I do believe that when we're in

5    the arena of these two individual's sentences when we look to

6    this other conduct, these other transactions, it has to fall

7    within the rubric of related conduct.  I don't think it falls

8    within that.  I don't think it's related.

9            The government may argue to the contrary.  But even if

10   it were related, the government has basically in agreement with

11   the defense stipulated that these two gentlemen, certainly my

12   client, virtually had no knowledge of any of those particular

13   transactions that are out there as the related conduct.

14           So I think that has to be taken into account.  It's

15   not -- this point is really not particularly germane to the

16   argument on the motion.  But because we got into these other

17   observations that you made from the bench, I felt that I should

18   at least rise and alert you to --

19           THE COURT:  Well, I think you're right, and I

20   appreciate the fact that you rose and alerted me to it.  And

21   here's what I'm having difficulty with.

22           MR. GREEN:  Yes, sir.

23           THE COURT:  It's footnote 1 in document 89.

24           MR. GREEN:  Would you -- is that -- I don't have that

25   number.

1          THE COURT:  It's your --

2          MR. GREEN:  Thank you.

3          THE COURT:  I always love it when lawyers reserve

4    things, you know, like interrogatory answers, without waiving

5    the following objections.  So footnote 1 as I recall it in

6    document 89 -- document 89 is your -- where you withdraw all

7    prior objections except for the ones set forth below.  You have

8    some very specific objections.  For whatever reason, the first

9    United States probation officer assigned to this case did not go

10   through the presentence report and update it, but I went through

11   and took every one of your objections, read them broadly, then

12   highlighted in yellow in the presentence report every possible

13   phrase in every paragraph that that objection could cover.  I

14   didn't have any problem doing that.  I mean, it took a little

15   while, but I didn't really understand what footnote 1 was.

16         MR. GREEN:  Well, I think footnote 1 --

17         THE COURT:  Is the argument you just made.

18         MR. GREEN:  -- captures the argument I just made, yes.

19         THE COURT:  So then how am I supposed to know what you

20   think is not relevant conduct and what isn't?

21         MR. GREEN:  Well, I don't think any of the -- I mean,

22   I don't think that any of the -- I can go -- I can get my file

23   back here if this is the appropriate time to do it.

24         THE COURT:  See, that's the problem with objections

25   like that.  We reserve the right to object to anything on

1    relevancy grounds, but you never -- I mean, you did in the

2    earlier objections.  You objected to a few things, but how am I

3    supposed to know today what you're objecting to because you

4    never came forward and told me?

5         MR. GREEN:  Because I think that that process, if I

6    may, has been eclipsed by the subsequent discussions with the

7    government where we took each of those categories -- I'm not

8    sure what the proper reference is but these other instances of

9    misconduct that the government put into its initial, you know,

10   statement of offense, and we worked through those.  And

11   basically where we ended up in offering to you, this Court, a

12   stipulation is that the conduct on the part of my client, my

13   personal individual client, Austin DeCoster, is not conduct that

14   he knew anything about and the transactions he knew nothing

15   about.  And that takes it out of the definition of, I think,

16   relevant conduct out of the guidelines.  And I think it's kind

17   of a two-step, three-step process like that.

18        So the --

19        THE COURT:  But you didn't really object that it

20   wasn't relevant conduct within the guidelines until I get to

21   your briefs where you do that.  And then you don't actually

22   object to anything specific.  You just give me this

23   well-recognized black letter law that relevant conduct doesn't

24   include everything, and you cite the relevant conduct guideline,

25   and I get all that but . . .

1    MR. GREEN:  I think we were trying to do the Court a

2    favor.  It may have been misplaced.  I think rather than --

3    rather than burrow down into whether this particular allegation

4    falls within the guideline definition of relevant conduct,

5    et cetera, we kind of tackled the overarching issue of just

6    whether or not it has any meaning whatsoever for purposes of the

7    definition.  And that really is based on do these individual

8    defendants know about this particular area of misconduct or

9    alleged misconduct, did they participate in it and so forth?

10   And that we tried to resolve through these stipulations.  We

11   kind of get to the same place through a different road but . . .

12        THE COURT:  Well, here's the place where I think you

13   got to, and I think we probably all agree on it, at least with

14   regard to -- well, the only knowledge at issue anymore based on

15   the government's e-mail, the only thing where I think knowledge

16   is at issue is the single incident about which report was

17   present at the Wal-Mart meeting and whether or not Peter

18   DeCoster had knowledge of some of the things in that -- if you

19   can -- you can't agree on which report was actually there.  One

20   had inaccuracies, and one didn't.  Even if I find that the one

21   had inaccuracies, I'm not sure I would be compelled to find that

22   Peter DeCoster knew of those inaccuracies.  But anyway, that's

23   the only knowledge issue that I think is actually left

24   regardless of what footnote 1 in document 89 means because of

25   the e-mail.

```
 1            MR. GREEN:  I agree.

 2            THE COURT:  Okay.

 3            MR. GREEN:  I agree.  And I'm not equipped to speak to

 4  that.

 5            THE COURT:  Right.  But at least from your client --

 6  your two clients' perspectives -- well, the corporation and

 7  Austin DeCoster, there isn't -- the government isn't alleging

 8  any more -- any knowledge on any of the incidents.

 9            MR. GREEN:  Correct, sir.

10            THE COURT:  Isn't that right?

11            MR. GREEN:  That is right, sir.

12            THE COURT:  Isn't that right, Mr. Deegan?

13            MR. DEEGAN:  On specific instances of bad acts that

14  happened at the company, yes.  We're not alleging actual

15  knowledge on the part of the individual defendants.

16            THE COURT:  Right.  Now, I could have found actual

17  knowledge based on the stipulation, and I'm not bound by the

18  government's withdrawal in that footnote, am I?

19            MR. GREEN:  I don't think the stip -- I don't think

20  the stipulation provides a predicate for you to find that Austin

21  DeCoster had knowledge of any of these specific allegations.  I

22  think the stipulation is --

23            THE COURT:  Well, I could find, for example, that he

24  had knowledge after the fact of the bribe.

25            MR. GREEN:  I don't think so.  I don't think so.  I
```

1    think that the --

2         THE COURT: Well, I think your better argument is you

3 don't want me to make that finding and that I should -- and that

4 I should go along with the government's position. Isn't that a

5 more preferable argument?

6         MR. GREEN: Well, that's certainly the truth.

7 However, I do believe that if you -- if the Court were to focus

8 on the literal language of the stipulation, it does -- it

9 provides no clarity to the allegation that Jack DeCoster,

10 Mr. Austin DeCoster, knew about the bribe after the fact. In

11 fact, it's because there is no clarity and because there is

12 continuing, you know, ambiguity about that I think --

13         THE COURT: Well, there's ambiguity, but I could

14 resolve it from the stipulation if I wanted to.

15         MR. GREEN: I don't think so because I don't think

16 there's -- I don't think there's anything in that stipulation

17 that would adequately serve as a factual predicate for you to do

18 that. And what also is very telling here, Your Honor, is that

19 when you get to the government e-mail -- when you get to the

20 government's e-mail and the government makes further statements

21 about the bribe, let me just read that if I may. This is the

22 final paragraph to Mr. Deegan's e-mail. The government relies

23 upon paragraphs 11 and 12 of the stipulation. In view of the

24 conflicting evidence and credibility considerations, the

25 government will not ask the Court to find that Jack or Peter

1    DeCoster knew of the bribes at any particular time.

2            Now, that reference to credibility considerations I

3    think is rather significant because that's the credibility of

4    their witnesses, not ours.  They have two cooperating witnesses.

5    They give conflicting testimony.  I think it would be very hard

6    for a court to try to look at the very little snippets of

7    testimony on their part that pertain to Austin DeCoster and come

8    to any conclusion about the facts.  The government --

9            THE COURT:  Well, that actually isn't my question.

10           MR. GREEN:  I'm sorry.

11           THE COURT:  My question is do I have the power to do

12   that.

13           MR. GREEN:  Well --

14           THE COURT:  And, of course, I do because nobody put a

15   gun to your head and made you stipulate.  I could have listened

16   to all this testimony for five days.  I didn't complain about

17   that.  You all decided to enter into a stipulation.  And I could

18   take that stipulation and decide those contested matters without

19   being able to determine the credibility because you all deprived

20   me of the right to determine the credibility by agreeing to

21   enter into a stipulation and not presenting live evidence.  And

22   I always have a preference for live evidence.

23           So I think I absolutely have the power to decide those

24   contested matters notwithstanding the government's e-mail if I

25   want to do that.  There are some prudent reasons why one might

1 not want to do it.  For example, how in the heck can you

2 determine credibility over whether something was said based on

3 a -- one paragraph that simply says he said this and he said

4 that and you have no way of knowing the context, how it was

5 said, who said it or judge -- or be able to judge the

6 credibility of the actual witnesses?  I understand there are

7 reasons that caution against doing that.  That wasn't my

8 question.  My question was I feel I'm free to do it.  Do you

9 disagree with that?

10    MR. GREEN:  Your Honor, I never really want to wrestle

11 with the Court.

12    THE COURT:  No, you should.

13    MR. GREEN:  And I --

14    THE COURT:  I'm going to give you a lot more to

15 wrestle with.

16    MR. GREEN:  The Court has very expansive powers.  I

17 think the Court can reject a stipulation.  I think a court could

18 say, gentlemen, I'm not going to abide, I'm not going to

19 consider this.

20    THE COURT:  Okay.  I'll do that.  Then I'll set it in

21 two months for a five-day contested sentencing, and I'll listen

22 to the evidence.

23    MR. GREEN:  You could.

24    THE COURT:  Do you want me to do that?

25    MR. GREEN:  No, sir, I do not.  All of that --

1        THE COURT:  See, you want it both ways.  You don't

2   want me to hear the evidence, but you don't want me to resolve

3   anything based on a stipulation either because you got a good

4   deal out of that stipulation when the government sent that

5   subsequent e-mail.

6        MR. GREEN:  Well, here's -- let me make this

7   observation.

8        THE COURT:  Do you disagree with that?

9        MR. GREEN:  No, no, I got a good --

10       THE COURT:  Do you disagree that the subsequent e-mail

11  which I provoked by my e-mail saying are these things really

12  being contested, I mean, are you really going to have me decide

13  something based on a paragraph stipulation -- then the

14  government withdrew it.  So you're in pretty good stead because

15  of that.

16       MR. GREEN:  I am.  And --

17       THE COURT:  So would you like to go back to an

18  evidentiary hearing?

19       MR. GREEN:  No, I don't want to go back to an

20  evidentiary hearing.

21       THE COURT:  Okay.  I would.

22       MR. GREEN:  Well, I'm hoping that we can persuade you

23  not to.  And let me just add that the government is very

24  involved in this ca -- the government had an extensive,

25  extensive investigation into this case.  These gentlemen to my

 1   left probably know more about this case than any of the rest of

 2   us in this courtroom.  They are the ones that had, you know,

 3   intimate access to the witnesses.  They're the ones who

 4   conducted countless interviews.  Numerous individuals cooperated

 5   with them or at least allowed themselves to provide evidence.

 6   The grand jury proceedings went on at length.  They're in a

 7   pretty good position, I think, to tell this Court things about

 8   the strength of their case and the quality of the evidence.

 9         And I believe that as officers of the court when they

10   report to you in the e-mail as Mr. Deegan did in response to

11   your question that they are giving you the very best and most

12   accurate assessment of the case as they see it, and in that

13   process they have indicated that they do not have evidence to

14   indicate that Austin DeCoster had personal knowledge of this,

15   that, and so forth.  I think you were right a few minutes ago

16   identifying the last kind of zone of contested allegations.

17         And so I would implore you, I would ask you to take

18   that into consideration and to accept that.  And if you are in

19   the mind to do that, if I'm able to convince you to do that --

20   and I would suspect that the government joins me insofar as they

21   want you to be in a position and to feel comfortable about

22   resolving this case this morning -- then we don't have to

23   struggle -- as I began this argument when I stood up, we don't

24   have to struggle with what is really relevant conduct or not.

25   We've kind of worked our way through that hopefully for the

1  benefit of Your Honor.  So I just -- I just wanted to add those

2  remarks to Mr. Hopson's.

3        THE COURT:  Thank you, Mr. Green.

4        MR. GREEN:  All right, sir.  Thank you.

5        THE COURT:  Mr. Deegan?

6        MR. DEEGAN:  Thank you, Your Honor.  I think we did

7  get into perhaps more factual kind of dialogue about what the

8  record represents.  I'm happy to perhaps try to dive into some

9  of those issues with the Court now.

10        The government's -- on the due process claim, the

11  government can rest on its brief.  I don't know that there's

12  much more that we need to say on that.

13        I guess I would like to dive into the e-mail issue if

14  the Court thinks this is the appropriate time.  You know, as the

15  Court knows, we entered into this extensive stipulation with

16  many, many, many -- originally many, many, many disputed facts.

17  And the attorneys sat down, and we really worked hard to try to

18  narrow them into something that wouldn't cause the Court to have

19  to -- well, waste the Court's time, quite frankly.  And I know

20  that the Court's perfectly happy to hear evidence that the

21  parties want to put on.  But we did our assessment, and we

22  decided that these stipulations really were what the state of

23  the record was and that at the end of the day this is where the

24  record would end up.  So we did our best to try to narrow the

25  issues for the Court.

1    As far as the e-mail goes, I know that the Court was

2    not happy with my not raising sort of precisely what our

3    position would be earlier.  But we did say in response to the

4    Court's question that our argument is that this happened on

5    their watch, the bribery specifically, and that --

6         THE COURT:  Well, a lot happened on their watch.

7         MR. DEEGAN:  Far more than just the bribery.  And I do

8    want to talk about just a couple factual issues too.  But just

9    to round out the bribery discussion, you know, Mr. Green does

10   say that we --

11        THE COURT:  I mean, the prior immigration matter

12   happened on their watch.  The illegal labeling of the eggs

13   happened on their watch.  The backdating of the time that the

14   eggs were processed happened on their watch.  Incredible

15   unsanitary conditions happened on their watch.  I mean, there's

16   a litany of things that happened on their watch.

17        And so what I'm str -- and I made a list, and it's a

18   long one, and it's right out of the presentence report.  It's

19   not like I had to go very far to find these things.  I mean,

20   there's a litany of shameful conduct in my view that happened on

21   their watch.

22        MR. DEEGAN:  Absolutely, Your Honor.  And it's --

23        THE COURT:  But what's the relevance of it?

24        MR. DEEGAN:  Well, because they're responsible

25   corporate officers, it was their responsibility to detect and

1  prevent these things from happening.  And we stuck to, in the

2  government's view, conduct at the company, misconduct at the

3  company, that had a direct relationship to Salmonella.

4         One thing that I want to make very clear is that

5  there's no dispute that the individual defendants, Peter and

6  Jack DeCoster, were generally aware of the environmental

7  positives as they were received.  And they -- that goes back,

8  Your Honor, to the beginning of 2006.

9         THE COURT:  To 2006.

10        MR. DEEGAN:  And I can, you know, make my more general

11  argument later.  But it was an awful long time coming for

12  Hofacre and Nolan to come to Iowa and actually start to address

13  something about the Salmonella contamination problem that they

14  knew they had.

15        So I think this goes a little bit to the due process

16  argument because I do think the Court can rely upon record

17  evidence that they did know about the contamination, and I point

18  to Dr. Davison's very extensive analysis of what happened and

19  what went wrong that created those risks that led to the

20  outbreak.  There's an awful lot that the defendants as

21  responsible corporate officers failed to do.

22        Now, just to round out on the bribery, you know,

23  Mr. Green says we don't have evidence of personal knowledge.

24  Well, the evidence is -- the stipulation is evidence.  We simply

25  in response to the Court's question wanted to say to Your Honor

1    when we stand up that we're not going to be able to say, Judge,

2    we want you to make a finding that on this specific time that

3    there was a knowledge of the bribe.  And we think that would be

4    the case whether or not we had the five-day sentencing hearing

5    or the Court looks at just the stipulation.  That's just where

6    we're at.

7           But we do believe that they should have known what was

8    going on.  We think that there's aggravating circumstances in

9    that event and that vignette, and we do believe that the bribery

10   was designed specifically to thwart U.S.D.A. oversight over

11   quality of eggs.  And Dr. Davison creates a link between checks

12   and Salmonella.

13          So, Your Honor, I don't want to get further off track,

14   but I did want to make those comments.

15          THE COURT:  Well, we're already off track.  That's my

16   doing.  There is something I'm curious about.  As I understand

17   it, paragraph 47 -- well, 45, 46, and 47 aren't objected to in

18   the individual defendant's presentence reports.  It deals with

19   the bribe except with regard to the defendants' alleged lack of

20   knowledge.  So here's one of my questions.  I notice that

21   Anthony Murga was the one who actually carried out the bribe.

22          MR. DEEGAN:  Yes, Your Honor.

23          THE COURT:  Okay.  When I was reading the personal

24   section of Peter DeCoster's presentence report, his ex-wife

25   happens to have the same last name.

1        MR. DEEGAN:  Yes.  It's not a coincidence, Your Honor.

2        THE COURT:  Well, because there's nothing in the

3   sentencing record, you know, I couldn't really consider it other

4   than to note, well, this is interesting, which I did note that

5   it was interesting.  Are they related?

6        MR. DEEGAN:  I understand that at least at the time

7   Murga was the son -- excuse me, the brother-in-law of Peter

8   DeCoster.  I had -- Mr. Dornan can connect me -- correct me if

9   I'm wrong.  And I don't know that that's found in the record

10  either, Your Honor, and I agree it's a significant point that --

11       THE COURT:  Well, it would have been interesting to

12  put in the offense conduct statement and the relevant conduct

13  statement.

14       MR. DEEGAN:  Absolutely, Your Honor, and it seems in

15  retrospect absolutely we should have done so, and I apologize

16  for that.

17       THE COURT:  But it's easy for me to be an armchair

18  quarterback and pick through this stuff when I'm not in the heat

19  of battle like the lawyers are.  So it's not a criticism, but it

20  was something that, particularly when I thought I was going to

21  be deciding the credibility of the stip -- based on the

22  stipulation, it was something very important to me.

23       Mr. Dornan, can you shed any light on it?

24       MR. DORNAN:  They were brother and sister, Judge.

25       THE COURT:  Yeah.  I kind of -- that was my guess, but

1   it was just a total guess.  They could have been unrelated and

2   just shared the same last name.

3           See, facts that are important to me aren't necessarily

4   important to the parties because you don't have -- thank God you

5   don't have the ability to predict what I might look at.  But --

6   so here's something that's super important to me that's not in

7   the sentencing record, and maybe there's nothing that can be

8   done about it.  How long did Mr. Murga work after the

9   responsible corporate executives knew he had bribed an official?

10          MR. DEEGAN:  Well, and, Your Honor, I'll try to point

11  to what there is in the record, but I'll agree that because we

12  don't have a specific date, time, event, even range that we can

13  point to the Court to about when it was discovered, it's

14  difficult to say.  I would say this.  We know there were two

15  bribes, and we know from Peter DeCoster's sentencing memo that

16  he says there was this conversation where the hypothetical bribe

17  came up.  Now, he doesn't identify when that conversation

18  happened in relation to the two bribes.

19          But I believe it's in the record that it would have

20  been one time -- and we know this -- around April 12, 2010.

21  That's because we have a record of it coming out of petty cash.

22  And we believe that was the first bribe.  But the other one

23  happened at some later time.

24          Our argument would be that setting aside the actual

25  knowledge and any particular time issue, the fact that it was

1    allowed to happen twice by a manager at Wright County Egg, at

2    Quality Egg, shows that the responsible corporate officers

3    weren't doing their job and allowed it to happen.

4         THE COURT:  Anybody else want to comment on it?

5         MR. DORNAN:  Your Honor, my understanding is that the

6    bribe was not learned by Mr. Peter DeCoster until after the

7    company had changed hands and was being run by the company that

8    it was sold to.

9         THE COURT:  Well, yes.

10        MR. GREEN:  May I --

11        THE COURT:  Mr. Green, yes.

12        MR. GREEN:  I'm not sure exactly where we are.

13        THE COURT:  Neither am I.  We're kind of wandering

14   here.

15        MR. GREEN:  But there were -- there was misconduct and

16   regrettable conduct that happened at the Quality Egg facilities.

17   There are two individuals, Mr. Murga whose name has just been

18   raised and Mr. Wasmund, who were -- particularly Mr. Wasmund who

19   were principally responsible for these areas of operations and

20   who have made deals with the government.  Mr. Wasmund I think

21   has pled guilty.  I don't know all the specifics of what

22   happened to Mr. Wasmund, but I believe that he was charged with

23   the misconduct that he was responsible for.  And Mr. Murga it's

24   my understanding traded his criminal exposure for immunity.  But

25   these two gentlemen are at the core of what went wrong at

1    Quality Egg.

2            Now, Quality Egg is here before this Court because

3    under the law, as we all know, it is vicariously responsible for

4    the acts of misconduct committed by its employees.  But that

5    does not mean that those who ran Quality Egg at the very top

6    level understood what their employees were doing.  I mean,

7    this -- I mean, it's not unusual that employees below the top

8    tier of management engage in misconduct.  And it is sometimes,

9    you know, a function of their exuberance or whatever it is, but

10   this misconduct was not counselled by either of the individual

11   defendants, wasn't certainly by Austin DeCoster aided and

12   abetted in any way whatsoever.

13           And there have been great strides made at Quality Egg.

14   I don't want this story to be left untold and particularly the

15   story about the Salmonella outbreak.  I mean, there are -- you

16   know, there are very critical details here.  This company was

17   not totally unaware of positive environmental tests prior to the

18   recall in August of 2010.  But no egg company ceases operations

19   and no egg company engages in a nationwide recall when there's

20   environmental test results coming back positive.

21           And when there was an increasing incidence of

22   positives, they went out and hired -- this is all before the

23   outbreak, all before they understood, you know, that there was a

24   major problem here.  They went out and hired two of the best

25   experts in the field to come in and advise them.  That started

1    in 2009 in the year preceding the recall.  And there was

2    significant egg testing in that year that came out negative.

3    And the experts are unanimous, the defense experts are

4    unanimous, that this was a very, very extraordinary, if not

5    unusual, occurrence when the vaccine that were administered to

6    the birds were not administered uniformly, that there were some

7    birds that failed to receive the vaccine.

8            THE COURT:  Well, that's just a -- that's just a

9    theory that these folks concocted.

10           MR. GREEN:  Pardon?

11           THE COURT:  That's just a theory that your experts

12   concocted.

13           MR. GREEN:  Why -- what leads the Court to say that,

14   sir?

15           THE COURT:  Because I read their reports.

16           MR. GREEN:  Well, I respectfully --

17           THE COURT:  Of course, you disagree.

18           MR. GREEN:  Well, the government's expert came in and

19   reviewed paper records and said that she just couldn't find

20   enough attention.

21           THE COURT:  Look, you're -- whoever drafted -- you

22   know, I don't for a second believe the experts actually drafted

23   those declarations which is why I generally don't even allow

24   them to be filed in cases.  I want live testimony.  But you

25   stipulated that the experts were wrong in concluding that their

1    recommendations were followed.

2         MR. GREEN:  Well, it was our -- I believe that the

3    experts would tell you that they believe that their

4    recommendations were followed.

5         THE COURT:  Well, yeah.  But then you turn around and

6    stipulate that that's not true.  So why should I put my reliance

7    on experts who claim their recommendations were followed when

8    the very parties who hired them turn around and debunk that

9    claim by stipulating that there's no evidence that that's true?

10        MR. GREEN:  I think what we were stipulating is that

11   there's no evidence showing that they, the experts, had specific

12   knowledge that every one of their recommendations was followed.

13        THE COURT:  Well, there's no -- there's no evidence in

14   the sentencing record that that's true which is even more

15   important.  But I'm just saying those are -- that's some of the

16   reasons why I think it was -- you don't like the word concocted.

17   I don't put -- I don't put any -- any credence in -- I don't

18   mean concocted that it came out of thin air.  It's a theory.

19   That's all it is.  It's a theory.

20        MR. GREEN:  I don't think it's theoretical when I

21   represent to you that the experts were hired and that they made

22   recommendations and observed that their recommendations were

23   followed.  They're not in a position -- we're not in a position

24   to contend --

25        THE COURT:  No, I'm talking about their theory about

1 the Salmonella outbreak.

2       MR. GREEN:  Well --

3       THE COURT:  It's a theory.

4       MR. GREEN:  I'm sure it is a theory, but I don't think

5 anybody understands precisely how Salmonella gets into the

6 ovaries of a chicken and the chicken thereby sheds the disease,

7 the infection, into the eggs.  We -- I don't think the

8 government knows and we don't probably know exactly how it

9 happened.

10      THE COURT:  I don't disagree with that.

11      MR. GREEN:  So the experts have looked at all the

12 attendant facts and circumstances, and they believe that

13 their -- I mean, it is certainly undisputed that we began to

14 vaccinate birds, and that is a prudent, an extraordinarily

15 prudent, course of action.  And we went from one vaccine -- one

16 vaccination to a second vaccination in an effort to eradicate or

17 reduce the possibility of this disease spreading.  And the

18 experts -- on their recommendation we did that.  And when the

19 experts went back then to try to analyze this, I mean, I think

20 they were acting in utmost good faith in trying to figure out

21 what happened.  And they concluded that --

22      THE COURT:  Was the government's expert acting in

23 utmost good faith?

24      MR. GREEN:  I'm sorry, sir?

25      THE COURT:  Was the government's expert acting in

1  utmost good faith?

2        MR. GREEN:  I think the government's expert was acting

3  in good faith, but I --

4        THE COURT:  But yours were in utmost good faith.  Is

5  that the difference?

6        MR. GREEN:  No.  Then utmost -- I concede utmost.

7        THE COURT:  Okay.

8        MR. GREEN:  I'm not trying to quibble there.

9        THE COURT:  Okay.

10        MR. GREEN:  But the experts that the defense tendered

11  were the hands-on experts.  They were there.  They were the ones

12  wrestling with the problem.  They were on site.  They were

13  making the observations.  I'm not trying to demean the

14  government's expert.

15        THE COURT:  Well, go ahead if you want to.

16        MR. GREEN:  No, I just -- that's not my style.  I'm

17  sure she's an extraordinarily qualified woman.

18        THE COURT:  She seems a lot more qualified than your

19  experts to me based on what I've read.

20        MR. GREEN:  I don't -- I would disagree on that too.

21        THE COURT:  But guess what.  I get to decide that.

22  You don't.

23        MR. GREEN:  You do, Your Honor.

24        THE COURT:  And that's my finding of fact.  The

25  government's expert is much more qualified on the things that

1   she opined on than your two experts were.

2           MR. GREEN:  But she herself does not opine on exactly

3   how this --

4           THE COURT:  I do understand that.

5           MR. GREEN:  -- moved and so forth into this

6   population, poultry population.

7           THE COURT:  But, you know, I'm not going to base any

8   sentencing decision based on the experts.  I actually don't know

9   even why you submitted all those pages of reports.  I read them

10  all, and I studied them.  But it actually has no bearing on my

11  sentence.

12          MR. GREEN:  I think we thought they would be helpful.

13  But if they're not, I understand that.

14          THE COURT:  No, I could see why you submitted them.

15  But you think I'm really going to determine whether somebody

16  goes to prison or not which is the fighting issue in this case

17  based on what any of the three experts said?

18          MR. GREEN:  No, sir, I do not.  I really rose just

19  simply to make the observation about what happened on the watch

20  of my client and as well I presume on the watch of Mr. Peter

21  DeCoster.  And I wanted the Court to be aware of the

22  circumstances surrounding what happened to the other two

23  gentlemen and their responsibility for that.

24          THE COURT:  You know, I did think about writing a law

25  review article about Salmonella now, but -- I'm just kidding.

1    But it's not going to have any impact on my sentencing, so let's

2    not talk about the experts.

3          So let's back up here.

4          MR. GREEN:  Yes, sir.

5          THE COURT:  We started off on the constitutional

6    issue.  A lot of this other stuff goes to something I want to

7    talk about later on, and that are what I consider to be

8    aggravating factors and mitigating factors.  And even though

9    there are some aggravating factors that I see here about the way

10   Quality Egg was run, I don't know whether I can consider those

11   in -- under the 3553(a) rubric, so we'll have to get to that.

12   But why don't we wrap up the constitutional issue.  Is there

13   anything else you wanted to add on the constitutional issue,

14   Mr. Deegan?  I apologize.  I'm the one that got folks off track.

15         MR. DEEGAN:  No, Your Honor.  The government will

16   stand on its brief on the constitutional issue.

17         THE COURT:  And anything you want to add?

18         MR. DORNAN:  I don't have anything to add, Judge, no.

19         THE COURT:  Okay.  Would -- anything else, Mr. Green,

20   that your team wants to add now that I've waived the tag team

21   rule?  Anything else your team wants to add on the

22   constitutional issue?

23         MR. GREEN:  I think we've made all of our arguments on

24   that, Your Honor.  Thank you.

25         THE COURT:  Okay.  So let's get into the application

1   of 3553(a) factors on the two individual defendants.  Before we

2   do that, I have one question with regard to the Quality Egg

3   sentencing, and that is your agreed-upon fine.  And my question

4   is why should I accept that agreement, because by my math I have

5   the power to go up an additional $500,000 and perhaps higher

6   depending upon Count 3 which I plead guilty to being a little

7   bit confused about?  But setting aside Count 3, I clearly have

8   on Counts 1 and 2 the ability, if I want to, to go up an

9   additional half million dollars on the fine.  At least that's

10  the way I understand it.  And I've spent quite a bit of time on

11  that.  But my question is should I even consider that, or should

12  I just be bound by what the parties agreed to, because I have no

13  idea how you agreed to it or why you agreed to it?

14          MR. DEEGAN:  Your Honor, I'll take a shot at

15  responding to the Court's question.  First of all, the fine,

16  both the guideline ranges as well as the specific fine is a

17  joint recommendation in the plea agreement.  I know the Court

18  knows that.

19          THE COURT:  Yeah.

20          MR. DEEGAN:  But I don't want to say anything that

21  would in any way vary from what we've agreed to in the plea

22  agreement, and I'm not going to do that.

23          Your question I understand to be really more not a

24  should question but a authority question.  And I don't disagree

25  that as calculated by the probation office there's extra room

1    there.  We'd ask the Court to defer to the parties' joint

2    recommendation.  It's several million dollars.

3           THE COURT:  Yeah, tell me why.  That wouldn't

4    violate -- I don't want you to violate your plea agreement

5    obviously, but certainly you can argue in support of why you

6    agreed to a specific number without violating your plea

7    agreement.

8           MR. DEEGAN:  Yes, Your Honor.

9           THE COURT:  Yeah.

10           MR. DEEGAN:  And as a factual matter -- and I want to

11    make sure that I'm referring to the right spot -- if you look

12    at -- and this may not be responsive, and I apologize if it's

13    not.  But there's a very extensive paragraph -- excuse me,

14    footnote 16.

15           THE COURT:  Yes.

16           MR. DEEGAN:  That's tagged to 60.  And that's the

17    answer, Your Honor, of how we got to where we got.  It was in,

18    I'll say, utmost good faith on the part of all the parties to

19    try to arrive at a number that was -- that accurately reflected

20    the loss for guideline purposes, and this is where we ended up.

21    And that's how we got to that guideline range of 4.8 million to

22    9.6 million dollars.  And then from there it was a -- simply

23    a -- didn't seem like quite a bottom-of-the-range case or a top

24    range of the case, and this is what we were able to agree upon.

25    I don't know that there's any real magic to it other than that.

1      THE COURT:  I'd like to ask you a question, but feel

2  free to tell me it violates your plea agreement if that's your

3  response.

4      MR. DEEGAN:  Certainly, Your Honor.

5      THE COURT:  Aren't there aggravating factors in this

6  case that would easily justify the additional half a million

7  dollars in a fine?

8      MR. DEEGAN:  Again --

9      THE COURT:  We're talking about the corporation now.

10      MR. DEEGAN:  No.  I understand exactly, Your Honor.

11  And I guess I'll just say that we do ask the Court to impose the

12  fine that's subject to the joint recommendation but that there

13  are a lot of factors and there are a lot of aggravating factors

14  in this case.  And I leave it to the Court I guess then whether

15  or not those would justify something outside of the joint

16  recommendation of the parties.

17      THE COURT:  Okay.  Thank you.

18      Mr. Green, are you going to address this?

19      MR. GREEN:  If you'll permit me to make a couple of

20  observations, Your Honor.

21      THE COURT:  Yes.

22      MR. GREEN:  The amount of the fine was a topic of

23  strenuous conversations.  Government demanded a severe fine, and

24  I think the level of this fine is severe.  And where we got into

25  most of our argument was over, you know, trying to actually

1  calculate what the loss was here.

2          THE COURT:  Yeah, very hard to do.

3          MR. GREEN:  And it became -- it became not only hard

4  but probably impossible.  And it is my belief I feel -- I mean,

5  the government paid a lot of attention to this -- that they

6  brought to the table in the person of Mr. Deegan's arguments

7  that he was making to us all of the factors that bore on their

8  determination of that figure to include anything that would

9  qualify as aggravating because you can argue that there's a

10  probability -- hard for me to measure -- that the actual loss is

11  quite -- you know, quite small in comparison to this figure.

12          So through a lot of discussion and a lot of back and

13  forth we got to this number, and we ultimately agreed not only

14  with the number but to pay the fine, and that fine has been

15  paid.

16          THE COURT:  Right.

17          MR. GREEN:  In total.

18          THE COURT:  A million one was paid last July, and the

19  rest of it was paid on Friday.

20          MR. GREEN:  Yes.

21          THE COURT:  And the clerk who handled it came in and

22  showed me a copy of the check for five million plus, and she

23  said, "Yesterday we got a check for 60 cents.  Look at this

24  check."

25          MR. GREEN:  Well, so it's been -- it's been paid in

1 full already.  So I would urge the Court to accept this figure

2 as one that is the product of a great deal of discussion and

3 thoughtfulness on the part of not just us but agents and

4 accountants.  Everybody had input into this number, and for that

5 reason I think it's a very appropriate number and would ask the

6 Court to accept it.

7          THE COURT:  I appreciate that.  Thank you, Mr. Green.

8          Okay.  Let's move on to considering the -- you know,

9 in every sentencing of individuals I always spend the majority

10 of my time looking at what I consider to be the aggravating

11 factors and the mitigating factors that are in the sentencing

12 record.  So I'd like to address those.

13          Why don't we start on an upbeat note and hear the

14 mitigating factors first.  So, Mr. Dornan, do you want to --

15 you've been silent because it hasn't affected your client.  Your

16 client has a number of mitigating factors that you've raised in

17 your memorandum.

18          MR. DORNAN:  He does, Judge.  Thank you very much.

19 I'd like to start out with lack of a criminal history except for

20 a retail theft at 21.

21          And in particular, Judge -- and you raised this

22 because you had an interest in what exactly happened a number of

23 years ago with respect to the immigration issue.  It's been my

24 experience, Judge, that when a diversion agreement is entered

25 into in any jurisdiction that I've had of a client get

1   diversion, number one, there's an admission of responsibility

2   and accountability that's required.  And number two, if they

3   don't do what they're supposed to do on pretrial diversion, it's

4   automatically a guilty plea, and that's the agreement.  That's

5   remarkably absent in this particular agreement, Judge.  This is

6   as a benign agreement as I can possibly -- that I have ever

7   seen.

8          And I think in part it goes to the fact that, number

9   one, Peter passed a lie detector test with respect to lack of

10  knowledge of any illegals.

11         And number two, that the primary purpose of that

12  agreement was to allow the government to have access to the

13  company to make sure that restorative measures were taken.

14         So I don't -- I don't think the Court can look upon

15  that as any indication that Mr. DeCoster committed any crime at

16  all.

17         THE COURT:  I'm not.

18         MR. DORNAN:  I appreciate that, Judge.

19         THE COURT:  It's just like an arrest to me.

20         MR. DORNAN:  That's right.

21         THE COURT:  It was an arrest.  There was no

22  conviction.  I don't -- I think I've told you this many times.

23  In most presentence reports, I don't even look at the arrests

24  section because I'm not interested in arrests.  And this is the

25  equivalent to kind of an arrest.  Somebody thought he did

something wrong.  They never -- government never pursued it.
They diverted it.  So to me he's absolutely not guilty of that
offense, and I believe that to my core.  So that's not a -- I'm
not going to consider that.

MR. DORNAN:  Thank you, Judge.  He is a mature man.
He is somebody who has a number of family responsibilities that
he is very studious about taking care of.  He's 51.  If you look
at most of the factors, Judge -- and I think I cited a 2004
sentencing commission study concerning the prospect of
recidivism -- Mr. DeCoster meets many of the factors that
mitigates him --

THE COURT:  Well, the company's been sold; right?

MR. DORNAN:  Company's been sold.

THE COURT:  So does he work in the new company?

MR. DORNAN:  Judge, what he --

THE COURT:  See, there are so many different companies
and stuff, so there'd be no possibility of recidivism if he's
not working in the egg industry.

MR. DORNAN:  He's not working in the egg industry,
Judge, correct.  He's working -- basically he's doing work
involving the management of land and properties that are owned
by the family and their related entities.  So you're right.
He's not working in the egg industry.

And in large part, Judge, one of the consequences of
this event is that they were no longer able to be credible in

1    the egg industry.  So that's a consequence, Judge, and a loss of

2    a substantial amount of income to the company and a loss of a

3    substantial amount of material wealth concerning the recall of

4    the eggs that resulted from this incident.

5           Judge, he also has a exemplary record of being

6    involved in the community.  There are a number of letters that

7    reflect that, reflect the fact that he has been extremely active

8    in the local community concerning charitable contributions and

9    not only in the local community but globally, Judge.  And I

10   think when you talk about the history and characteristics of

11   Mr. DeCoster, they are ones that are reflective of tremendous

12   service to humanity.

13          The letter from Dr. Martin -- excuse me, Pastor Martin

14   is about as an impressive letter of charitable acts around the

15   globe that I've -- probably I've had any defendant ever exhibit.

16          And I want to bring up a point, Judge, that I hope the

17   Court thinks is a creative just punishment in this case because

18   it's something that is sorely lacking in the criminal justice

19   system and which Mr. DeCoster wants to do.  And that is what do

20   you do with all the victims here?  What's the best way for

21   Mr. DeCoster to address the harm that has resulted from the

22   sickening of a number of people?

23          Well, Mr. DeCoster wants to take the hard road with

24   respect to that.  And he would like to sit down -- and, of

25   course, the victims have to be willing to do it because victim

1   offender mediation requires that -- sit down and look each one

2   of them in the eye and say, "I am sorry; I am sorry this

3   happened; I want to hear how it's impacted on your family; I

4   want to hear what I can do to restore you, restore the

5   community."  It's something that is, I think, particularly

6   appropriate for this case.

7          I know that Mr. DeCoster is going to address that in

8   his allocution.

9          THE COURT:  Yeah, but he could do that whether I send

10  him to prison or not.  It's not an either/or.

11         MR. DORNAN:  That's true.

12         THE COURT:  You characterize it in your brief as, you

13  know, in lieu of sending him to prison he could do the

14  restorative ju -- I'm a big believer in restorative justice.

15  I've read a number of books about it.  I know a number of people

16  involved in the restorative justice movement.  And it's actually

17  something I was considering doing with my own life after I --

18  whenever I step down as a judge.  But it's not an either/or

19  thing.

20         MR. DORNAN:  I agree, Judge.  But it would --

21  imprisonment would take away his -- and this would -- I guess,

22  Judge, this would significantly disrupt his life, and it would

23  significantly disrupt his life in a positive way with respect to

24  whatever conditions the Court imposes.

25         In addition, Judge, it would impact on his -- on the

charitable acts that he's been doing over the last number of

years.  He began those acts, Judge, in part because of this

occurrence.  He's doing what he can do on his own to provide

back to the community and back to people who are in need as much

as he can.  And I think that's -- you know, that's not

something -- that's in anticipation of whatever the Court is

going to do here today, Judge.  It's a -- it's something that's

in his fiber.  It's in his being.  And --

THE COURT:  Why didn't he do it on his own before

sentencing today?  I mean, if it was something he was so hopped

up about doing, why didn't he just go ahead and do it?  And then

you could come in and say, look, he's done this restorative

justice; he ought to be rewarded for it.

MR. DORNAN:  I can answer --

THE COURT:  You know -- you know what it strikes me

as?  I know you're not going to like this, but it's just like

the 2,000 drug defendants I have that say, you know, Judge, when

I get out of prison after I serve my mandatory minimum 20 years,

I really want to be a drug counselor.  It really is no different

than that to the extent that they're sincere about it.  I assume

your client's sincere about it.  But it's really no different.

Go do -- but why didn't he do it before?  Wouldn't it be more

impressive to me if he had done this on his own or with your

counsel and then you came in and you said, hey, here's how many

victims he met with?

1          MR. DORNAN:  Well --

2          THE COURT:  What were you waiting for?

3          MR. DORNAN:  Well, it requires -- it requires a lot of

4     preparation.  It requires a trained mediator.  It requires --

5          THE COURT:  Yeah, all of that could have been done in

6     a tenth of the time as this case has taken.

7          MR. DORNAN:  Well, Judge, it could have, but it's a

8     process that is rather involved and requires that the victims --

9     and, you know, we're still receiving information as to who they

10    were, what the circumstances were up until this date.  So it

11    would have been a little --

12         THE COURT:  You could have talked to the lawyers that

13    filed the class action lawsuit.  They could have told you that.

14         MR. DORNAN:  Well --

15         THE COURT:  I mean, you're -- no offense, Mr. Dornan.

16    You're just making excuses.  It all -- let me ask you straight

17    up.  This all could have been done before.

18         MR. DORNAN:  Could have been done.

19         THE COURT:  And it wasn't.

20         MR. DORNAN:  Could have been.

21         THE COURT:  And it wasn't.

22         MR. DORNAN:  Correct.

23         THE COURT:  Okay.  So I appreciate he says he wants to

24    do it.  So what?

25         MR. DORNAN:  Well, Judge, I think when you take a look

1  at all of the mitigating factors here and the fact that

2  Mr. DeCoster is somebody who is very conscious of the harm

3  that's been caused, Judge, if you note that when there was a

4  outbreak in Minnesota in 2009 that as soon as Mr. DeCoster found

5  out about it and there was a -- and then it was suspected that

6  the Quality Egg may have been responsible for some of the eggs,

7  he immediately took action with respect to having the eggs

8  tested.  And the eggs tested negative.

9         Judge, I think that goes to his state of mind with

10  respect to responding to an outbreak and doing what he could do

11  to get to the nub of the matter.  If he didn't care about this,

12  Judge, then obviously he wouldn't have responded in the way he

13  did.  And I think that goes to his character and to the history

14  and characteristics of him.

15         So I think that all of those factors, Judge, when the

16  Court is considering imposing a sentence mitigate toward the

17  imposition of a probationary one.  And I think that the added

18  requirements that the Court could impose would be far more

19  proactive with respect to the victims involved here and would

20  allow this Court to send a very clear message that somebody's

21  going to have additional skin in the game other than doing a

22  period of incarceration.

23         So all of the factors here, Judge, with respect to his

24  history and characteristics are in favor of the Court

25  withholding punishment and imposing a term of probation.

1          THE COURT:  I'm confused, Mr. Dornan.  Are you saying

2    that as a condition of probation I have the authority to order

3    your client to do the restorative justice aspects that you've

4    suggested in the brief?

5          MR. DORNAN:  Well, it's a -- it's a condition that I

6    think was -- yes, I do.  I think it's within your authority, and

7    he wants to do it.

8          THE COURT:  Do you have any case law that says I have

9    the authority to order it?

10          MR. DORNAN:  Well, I think you have wide -- you have

11    wide latitude, Judge, in imposing probationary conditions.  I

12    don't think that imposing that sort of thing if both parties --

13    if the victims are willing to do it and Mr. DeCoster's willing

14    to do it, I don't see that as anything that you're prohibited

15    from doing.

16          THE COURT:  Well, I doubt very much that I have that

17    authority but . . .

18          Could I order him to go to a monastery for three

19    months as a condition of probation and not speak to anyone and

20    just meditate about what Quality Egg did?

21          MR. DORNAN:  No, I don't think so.

22          THE COURT:  Okay.  Why is this any -- why is ordering

23    him into a restorative justice program or creating one, why is

24    it any different than ordering him to go to a monastery and

25    meditate about it?  I mean, I understand the result may be

1 better. It could actually help people. But why is it any

2 different in terms of my authority?

3       MR. DORNAN: Well, it's different, Judge, in that he

4 is willing and able to do that, wants to do that.

5       THE COURT: That has nothing to do with my authority.

6 Does it? Does his willing and able have something -- somehow

7 he's willing and able to join the Church of the Latter Day

8 Saints, I can order that? I don't think so.

9       MR. DORNAN: I would agree with that, Judge.

10       THE COURT: Yeah. So being willing and able really

11 has nothing to do with authority; right?

12       MR. DORNAN: Yes.

13       THE COURT: So how is my hypothetical different other

14 than he's willing and able which we've agreed now doesn't affect

15 my authority to order it?

16       MR. DORNAN: I would agree with that, Judge.

17       THE COURT: So do you agree that I don't have

18 authority to order it or that I do have authority?

19       MR. DORNAN: Well, I would suggest that under these

20 circumstances with a willing defendant who's willing to do that

21 that you could.

22       THE COURT: Well, I think what that means is if I

23 ordered it he would do it because he's willing and able.

24       MR. DORNAN: Correct.

25       THE COURT: But I don't want to order something I

1    don't have the authority to do.

2          MR. DORNAN:  I understand your position, Judge.

3          THE COURT:  Now, we haven't taken up this one little

4    piece of the stipulation in the e-mail that's left, and that

5    regards your client.  So why don't we do that now.  And then

6    we'll turn to the aggravating factors because it's potentially

7    an aggravating factor, but I have to decide it first.  And that

8    is this issue about whether your client had -- made or had

9    knowledge of misrepresentations at the Wal-Mart meeting.

10         MR. DORNAN:  Correct.  Judge, the exhibits would

11   reflect that there was a presentation that was mailed to

12   Wal-Mart, would have been six days before the actual

13   presentation that involved -- I believe it's Government Exhibit

14   4 that showed that there was -- there was not any material

15   concerning flock testing and no false statements with respect to

16   that.

17         The testimony or the lack of testimony that you have

18   here today I think would go back to the point that this Court

19   was making earlier as far as how do you decide what you're going

20   to consider and what you're not going to consider.  Judge, the

21   case law states that as far as any objection to the presentence

22   report that the Court can either or must either make a finding

23   as to whether a disputed fact exists or state that it will not

24   take into -- will not take the disputed fact into account if the

25   Court chooses to make a finding with respect to disputed facts.

1    I don't think that the Court has enough evidence to

2    make a finding based on the record before it that Mr. DeCoster

3    did anything inappropriate with respect to making false

4    statements at the Wal-Mart meeting.

5    You have -- and I've been in front of this Court many

6    times, and I know that this Court really wants live testimony.

7    But you don't have to. You have conflicting testimony here,

8    Judge. You have Mr. Crawford's statement that this clean

9    presentation was mailed in advance of the meeting. It makes no

10   sense at all that the government is arguing -- or the

11   government's arguing that that would get lost and we wouldn't

12   have that. I mean, that's -- that's not a strong argument.

13   And you have Mr. Crawford himself who, while his

14   memory is not completely clear, his notes would be reflective of

15   the fact that with respect to SQF testimony that that had to do

16   with a future occurrence in September of '09 and had nothing to

17   do with Mr. DeCoster making a statement concerning SQF

18   certification.

19   So I think that this is a wash, Judge, with respect to

20   the evidence that was presented to you by both Mr. DeCoster and

21   the government.

22   THE COURT: Well, what's the significance of the name

23   tag as I understand it on the exhibit with the inaccurate

24   representations in that exhibit? I realize that's a different

25   exhibit than what Mr. Crawford mailed.

1          MR. DORNAN:  You know, there were --

2          THE COURT:  But how do you explain that name tag?

3          MR. DORNAN:  Well, there were a number of different

4     proposals that had been made.  And where they ended up in a file

5     and whether or not that was proposals -- that was one proposal

6     that had previously been done but was not the proposal that

7     Mr. DeCoster gave, it doesn't mean that in the subpoena and

8     where that presentation was ultimately stored that that name tag

9     didn't get thrown in with more than one proposal.

10         THE COURT:  So the name tag gets thrown into a file

11    and affixes itself to the proposal that is contrary to your

12    client's best interest.  That doesn't make any sense.

13         MR. DORNAN:  Well, I don't --

14         THE COURT:  Seriously?  Let me try this.  Isn't the

15    most logical explanation is that Mr. Crawford mails one with no

16    incorrect statements in it?  Mr. Crawford mails that to

17    Wal-Mart.  I'm assuming Wal-Mart receives it.  Isn't the most

18    logical explanation of how Mr. Peter DeCoster's name tag gets on

19    the version that's inaccurate is that that's the version he had

20    with him at the meeting and when he left the meeting he put his

21    name tag on it?

22         MR. DORNAN:  Well, it's possible, Judge.  That is an

23    explanation.

24         THE COURT:  Well, you tell me a better explanation.  I

25    like mine better.  I'm just throwing it out there.  I haven't

1   made a finding of fact.  But I like mine better than your

2   suggestion that a name tag was thrown in some file and then it

3   auto -- it kind of affixes itself to the incriminating document.

4   That's fanciful.

5           MR. DORNAN:  Well, we're --

6           THE COURT:  I mean, I have a good sense of reasonable

7   doubt and all, but that's -- in this sentencing all my findings

8   of fact have to be by a preponderance.  But that pushes fanciful

9   to me.  I'm kind of surprised that was your best shot at it.

10          MR. DORNAN:  Well, I would say, Judge, that the better

11  explanation is that there would have been no reason for the

12  final or the report that was sent six days before -- and there

13  is evidence that Wal-Mart did receive it; we have that

14  receipt -- that in preparation of giving that presentation there

15  would be no reason why Mr. DeCoster would not have used that

16  report.

17          THE COURT:  Because it makes it a stronger

18  presentation to use the report he had --

19          MR. DORNAN:  Well --

20          THE COURT:  -- if they're trying to get the business.

21          MR. DORNAN:  Well, I think the background of that

22  meeting, Judge, was that it was primarily going to be concerned

23  with pricing.  But why would you go through the trouble of six

24  days before providing a presentation and having Wal-Mart have it

25  and giving it to them as what you are representing your company

1  is doing and then not follow through with it at the

2  presentation?

3        THE COURT:  Because in the interim he came up with

4  some better ideas with what might impress Wal-Mart.  People

5  change presentations all the time.  I've done almost 400 CLE

6  programs where I've sent -- the vast majority of them I've sent

7  a PowerPoint ahead of time.  Never once have I used the

8  PowerPoint I've sent because I've always made changes to it in

9  the interim, sometimes the morning of.

10        So it doesn't strike me as odd that you send a

11  presentation to Wal-Mart and then you make changes in it to try

12  and enhance the persuasiveness of the presentation.  I mean,

13  doesn't that jive with kind of common experience?  I don't know

14  that that's what happened here, but wouldn't that be a more

15  reasonable explanation?

16        MR. DORNAN:  Well, possibly.  But another reasonable

17  explanation, Judge, is that was a -- that was a presentation

18  that eventually was subpoenaed or found was a previous

19  presentation that had been altered six days before by the one

20  that was actually physically sent to Wal-Mart as the hard core

21  copy.  You could look at that both ways, Judge.  You could look

22  at it as the way that you just expressed.  Or you could look at

23  it and that was an old presentation, one that had not been

24  refined but was refined six days before.

25        THE COURT:  Well, more than six days before, right,

1   because when you say refined --

2           MR. DORNAN:  More than six days before it was sent,

3   yeah, because the presentation --

4           THE COURT:  In other words, the inaccurate

5   presentation with the false representations was first.

6           MR. DORNAN:  Correct.

7           THE COURT:  And then when someone realized there were

8   false representations in it, they took it out, and then

9   Mr. Crawford sent the one with no --

10          MR. DORNAN:  Correct.

11          THE COURT:  Yeah, I think that's a great explanation,

12  and it's one I would very much like to believe in.  The problem

13  is there's no real explanation then about how the name tag gets

14  affixed to it, and that's why I find it implausible or less

15  plausible.  It's not implausible.  It's less plausible than

16  there was a person at the meeting with the false report that

17  affixed Peter DeCoster's name tag to it.  And because I assume

18  there's no evidence that somebody else was wearing

19  Mr. DeCoster's name tag, he was the person that took his name

20  tag off and affixed it to the presentation so you would remember

21  that's the presentation I gave because it has the name tag on

22  it, something I've also done on many occasions too.

23          MR. DORNAN:  Well --

24          THE COURT:  Isn't that the most plausible explanation?

25          MR. DORNAN:  If in the period of time, Judge, between

1    the making of the presentation, putting this presentation in a

2    file, and other people in the company having access to that or

3    taking the name tag and putting it in there -- there were other

4    people from --

5             THE COURT:  And maybe Mr. Murga did it.

6             MR. DORNAN:  Well, I don't think Mr. Murga was at the

7    presentation.

8             THE COURT:  No, no, he's the one that went in the file

9    and put the name tag on it to frame his brother-in-law.

10            MR. DORNAN:  Well, I'm not --

11            THE COURT:  Or his ex-brother-in-law.

12            MR. DORNAN:  Well, I'm -- all I'm saying, Judge, is

13   that the time frame between the making of this presentation and

14   the fact that it was subpoenaed by the government, I guess if

15   you look at it that way -- and Mr. DeCoster knew that that was

16   attached to it, that he had ample opportunity to take it off.

17   You know, I guess if you're looking at bad intent, I guess he

18   would have had ample opportunity to take it off.

19            THE COURT:  How many times in the last 20 years have

20   you worn a name tag?

21            MR. DORNAN:  You know, when I was running for county

22   attorney, I wore it quite a bit.

23            THE COURT:  But you go to conferences.

24            MR. DORNAN:  Yes.

25            THE COURT:  You have -- or I guess Nebraska doesn't

1  have required CLE, does it?

2            MR. DORNAN:  It does.

3            THE COURT:  Oh, it does now?

4            MR. DORNAN:  Yes.

5            THE COURT:  Yeah, I think they were one of the

6  holdovers.  So when you go to a CLE program, you get a name tag;

7  right?

8            MR. DORNAN:  Yes.

9            THE COURT:  You ever go back to your office and put

10 that name tag in a file?

11           MR. DORNAN:  Sometimes I'll put it -- sometimes it

12 will go in whatever file I took with me.

13           THE COURT:  Right.

14           MR. DORNAN:  Sometimes.

15           THE COURT:  Right.  But you never go back to the

16 office and put it in some kind of file.  You never go to a CLE

17 program in Lincoln and drive back to Omaha and then go into your

18 office and take the name tag off and put it into some kind of a

19 file, do you?

20           MR. DORNAN:  Probably not, no.

21           THE COURT:  Probably not, right.  But isn't that what

22 you're suggesting is the most probable thing that happened here?

23 They fly back from the meeting with Wal-Mart folks in Arkansas,

24 and somehow this name tag gets put in a file in the Northern

25 District of Iowa?  That just doesn't seem to jive with your

1  common experience and mine.

2  　　　　MR. DORNAN:  Sometimes, Judge, things that appear to

3  be what they are are not.

4  　　　　THE COURT:  Okay.  So let's assume that I'm right and

5  I'm going to make the following finding of fact.  Mr. Peter

6  DeCoster put that name tag on the printout of the presentation

7  that contained false information.  Let's assume I make that

8  finding of fact.

9  　　　　MR. DORNAN:  I don't think it's relevant.

10  　　　　THE COURT:  It's not relevant to this contested issue?

11  　　　　MR. DORNAN:  I don't think it's relevant with respect

12  to -- I think it's relevant to the contested issue, yes.

13  　　　　THE COURT:  Okay.

14  　　　　MR. DORNAN:  I don't think it's relevant with respect

15  to your sentencing.

16  　　　　THE COURT:  Okay.  But before we get there, let's

17  assume I'm right and you're wrong and you kind of see that's

18  probably how it's going to go; right?  Are you seeing that?

19  　　　　MR. DORNAN:  Yes.

20  　　　　THE COURT:  Okay.  That doesn't establish that he made

21  any false representations in the presentation, does it?

22  　　　　MR. DORNAN:  No.

23  　　　　THE COURT:  So why don't you argue that?

24  　　　　MR. DORNAN:  Well, I have in part, Judge.  I have in

25  part because there is a -- grand jury testimony and a letter

1  from Mr. Crawford which states that he doesn't have any

2  recollection of any statements related to flock testing or the

3  SQF other than the 2009 one.

4          THE COURT:  And nobody at that meeting did either.

5  The government didn't produce any evidence that anybody at that

6  meeting claimed that there were false representations made.  Did

7  the government produce that evidence?

8          MR. DORNAN:  Not here today, no, Judge.

9          THE COURT:  Anything else you'd like to argue?

10         MR. DORNAN:  No, Judge.

11         THE COURT:  Mr. Deegan?

12         MR. DEEGAN:  Thank you, Your Honor.  On the Wal-Mart

13  presentation issue --

14         THE COURT:  Yes.

15         MR. DEEGAN:  -- just getting to the Court's last

16  point, it is part of the stipulation -- and I believe that

17  there's portions in the presentence report too -- that two other

18  participants in the meeting would testify that those topics were

19  discussed.  The flock testing, the SQF --

20         THE COURT:  And which paragraph is that now?

21         MR. DEEGAN:  I'm looking at Government's Exhibit 1,

22  the stipulation, if the Court will indulge me for a moment.

23         THE COURT:  Five?

24         MR. DEEGAN:  Yes, Your Honor.  I believe that's

25  correct.  I believe it's 6, Your Honor.

THE COURT:  So not only do you have the Wal-Mart employee testifying to that, but you also have Alison Marshall who worked at Quality Egg testifying that those subjects were discussed.

MR. DEEGAN:  Yes, Your Honor, that's correct.

THE COURT:  Well, I thought you told me there wasn't any evidence of those.

MR. DORNAN:  Well, at today's hearing, Judge, with respect to live testimony but not with respect --

THE COURT:  Oh.  So when you meant today's hearing -- I didn't understand what you meant by that, but now I do.  So there's testimony in a stipulation that you agreed to that I should disregard even though the parties agreed to it, and I should disregard it because I have a preference for live testimony.

MR. DORNAN:  I would -- I would say --

THE COURT:  Seriously?

MR. DORNAN:  Well, Judge, I would say that with respect to this particular issue, this is what they would testify to if called.  But with respect to our evidence and what Mr. Crawford would testify to if called would be that he didn't remember the flock testing policy, the SQF program being discussed.

THE COURT:  Well, that's not inconsistent with paragraph 6.  It's just that Mr. Crawford -- he's a busy guy.

He's got his finger in a lot of important things.  This happened

quite a while ago.  He doesn't remember it.  But a witness who

was there does remember it.  So why would that witness have a

motive to fabricate?

MR. DORNAN:  I don't know the -- I don't know the

circumstances, Judge, with respect to the government's contact

of that witness and the discussions related to this.

THE COURT:  And what would Alison Marshall's motive be

to testify that the version of the presentation presented at the

meeting contained the inaccurate statements about Quality Egg's

flock testing policy and its SQF program?

MR. DORNAN:  I don't know the answer to that, Judge.

THE COURT:  Disgruntled ex-employee?

MR. DORNAN:  I don't know.

MR. GREEN:  May Mr. DeCoster be excused for a moment?

THE COURT:  Yes.  Matter of fact, we've kind of pushed

the limits here.  Why don't we take a recess until 11:30.  Thank

you.

(Recess at 11:05 a.m.)

THE COURT:  Thank you.  Please be seated.

Mr. Deegan?

MR. DEEGAN:  Thank you, Your Honor.  I'd like to

respond to just a few things with regard to Wal-Mart, first of

all.

In addition to the portions of the stipulation that we

1    pointed out, we'd also point out that also paragraph 6, the

2    parties stipulate Jerry Crawford who was present at the meeting

3    would testify that while he does not specifically recall what

4    was discussed that he believes that those two items weren't

5    discussed.

6         Then we pointed out in our brief, of course, that his

7    notes talk about SQF, and then we have now grand jury testimony

8    where what he says is I assume that that's what that means.  But

9    I think the state of the record is that if Mr. Crawford had

10   testified that bottom line is he doesn't have a specific

11   recollection of what was discussed at the meeting while the

12   other two folks that we mentioned in the stipulation do recall

13   what happened, and they say that those items were discussed.

14        The other thing I'd like to point out is if you look

15   at -- first of all, I'd invite the Court to take a look at

16   actually the original exhibit which was just on the Court's

17   bench, Exhibit Number 3.  That's -- we had marked for the Court

18   the actual one that we got from the company only to make the

19   point that it is bound.  It's got a nice plastic cover on it.

20   It's multi-color.  And there's a couple things I want to point

21   out that weren't in our brief.

22        First of all, if the Court looks at the table of

23   contents which is, I guess, on page 4, it's numbered 1 through

24   15.  Of course, the flock testing policy is at tab 10.  Then the

25   Court can easily go to tab 10 and see the flock testing policy

1   that we're talking about, and the other items are in there as

2   well.  If the Court looks at the Crawford version at the table

3   of contents, you'll notice that it starts at 4, goes to 6, and

4   then it's kind of a mish mash of numbers going all the way

5   through.  That's Exhibit 4, and I'm referring to page 3.

6        The government submits that that is indication that

7   this is really a draft.  You'll see from the stipulation that

8   only one version was produced from Mr. Crawford and it was from

9   his digital records.  So that I think indicates that this can't

10  be the one that was discussed at the meeting.

11       The other thing I'd like to point out for the Court is

12  if you flip the page on the Crawford version and now you're at

13  page 4, at the very top there's a confidentiality agreement, and

14  it says Fareway Stores and Wright County Egg hereby agree as

15  follows.  And then the correct Quality Egg -- or excuse me,

16  Wal-Mart is at the signature line.

17       But this, I believe, is a draft because if you look at

18  Government's 3 which we believe was the one that was actually

19  discussed, that error has been corrected.

20       All of those I believe, Your Honor, are indicate --

21  Your Honor, the government doesn't get an exhibit really as

22  compelling as this very often, and if you'll flip to the back

23  cover you can see that that is -- that name sticker is stuck to

24  the back cover, and the government feels like there's ample

25  evidence to find by a preponderance that that was the one that

1   was presented at the meeting in Arkansas.

2           THE COURT:  Thank you, Mr. Deegan.

3           Would you like to respond to the government's

4   argument, Mr. Dornan?

5           MR. DORNAN:  Judge, just to say that the -- we

6   disagree with the fact that flock testing was discussed.  In

7   Exhibit Number 4, Judge, there is no reference to flock testing

8   being discussed and that the better evidence would be

9   Mr. Crawford's notes with respect to what did or didn't happen

10  at the meeting.  The government hasn't presented any evidence of

11  any notes from the Wal-Mart representatives with respect to what

12  happened at that meeting, and that is --

13          THE COURT:  Well, you know, I think I asked you this,

14  but what motive would Wal-Mart have to -- for that Wal-Mart

15  person to fabricate her testimony?

16          MR. DORNAN:  Well, the -- Alison Marshall?

17          THE COURT:  No.  She's the Quality Egg person.  The

18  Wal-Mart person.

19          MR. DORNAN:  Well, I can't speak to --

20          THE COURT:  It's, you know, paragraph 6.  The parties

21  stipulate that the Wal-Mart employee present at the meeting

22  would testify.

23          MR. DORNAN:  I can't speak to what transpired between

24  the government and the Wal-Mart witness, purported witness,

25  Judge, between the time that this presentation was made until

1　this action was brought against Mr. DeCoster.  But I again would

2　urge the Court to consider the fact that you have conflicting

3　testimony here.  You don't have live testimony that's been

4　presented.  And I would ask the Court to not consider this fact

5　that's in dispute as evidence.

6　　　　THE COURT:  Well, but you didn't have to sign the

7　stipulation.  You could have put the government to their burden

8　of proof, or even having signed the stipulation you could have

9　subpoenaed that Wal-Mart witness and put her on.  I would have

10　given you permission to lead her because she's adverse, and you

11　could have cross-examined her.

12　　　　MR. DORNAN:  I could have, Judge, but it's not my

13　burden.

14　　　　THE COURT:  Well, I think the government's more than

15　carried its burden based on paragraphs 5 and 6, particularly

16　that they have -- that two -- one Wal-Mart employee and one

17　employee of Quality Egg were willing to testify that Peter

18　DeCoster discussed the Quality Egg's flock testing policy, its

19　HACCP and SQF programs, and that that discussion contained

20　inaccurate statements about flock testing policies and SQF.

21　　　　And, you know, the government has a very plausible

22　and, I find, believable explanation between Exhibits 3 and 4,

23　and that is that the one that Mr. Crawford had was a draft which

24　kind of makes sense he'd send a draft to the lawyer to review

25　and that -- but the real -- I mean, I just think it's -- a very

strong piece of evidence is the name tag, and there's just no

logical explanation for how it gets in this -- how it gets

attached to Government's Exhibit 3.  There's just no logical

explanation for it other than Mr. DeCoster attached it and that

that was the one with the -- and then pointing out the Fair View

or Fareway and Wal-Mart.  Clearly was a draft.  Table of

contents had a gap in it.  So that's not a difficult finding to

make.  I mean, I think the evidence is very strong that

Mr. DeCoster made false statements to Wal-Mart at that meeting.

Yes.

MR. DEEGAN:  And, Your Honor, if this is an

appropriate time, I'd like to speak briefly to the restorative

justice proposal and again understanding we're not advocating

for one particular type of sentence.  But Peter DeCoster has

asked that the Court consider that.  Of course, under the

3553(a) factors, one factor the Court's to consider is the types

of sentences available.  And I don't know of authority for

ordering this type of --

THE COURT:  Well, I think I can consider that he wants

to do it.

MR. DEEGAN:  I believe -- and I think that's the

point.

THE COURT:  Sure.  That's under history and

characteristics of the defendant.  You'd interpret broadly,

which I do, the fact that he wants to engage in restorative

1  justice project concerning the victims in this case as both -- I

2  mean, it's admirable.  But I just don't think I have the power

3  to order it.

4       MR. DEEGAN:  And, Your Honor, the fact that the Court

5  was willing to take him at his word when he says this is

6  something he wants to do really means a couple things.  Number

7  one, that as long as the victims who, by the way, have a right

8  not to participate if they don't want to, but if they want to

9  meet with him and he's genuine in his approach to meet with

10 them, then it will happen.  There are a couple lawyers that

11 represented the vast majority of folks that were identified, and

12 he can contact them.  So it will happen.

13      The other component of the proposal is restitution

14 which the Court can order without this sort of extraordinary

15 probationary condition.

16      THE COURT:  And the parties have stipulated to

17 restitution.

18      MR. DEEGAN:  That's correct.  So again, all of this

19 can happen.  I think, though, that, again, on the topic of the

20 types of sentences available, when Mr. Peter DeCoster says this

21 is something I really want to do, well, it's at the end of the

22 day not all entirely his choice, and you have to consider, of

23 course, the need for adequate deterrence and what is that --

24 what message is that going to send again to the next company

25 who's looking perhaps at this case and looking at the

1  consequences of what can happen.

2       If it's as simple as, well, he decided that his -- he

3  would like to sit down and talk to the victims -- and, again,

4  that's laudable for him wanting to do that, but I don't know

5  that it has -- I think the Court needs to weigh whether or not

6  that provides an adequate deterrent effect or not.

7       THE COURT:  Well, it certainly has nothing to do with

8  general deterrence.

9       MR. DEEGAN:  I think that's correct, Your Honor.

10      THE COURT:  And I don't think I'm going to make a

11  finding that Peter DeCoster needs specific deterrence.  So I

12  think it's kind of unrelated to deterrence.

13      But does the government have a view about my point?

14  You know, in the analogy to the drug defendants, they're all

15  incarcerated, so they can't go out and become a drug counselor,

16  you know, prior to their sentencing, and those move on a much

17  faster track than this case did.  He's had well over a year.

18  When was -- when were they originally notified of the

19  information?

20      MR. DEEGAN:  Your Honor, I don't have a specific date,

21  but we would have been in discussions with the company for a

22  very long time.  It's been well over a year.  It's closer to

23  three.

24      THE COURT:  Closer to three years.  So my point is

25  Mr. Peter DeCoster had ample time to engage in any restorative

 1  justice he wanted to.

 2         MR. DEEGAN:  Yes, Your Honor.

 3         THE COURT:  And doing something is a lot more

 4  persuasive than saying somebody's going to do it, to me.

 5         MR. DEEGAN:  Yes, Your Honor.

 6         THE COURT:  Any response you'd like to make on that

 7  one?

 8         MR. DORNAN:  No, Your Honor.

 9         THE COURT:  Okay.  You want to talk about aggravating

10  factors for Mr. Peter DeCoster?

11         MR. DEEGAN:  Yes, Your Honor.  And I don't -- we filed

12  a sentencing memo where we address what we believe for the

13  individual defendants are the key aggravating factors.  And I

14  don't want to repeat what's in there but just to summarize a

15  number of things having directly to do with food safety at

16  Quality Egg that either weren't done or they played lip service

17  to like the independent AIB audits, like a HACCP plan, things

18  that were required from a large customer of theirs and, you

19  know, rather than having those in place, the company fabricates

20  documents at audit time, changes practice at audit time.  And

21  these aren't really -- they aren't very real food safety

22  programs.  And I think that's something that as the chief

23  operating officer on the ground, Peter DeCoster needs to be

24  responsible for.

25         They do relate to Salmonella and the outbreak that

1    occurred.  I think if the Court reads Dr. Davison's report,

2    there is a link between a lot of these items, things like check

3    detectors, et cetera, excess checks that increase the risk that

4    there's going to be a Salmonella outbreak.

5         And, of course, to the government the key fact here is

6    that the company, while it wasn't legally required to, was doing

7    Salmonella testing and was getting positive results that

8    increased as you approached the time of the egg rule in 2010.

9         That actually raises another, I think, significant

10   point about timing.  There is evidence in the record regarding

11   them hiring two experts, one for rodent control and one for

12   other issues including addressing Salmonella in Iowa, but

13   neither of those individuals were hired to come into Iowa and

14   address the problem of the -- of too many environmental

15   positives or a contamination in Iowa until early 2010.

16        Why is that important?  Because it was July 9 of 2010

17   that the egg rule was coming into effect.  That was when they

18   were going to be legally required to do environmental testing.

19   And if they had positives, they were going to have to suddenly

20   test some eggs.  And if those came back positive, then they're

21   going to have to divert.

22        That's -- so what was happening is Quality Egg's about

23   to get hit in the pocketbook with their contamination problem.

24   Up until that point, they didn't test an egg.

25        Now, there is -- in the stipulation we talk about the

1  fact that there was this one incident in 2009 when Peter

2  DeCoster was notified by the FDA that there was a possible

3  outbreak -- there was an outbreak at a facility that got eggs

4  from Wright County and turns out it was not them, but Peter

5  DeCoster tested some eggs in response to that call.  That was

6  not in response to environmental positives.  And I'd submit to

7  the Court that on this record they didn't do anything in

8  response to environmental positives until 2010 when the egg

9  rule's coming online and suddenly they're going to have to be

10  legally responsible for doing something.

11        There's some discussion about dry cleaning of barns.

12  But if the Court reads the record very carefully, they dry

13  cleaned all their barns.  That's just what you do between

14  flocks.  They didn't change that because they had an

15  environmentally positive barn.  Significantly, they'd never

16  tested or retested to make sure that a barn was coming back SE

17  negative before putting a new flock in.  That just didn't

18  happen.

19        They never diverted eggs, and until the egg rule went

20  into effect on July 9, 2010, they never tested an egg for

21  Salmonella, not one time, because of an environmental

22  contamination problem at Wright County Egg.

23        So there's just far too little that was done to try to

24  prevent the possibility of an outbreak, and by the time they

25  were doing -- taking certain steps and having somebody come in

1    to actually address the problem in Iowa, the outbreak was

2    already underway.

3          And, Your Honor, be happy to try to address other

4    areas in the record, but those are the basic aggravating facts

5    that the government sees when it comes to the individual

6    defendants and Mr. DeCoster, Peter DeCoster, in particular.

7          THE COURT:  Mr. Dornan, anything else you'd like to

8    add?

9          MR. DORNAN:  Just to reference, again, the April of

10   2009 action by Mr. DeCoster concerning when the FDA contacted

11   him concerning the outbreak, he took immediate action to address

12   it.

13         THE COURT:  Okay.  Why don't we move to Austin Jack

14   DeCoster, and you can talk about the mitigating factors.

15         MR. GREEN:  Your Honor, please, just listening to

16   Mr. Deegan for the last couple of minutes, I must say I'm a

17   little bit confused.  His argument seems to be that before a law

18   is passed and before there are obligations to do things you're

19   under an obligation to do things.  And then when the law is

20   passed and you're under an obligation to do something and then

21   you do it, all of that, you know, amounts to an aggravating

22   circumstance.  That makes absolutely no sense to me.

23         Now, one thing is indisputable, and I wish -- I'm not

24   in a position to, you know, make this representation to you.

25   But I'm going to say it anyway, and that is that all egg

1    producers in the United States of America and elsewhere

2    experience positive results from environmental testing.  There

3    is no rule, there is no obligation that when you get positive

4    tests from -- positive results from environmental testing that

5    you have to recall eggs, shut down your plant, or do anything

6    else.  It's a matter of judgment.  And it remains a matter of

7    judgment.  And the egg rule changed a few things, and this

8    company abided by the egg rule.  There's no allegation that it

9    violated the egg rule.

10           Now, before the recall, before the recall, there were

11   environmental test positives.  Tests came back positive.  The

12   company did not sit on its behind and do nothing; okay?  It did

13   react.  It fumigated.  It cleaned out barns.  It implemented

14   rodent control measures.  It did a variety of things.  And I

15   think they're set forth in our sentencing memorandum.

16           The point is that despite those practices, okay, there

17   was an outbreak of unprecedented proportion, clearly unusual and

18   unanticipated, which occurred at the facilities in Iowa.

19           Counsel for the government says, well, they did some

20   egg testing, and, okay, the egg testing came out negative.  You

21   can't do a better test than test eggs and have them come out

22   negative.  But he says -- but he says, well, that really wasn't

23   in relation to a particular positive environmental test.  What's

24   the difference?  It all goes into the mental calculus of what's

25   happening on your property and what measures you need to take

1 and what's reasonable under the circumstances.

2        What really happened here is is that as the incidences

3 increased of positive test results and environmental test

4 results now, the company did ramp up its activity. And then the

5 outbreak occurred.

6        And what this company did is it voluntarily

7 recalled -- they didn't wait for administrative orders. They

8 didn't wait for the skies to open up and thunder and lightning

9 to happen. They voluntarily recalled millions and millions of

10 eggs. They took them off the market, first in one massive

11 recall, then in a second recall.

12        As a result of that, they lost millions and millions

13 of dollars of revenue. They lost countless numbers of

14 customers. They lost so much business and so much revenue and

15 their reputation took such an enormous hit that the company was

16 on the path to its own demise. And eventually all egg

17 operations everywhere were sold.

18        And there were -- I just want to go back and make a

19 point about environmental testing. There were positive

20 environmental tests in Maine as well which the company

21 understood and reacted to. But there was no Salmonella outbreak

22 there. The point is environmental testing positives do not

23 equate with a Salmonella outbreak. So there were a set of other

24 circumstances like a perfect storm which came together to create

25 this unfortunate and very tragic situation and one for which

1  Austin DeCoster will apologize when he stands here in front of

2  you.

3          As far as his reaction after that, he undertook

4  diligently to see that anyone who was injured through this

5  outbreak, that their claims were recognized and paid for.  There

6  were millions of dollars of claims paid for by insurance.

7          THE COURT:  Where is that in the sentencing record?

8          MR. GREEN:  Pardon?

9          THE COURT:  Where's either one of those statements in

10  the sentencing record?

11          MR. GREEN:  I believe it's in our memorandum.

12          THE COURT:  Yeah.  Well, that's a good point.  Do you

13  see a difference between a fact that I make at sentencing based

14  on contested evidence -- I've only made one really here, and

15  that was with regard to the Wal-Mart meeting -- or -- or the

16  other way facts can get into the sentencing record is

17  uncontested portions of the presentence report.  So I'm now

18  adopting as findings of fact all of the uncontested portions of

19  the presentence report.

20          But putting a piece of information in a sentencing

21  memorandum does not make it a fact.  Let me give you an example.

22  You're -- one that comes clearly to mind is 16 million dollars

23  worth of donations by Austin DeCoster in the last 14 years --

24  I'm sorry, in the last 4 years, you had that in your sentencing

25  memorandum.

1          MR. GREEN:  Yes, Your Honor.

2          THE COURT:  There's not a shred of evidence to support

3   that in the sentencing record other than some of the letters

4   that talk about things that he's done that would require money.

5   But there's nothing that quantifies it.  There's no spreadsheet.

6   There's no certified audit.  There's no financial information

7   whatsoever about this 16 million dollars.  That's just something

8   you throw into the sentencing memorandum, and I guess you expect

9   me to swallow it as a fact.  But it's not a fact.  And the two

10  things that you just mentioned, they're not facts either.

11  They're argument.  But unless -- but the only thing you can

12  argue is based on facts in the sentencing record.

13         It seems to me that that's very elementary.  But I

14  constantly have lawyers who don't see the difference between a

15  fact that you can argue from and putting a fact -- putting an

16  alleged piece of -- alleged fact or information in a sentencing

17  memorandum and expecting me to accept it as true.  I don't.

18         MR. GREEN:  Well --

19         THE COURT:  Nor should I.  It would violate my oath.

20  That's not a fact.

21         MR. GREEN:  Your Honor, in the traditional setting of

22  a courtroom, you're absolutely right.  It's not an established

23  fact because I did not support that with documentary evidence.

24         THE COURT:  Right.

25         MR. GREEN:  But I assure you that I would not say that

1  to you if I did not believe that to be true.

2          THE COURT:  Oh, I know you believe it to be true.

3  But, you know, if I took as a finding of fact everything that a

4  lawyer believed to be true, that would be a pretty bizarre

5  situation.

6          MR. GREEN:  These two examples that we've just talked

7  about are demonstrable, and so if the Court feels that there's

8  been a deficient showing here, I mean, I think in very, very

9  short order I could -- I could substantiate that.

10          THE COURT:  Well, I asked at the beginning of the

11  hearing if anybody had any witnesses.  The answer was no.  So,

12  you know, if you didn't understand the difference between fact

13  and argument before now, I apologize.  But . . .

14          MR. GREEN:  No.  I understand your point.  But I do --

15          THE COURT:  Well, there's no buts about it, see.

16  That's the difference, Mr. Green.  There is no but.  You had a

17  chance to put on evidence.  You elected not to.

18          MR. GREEN:  I think Mr. DeCoster may be able to give

19  some evidence --

20          THE COURT:  That's not evidence.  It's an allocution.

21  It's different than evidence.

22          MR. GREEN:  Very well, sir.

23          THE COURT:  I consider allocutions, but it's not

24  evidence.

25          MR. GREEN:  Your Honor, with respect to -- let me

1  address the concept of deterrence here both on the part of

2  Quality Egg and on the part of Mr. DeCoster.  Since the egg

3  business has been entirely sold, I mean, there's no likelihood

4  here of any further conduct with regard to Salmonella prevention

5  and so forth.  I mean, that's been terminated, and that's over

6  with.

7       As far as the deterrent on the personal level, on the

8  more personal level, we've been here now for a few hours, and I

9  hope that I've ably explained to you that with respect to the

10 other pockets of misconduct that the government and we agree

11 that on behalf of Austin DeCoster that there simply was no

12 knowledge on his part that that was occurring.  So that would

13 undercut, I think, the need for deterrence as well.

14      We have agreed on a number of claims with the

15 government, and there's been an amount that has been tendered to

16 the Court for the Court's approval that can be ordered both

17 for -- not both but for the -- for restitution.  And we have

18 also included in the materials that we have given the Court some

19 background on Mr. DeCoster's health.  He's 80 years old and

20 suffers from a variety of conditions which I would prefer to

21 rely on my presentation rather than elaborating on here in open

22 court.  But if you want me to, I will.

23      And you do have some letters from three individuals

24 attesting to his charitable endeavors.  And he has --

25           THE COURT:  And the letters were very impressive.  And

what he's done and what Peter DeCoster have done, very
impressive.  And even assuming the 16-million-dollar figure is
true, you know, I sent you all an e-mail, and I realize I was
comparing apples and oranges when I sent it.  But as a
percentage of his net worth, while 16 million dollars sounds
incredibly impressive, as a percentage of his net worth, it's
less than the average taxpayer who earns ten to forty thousand
dollars a year pays -- donates in charitable deductions on an
annual basis.  And I realize I'm comparing income to net worth
which is why I said apples and oranges.

        But I think you would agree with me, Mr. Green, that
the average taxpayer between the 10,000 and $50,000 a year worth
of taxable income pays -- I think it's about three times -- I
gave you the percentages in the e-mail.  It's about three times
what Mr. DeCoster has paid over the last four years.  But the
average person -- the average taxpayer with income of ten to
fifty thousand dollars does not have a trust worth in excess of
three hundred million dollars.  Matter of fact, they don't have
a positive net worth.  The average taxpayer that earns $10,000 a
year and is giving a higher percentage of their income to
charity than your client not only doesn't have a big trust, they
don't even have a positive net worth.  They live month to month,
and they pay a higher percentage.

        So am I impressed by the fact that your client
allegedly donated 16 million dollars over the last 4 years?

1  Yeah.  But compared to the average taxpayer, not impressed at

2  all, not at all.

3          MR. GREEN:  Well, Your Honor, his net worth took a

4  incredible hit on the sale of this business, and it is his net

5  worth which allows him to continue to make these charitable

6  contributions.  And I think that they have to stand on their

7  own.

8          THE COURT:  What do you mean stand on their own?

9          MR. GREEN:  Well, I don't think -- I don't think --

10         THE COURT:  To whom much is given much is expected?

11  You know that proverb?

12         MR. GREEN:  Well --

13         THE COURT:  It's actually a biblical verse.

14         MR. GREEN:  To me -- to me those are significant

15  contributions, Your Honor.  To me they are.  And I -- you know,

16  without regard to what the average man gives or makes, I'm well

17  aware of how people struggle in this country.  I am indeed.  But

18  nevertheless, I still believe those are significant charitable

19  contributions.

20         THE COURT:  Well, not so significant when the

21  presentence report indicates that he's the owner of the DeCoster

22  Revocable Trust that had a net worth of over 277 million

23  dollars.

24         MR. GREEN:  Well, I think it's in the eye of the

25  beholder, Your Honor.  I think it's a significant -- I don't

1  want to get into an argument with the Court.  I think -- I think

2  it's a significant amount of charitable contribution.

3          THE COURT:  Yes, I would agree with that.  It's a

4  significant amount of charitable contributions.  Is it going to

5  buy your way out of prison?  I don't think so.

6          MR. GREEN:  Well, Judge, I'm not here -- I'm not here

7  trying to offer that as any way --

8          THE COURT:  Well, why are you offering it?

9          MR. GREEN:  Because I think it's indicative of the

10 man, okay, and who he is and his desire --

11         THE COURT:  Well, isn't it more indicative of a

12 taxpayer that earns ten to fifty thousand dollars a year that

13 they give a higher percentage of their income to charity than

14 your client does?

15         MR. GREEN:  I -- Your Honor, I don't really know about

16 those statistics.  That's the honest answer.

17         THE COURT:  Well, you can get them off the IRS web

18 page.

19         MR. GREEN:  I don't know that I would agree with that.

20 I just don't know.  I would have to delve into that.  I honestly

21 would.  But they're not cited to buy his way out of prison;

22 okay?  This is not a recently, you know, manufactured charitable

23 contribution.  These are contributions.  He's made these

24 contributions for a long time.

25         THE COURT:  Well, wait.  Your brief said the last four

1 years.

2          MR. GREEN:  Well, we gave you data on the last four

3 years, okay, but he's made charitable contributions throughout

4 his life.

5          THE COURT:  Where is that in the presentence report?

6          MR. GREEN:  It isn't in there.

7          THE COURT:  Pardon me?

8          MR. GREEN:  It isn't in there.  I will have to

9 document that for you if that is what you require.  I will do

10 that.

11          THE COURT:  What do you mean you're going to document

12 it?  When's that going to happen?  After I sentence him?

13          MR. GREEN:  No.  We would have to ask for 24 hours or

14 36 hours.

15          THE COURT:  That's not happening.  You've had years to

16 get ready for this.

17          MR. GREEN:  No, I understand that, Your Honor.  I

18 thought that you would accept my representation.

19          THE COURT:  You thought that I would accept --

20          MR. GREEN:  Yes.

21          THE COURT:  -- something in a brief?

22          MR. GREEN:  Well, it's a brief signed by me, officer

23 of the court.  I thought you would accept my representation.

24          THE COURT:  Well, I can -- you know, I'm going to file

25 a relatively lengthy opinion, and I'm going to point out many

1 represen -- misrepresentations you've made in your brief.  I'll

2 be happy to do that.  So the answer is no, I don't accept

3 representation in briefs from anybody but let alone a party that

4 files a brief that has misrepresentations in it.

5          MR. GREEN:  I'm not aware that we have

6 misrepresentations.

7          THE COURT:  Well, I'm going to point them out to you.

8 I'm not shy about doing that.

9          MR. GREEN:  Well, I have -- as far as --

10          THE COURT:  So yes, is it a mitigating factor that

11 your client has been charitable?  Yes.  I agree with that.

12          MR. GREEN:  All right.

13          THE COURT:  Is 16 million dollars significant?  Yes.

14 Is two thousand dollars from somebody who makes between ten and

15 fifty thousand dollars a year and makes an annual donation of

16 over two thousand dollars significant?  Yes.  More significant

17 than your client in my view.

18          MR. GREEN:  Well, I tender it to you, Your Honor, for

19 the weight that you will give it.

20          THE COURT:  Not much.  Give it some weight.

21          MR. GREEN:  Well, that -- I believe -- I believe those

22 are the mitigating --

23          THE COURT:  What about his prior conviction in this

24 court?

25          MR. GREEN:  I think, first of all, that the prior

1    conviction is on the cusp of, you know, the guideline period for

2    considering it.  But notwithstanding that, I'm not st -- I'm not

3    standing on that.

4              THE COURT:  Just a second.  It's not on the cusp of me

5    being able to consider it.  It's on the cusp of scoring for

6    guideline purposes.  They're very different.

7              MR. GREEN:  I stand corrected.

8              THE COURT:  They're very different.  Did you read his

9    presentence report from the prior case?

10             MR. GREEN:  No.

11             THE COURT:  Why not?

12             MR. GREEN:  From the prior case?

13             THE COURT:  Yeah.

14             MR. GREEN:  No, I've not read it yet.

15             THE COURT:  Well, I did, because I sentenced him.

16             MR. GREEN:  But I was going to continue if I may.

17             THE COURT:  No, I'm interested in the prior offense.

18   What do you know about the prior offense?

19             MR. GREEN:  Well, I know it involved the hiring of

20   undocumented workers, Your Honor.

21             THE COURT:  Yeah.  How many?

22             MR. GREEN:  I don't have that number on my -- at hand.

23             THE COURT:  In excess of a hundred.  How many years

24   did it go on?

25             MR. GREEN:  I can't tell you that I know right now,

1    sir.  I would add that the offenses are dra -- you know, in my

2    mind dramatically different.  This offense to which he pled

3    guilty is a status offense as Mr. Hopson has so ably explained.

4    And it is an offense which basically alleges that this

5    Salmonella outbreak occurred on his watch and that eggs infected

6    with Salmonella were introduced into commerce.  The government

7    has acknowledged that there was no knowledge on the part of

8    either Mr. DeCoster that that was, in fact, occurring or had

9    occurred.  And so I see the offenses as very, very different.

10   And I would urge Your Honor that the earlier offense should not

11   play a major role in your consideration or any role in your

12   consideration.

13           THE COURT:  It shouldn't play any role that he pled

14   guilty to a federal offense involving how he ran his company and

15   committed numerous violations of federal law and then as a

16   reward for one of his codefendants he transfers him to a plant

17   in Maine.

18           MR. GREEN:  Are you talking about the earlier episode?

19           THE COURT:  Yes.

20           MR. GREEN:  Well, Your Honor, he did enter a plea to

21   that.  There's been no recurring conduct.

22           THE COURT:  Yeah, and he didn't terminate one of his

23   codefendants who also pled guilty.  He transferred him to one of

24   his facilities in Maine.  You think maybe if one of your

25   employees committed a federal offense you might let him go?

 1          MR. GREEN:  No.  I think that's a question that you

 2    could put to Mr. DeCoster, but I will tell you that Mr. --

 3          THE COURT:  I'll be happy to.

 4          MR. GREEN:  -- Mr. DeCoster is of the view that people

 5    can be redeemed and that it's not necessary always to terminate

 6    them or to treat them in that fashion.  That's his belief.

 7    That's how he runs his life in large degree.  But he's never --

 8    he's never been in trouble again for that, for those

 9    occurrences.  There was a remarkable turnaround in the hiring

10    practices of the company.

11          THE COURT:  Now wait a minute.  Here's what the

12    presentence report says.  In 1996, DeCoster's Maine operation,

13    the egg processing plant in Maine, was fined 3.6 million

14    dollars, one of the largest fines ever imposed, for doing the

15    same thing they were convicted of in my court in 2003.

16          So for you to sit there and tell me this is somebody

17    who actually learns from his mistakes and tries to correct

18    everything, the presentence report is just the opposite.

19    Then -- I'm not done.  So then after -- so his codefendant -- he

20    was the one that was responsible for getting him the

21    3.6-million-dollar fine back in '96.  Then he goes to work for

22    another company.  Then Mr. DeCoster rehires him, and then they

23    get in trouble.  And what'd they pay for a fine?  I think they

24    paid like over a million dollars in restitution and a fine back

25    in this 2003 case.

1       MR. GREEN: What was the other date that Your Honor

2 mentioned?

3       THE COURT: Well, before Austin Jack DeCoster was

4 sentenced in this 2003 case, one of his codefendants who worked

5 for him according to the uncontested portion of the presentence

6 report says in 1996 they were fined 3.6 million dollars in

7 Maine.

8       MR. GREEN: I believe my statement to the Court was

9 that since the 2003 proceeding there's been no recurrence and

10 that there's been an attempt to be fully compliant with all

11 regulations and obligations. And I don't believe there's any

12 evidence contradicting that.

13       THE COURT: Kind of surprised you didn't read the

14 prior presentence report.

15       MR. GREEN: I would like to talk a minute about

16 disparity which is one of the factors in your analysis, and I

17 think that --

18       THE COURT: Among similarly situated codefendants?

19       MR. GREEN: Well, disparity among defendants who are

20 convicted of responsible corporate officer offenses, disparity

21 in sentences among those individuals. And the point I'd like to

22 make is that with the -- I think it was two exceptions that

23 Mr. Hopson discussed with you, Your Honor, there's been no

24 sentence of incarceration for a defendant who has pled guilty to

25 a responsible corporate officer status.

1              And I will say more.

2              THE COURT:  Now where is that in the presentence

3    report?

4              MR. GREEN:  I don't know that it's in the presentence

5    report, but it flows from the motion that we filed and the

6    analysis that we've made and that was discussed with you during

7    argument.

8              THE COURT:  Well, that was on a legal argument.  We're

9    now talking about a factual argument that has then a legal

10   consequence to it.  But is there any information in this

11   sentencing record to show that there would be disparity if I

12   imposed a term of incarceration?

13             MR. GREEN:  Just the information that we present in

14   the motion, Your Honor.

15             THE COURT:  Well, who's more culpable in this case?

16   Peter DeCoster or Jack DeCoster?

17             MR. GREEN:  Well, Your Honor --

18             THE COURT:  While I can consider -- this is part of my

19   question.  While I can consider disparity in other cases, I've

20   always been more concerned about disparity among similarly

21   situated codefendants in the same case or in a series of cases.

22   They're charged with the same crime here.  Who's more culpable?

23             MR. GREEN:  Your Honor, I want to resist an opinion.

24             THE COURT:  That's fine.

25             MR. GREEN:  I just simply want to say I've tried my

1  best to take you through the facts as they've been for the most

2  part stipulated that apply to my client, and that's what I've

3  focused on.

4          THE COURT:  And you've done an excellent job.

5          MR. GREEN:  Pardon?

6          THE COURT:  You've done an excellent job.

7          MR. GREEN:  Thank you.  And I know that you will

8  listen to both counsel and then make your decision.  But I would

9  conclude just simply by saying that I think that Mr. DeCoster's

10  not running away from this unfortunate situation.  He's not.

11          THE COURT:  No, he pled guilty to it.

12          MR. GREEN:  And he's -- but, I mean, even that -- I

13  mean, that is an expression of acceptance --

14          THE COURT:  Absolutely.

15          MR. GREEN:  -- of responsibility.

16          THE COURT:  I agree with that.

17          MR. GREEN:  He's tried to make financial amends.  And

18  he has tried to live his life so that he didn't violate any

19  prior restraints or prohibitions on him from an earlier case

20  with Your Honor.  And he has tried to serve and live his life as

21  an example.  And this was unfortunate.  But it happened on his

22  watch.  And he will receive judgment at your hands for that.

23          THE COURT:  Well, not too many corporate executives

24  have two federal criminal convictions on their record --

25          MR. GREEN:  You're right.

1    THE COURT:  -- that span over a decade.

2    MR. GREEN:  You're right.

3    THE COURT:  So what does that say about him, if

4    anything?

5    MR. GREEN:  Well, what I've tried to convince you of

6    is it doesn't say -- I mean --

7    THE COURT:  It doesn't say anything about him?

8    MR. GREEN:  It does -- if I may, it doesn't say that

9    he didn't make a mistake in 2003 because he did.  But to equate

10   that with what has happened here and with the fact that he --

11   his conviction follows from the fact that there is a law in this

12   country that can make him responsible for misconduct that

13   occurred on his watch.  But I think when you look at the

14   totality of the circumstances, you know, there was no attempt

15   here to violate the law.  This is a case of unintended

16   consequences.  Nobody -- I don't think that these epidemics of

17   this type are easily analyzed.  But it wasn't because he went

18   out and did something or tried to make it happen.  He ran his

19   company.

20   THE COURT:  That would be pretty farfetched that he

21   would try and make a Salmonella --

22   MR. GREEN:  But I'm trying to draw distinctions

23   between this situation and what occurred ten years ago, over ten

24   years ago, because I think distinctions are justified.

25   THE COURT:  Well, here's a distinction for you.  Ten

1  years ago he hired people who routinely violated federal law.

2  And while the presentence report ten years ago said he was

3  intimately involved in every detail including reviewing all the

4  bills that got paid, all of a sudden he didn't have any

5  knowledge that they had recruiters along the border recruiting

6  illegals.  And then, you know, when they found out that there

7  were some illegals and the government forced him to terminate

8  them, they hired them back a few months later with different

9  names.  That's how he ran his company.  You can't hide from the

10 record.

11             MR. GREEN:  That's how he ran his company over ten

12 years ago.

13             THE COURT:  And he ran a company where federal

14 officials got bribed.  How often does that happen?

15             MR. GREEN:  Well, Your Honor, it happens.

16             THE COURT:  Yeah.  Well, I've sentenced over 4,000

17 people, and I've never had it happen.  And I've never had a

18 corporate executive be a repeat offender in this court.  And

19 I've been at it for 21 years.  He's the first one, first repeat

20 offender.

21             MR. GREEN:  Well, I respectfully submit to you that

22 there is still a meaningful distinction, many meaningful

23 distinctions, between what happened in 2003 --

24             THE COURT:  Absolutely.  There are more distinctions

25 than there are differences, but there -- I mean -- I'm sorry.

1   There's more differences than there are similarities.  But

2   there's one overriding similarity:  He ran a company with

3   employees that violated federal law with impunity.

4           MR. GREEN:  Are we talking about 2003 now or . . .

5           THE COURT:  Yeah.  Well, is there another time he's

6   been convicted --

7           MR. GREEN:  No, but --

8           THE COURT:  -- that I need to be aware of?

9           MR. GREEN:  No, but I think the rec -- I think -- I

10  mean, he's never been rebuked for that kind of conduct since he

11  appeared in your court.

12          THE COURT:  Well, how many times do you think

13  executives get convicted in federal court?  I'm supposed to

14  what?  Pin a medal on him because he only got convicted twice

15  and not three times?  Is that your argument?

16          MR. GREEN:  No.

17          THE COURT:  I'm sorry, Mr. Green.  I'm missing the

18  point.

19          MR. GREEN:  My argument is that he made a mistake over

20  ten years ago, and he corrected his behavior.  In fact, there's

21  a letter in there I think from the Mexican -- one of the Mexican

22  authorities or ministries saying how he, you know, cleaned up

23  the employment situation.  He worked hard to remedy, to rectify,

24  and to see that that didn't happen again.  Now 15 years, 12

25  years later, we have a Salmonella outbreak.  I understand that

because of that outbreak and because of his status he's back

here in your courtroom.  But I honestly, you know, feel and

submit to you that those are such disparate events that they

should not bear any meaningful relation in your mind as you pass

sentence on Mr. DeCoster.

THE COURT:  I understand you believe that.

MR. GREEN:  It's also my hope.

THE COURT:  It's good to have hope.  And I want you to

know -- I said at the beginning I've spent more time on these

three misdemeanor convictions than I've spent on sentencing in

any case.  And I'm still considering all possible ranges.  And

about 80 percent of the time -- you ask the lawyers -- I give a

different sentence than what I thought I was going to do when I

come out on the bench.  And I've considered every possible

sentence and still am from probation to the maximum sentence of

a year.  And I have not made up my mind what the sentence should

be.

So you're still able to convince me.  Anything else

you'd like to argue?  Be happy to hear anything you want to

argue.

MR. GREEN:  Well, I think -- I think from our

perspective, Your Honor, I've tried -- what I -- let me -- I

came to this courtroom principally concerned about the

Salmonella outbreak because I think at -- you know, when all is

said and done --

1          THE COURT:  That's the crime of conviction.

2          MR. GREEN:  Yeah.  I mean, that's at the core of this

3   problem.  And based on our analysis of this entire investigation

4   record -- let's put it that way, if I may, because it isn't all

5   here in this -- in this courtroom -- I became convinced that the

6   DeCosters as evidence of a rise in incidence of environmental,

7   you know, positives got cracking; okay?

8          Now, they hired experts, and they cleaned their barns,

9   and they undertook a lot of measures that were designed to try

10  to help them evaluate what the potential for risk was here.  And

11  they didn't see this coming.  And I don't think the experts saw

12  this coming.

13         And when it happened, they jumped on it.  I mean, it's

14  not -- it's not a case of a couple of executives who simply

15  ignored it.  I mean, they were incredibly concerned, and they

16  set out to recall, as I say, millions upon millions of eggs at

17  great cost and expense and detriment, loss of customers,

18  ultimately the loss of their company.

19         So for me when I look at that -- when I look at that

20  picture, it's not that I give them a gold star.  But I do say

21  that they acted appropriately, expeditiously, and tried to do

22  what they could to react to this problem and contain it.  As a

23  result, they ultimately lost their business.  They lost millions

24  of dollars.

25         I'm well aware that you've pointed out and criticized

1  me for the fact that that's not all documented, and I accept

2  your criticism.  But I believe that this situation is different

3  from your earlier encounter with my client.

4          I think they've paid a terrible price in loss of

5  reputation and a financial penalty already, and they're going to

6  pay another, I think, significant, very significant, financial

7  penalty if Your Honor accepts the figure that's been submitted

8  to you for your approval.

9          And Mr. DeCoster, as I say, is out of the egg

10  business.  And he will continue -- if people appear who are yet

11  uncompensated or injured if indeed there are such individuals,

12  they will be taken care of.  And that is essentially what I want

13  to leave with the Court.  I think this company stepped up to the

14  plate and tried to do what was appropriate.

15          THE COURT:  Thank you.  Anything else?

16          MR. GREEN:  No, sir.

17          THE COURT:  Okay.  Thank you.

18          Mr. Deegan?

19          MR. DEEGAN:  Thank you, Your Honor.  And I'm going to

20  do my very best not to be repetitive of what's in my brief or

21  other comments that I made earlier in the sentencing.

22          I already addressed what the government feels were the

23  problems with the response to the environmental tests and the

24  timing of that response.  So I don't -- I think the record is

25  that they didn't get cracking on responding to the environmental

1   positives.  It happened too late.  And I believe that it's a

2   fair reading of the record to say it had more to do with the egg

3   rule than anything else.  Otherwise, it may have happened

4   earlier.  Somebody -- an expert would have been sent to Iowa to

5   try to address the problem.

6          I do want to talk a little bit more about the

7   individual characteristics.  And there, Your Honor, I do think

8   that it is very unusual.

9          First of all, on the topic of charitable contributions

10  and good works, I know the Court has sentenced many, many

11  defendants for business crimes.  And in my experience that's a

12  fairly common type of argument that's made that folks that have

13  successful businesses, have resources can often come in and

14  point to examples of where they've done good works.  And that's

15  all fine and good.  But I don't know that it makes Mr. Jack

16  DeCoster's case very unique or Peter DeCoster's case, for that

17  matter.

18         What really makes Jack DeCoster's case unique is the

19  fact that he is a business crime defendant who has a record of

20  other business crimes.  And, Your Honor, I'll just leave you

21  with that's something that I think the Court can take into

22  account and should take into account in this case and give

23  weight to in arriving at an appropriate sentence.

24         THE COURT:  I wanted to ask you about intracase

25  disparity considering the two cases combined.  Who's more

culpable in the government's view, Austin Jack DeCoster or Peter

DeCoster, taking into consideration Peter does not have a prior

criminal record in this court and Jack DeCoster does?

MR. DEEGAN:  Yes, Your Honor.  And again, I'll preface

everything I say by stating we're not taking a position on the

type of sentence imposed --

THE COURT:  Yes.

MR. DEEGAN:  -- pursuant to the plea agreements.

THE COURT:  And I didn't ask you to.

MR. DEEGAN:  I appreciate that.  Thank you.  But, Your

Honor, I do think that that's the big distinction is Mr. Jack

DeCoster's prior record that doesn't exist in Mr. Peter

DeCoster's case.

That being said, there are a couple things with Peter

DeCoster's role at Quality Egg that I think are significant.  If

you start with -- going back several years with the Wal-Mart

presentation, you know, here is the chief operating officer, the

guy -- you know, the boots on the ground in Iowa responsible for

running Quality Egg in Iowa, and he is at a meeting making

statements about flock testing that just simply didn't happen.

That does a couple things.  It says that at least he's willing

to present something that he doesn't know to be true because it

wasn't true that it was happening.

THE COURT:  But there's -- is there any evidence in

the sentencing record that he knew those statements were --

1  there's evidence that the statements were false.

2          MR. DEEGAN:  That's correct.

3          THE COURT:  But is there any evidence that Peter

4  DeCoster knew that those statements were false?

5          MR. DEEGAN:  Your Honor, we don't have any direct

6  evidence going to that point.  However, I would say that given

7  his role at the company and the fact that he's the one doing

8  most of the talking at the presentation and the presentation

9  says what it is, he should have known whether they were false or

10  not, and they were false.  So I think that's aggravating and I

11  think that the fact that the sham AIB audits that were going on

12  were happening while he's the chief operating officer on the

13  ground in Iowa.

14          And while, you know, documents are being produced, we

15  don't have evidence that he knows of documents being produced

16  for the audit.  Manufactured I should say for the audit.  But

17  that's not taking any sort of food safety measure seriously when

18  that type of activity's happening.

19          And then you, I think, go to an even more significant

20  example when you get to the bribing of the U.S.D.A. inspector.

21  I mean, those eggs were retained because they didn't meet

22  minimum quality standards for the U.S.D.A.  They had more than

23  10 percent checks in them.  And again, it's a -- it's profit

24  over food safety when you say, well, for 300 bucks that we can

25  get them moved on down the road as opposed to the cost of either

rerunning them through the machine or sending them off to the
breaker where they can be pasteurized and getting about 50
percent value.

So it's -- again, it's a profit over a safety kind of
culture.  And again, Peter DeCoster's the one in Iowa who is the
chief operating officer, and he's responsible.  So those are all
things that are aggravating.

But I still come back to in this case that the real
distinction between Jack -- Defendant Jack DeCoster and Peter
DeCoster is the prior criminal convictions of Jack DeCoster.

THE COURT:  Well, but -- okay.  What about the fact
that he's older?  He's 80, and he has some health conditions,
although actually he's taking less medications than I am by a
factor of a couple multiples, and I'm not 80 yet.  So he's
actually in pretty good health.  And I want you to talk about
his age and health as to how I should consider them.  I mean,
they both are potentially mitigating.  I don't find the health
issues to be very mitigating in this case because he's actually
in quite good health.

MR. DEEGAN:  I think that's absolutely correct.

THE COURT:  For somebody who's 80.

MR. DEEGAN:  For a man of his age, he appears to be
healthy.  And I would say a couple things.  Number one, that
within the range of discretion the Court has about the types of
sentences that the Court could impose, again, I don't want to

1   say this in a way that sounds like I'm advocating for any

2   particular type of sentence with regard to custody except to say

3   that it can't be more than a year, and I think that's

4   significant.  It's not as if you're going to send a man with

5   health conditions of a sort or an age of a certain -- you know,

6   which may make you more frail, et cetera, off to prison for 15

7   years.  That's not going to happen in this case.

8            So I think that sort of tempers whether or not those

9   are really significant factors the Court -- but I do think

10  absolutely age and health, the Court needs to take those into

11  account in deciding what an appropriate sentence is.  And I know

12  the Court will.  But I don't know that those turn out to be the

13  most significant factors when the Court is deciding what type of

14  a sentence to impose.

15           THE COURT:  But are you open to the possibility that

16  using your analysis if Austin Jack DeCoster is more culpable

17  largely because of his prior record in this court that his age

18  and health may offset that so that there might not be a

19  difference in what sentence both defendants should receive?

20           MR. DEEGAN:  Your Honor, I think that is a

21  reasonable -- it's certainly within the realm of an acceptable

22  approach for the Court to take.  And I can understand where the

23  Court's coming from with that.

24           THE COURT:  And just to make sure I understand, you're

25  not opposed to probation for either defendant.

1          MR. DEEGAN:  We're leaving that entirely up to the

2    Court, so no, we aren't objecting to any particular type of

3    sentence.  We're confident the Court is well advised of the

4    facts and circumstances, and we're willing to leave it to the

5    Court's discretion.

6          Your Honor, I would like to say that once we get

7    closer to one o'clock, we do run into a timing issue with regard

8    to our victim representative.

9          THE COURT:  Okay.  Why don't we -- do you want to

10   respond now, Mr. Dornan?

11         MR. DEEGAN:  We still have time.

12         THE COURT:  Okay.  You want to go ahead and respond?

13         MR. DORNAN:  Sure, Judge.  Judge, I think you have

14   identified the pertinent issues with respect to this, and I'm

15   not abandoning my argument.  But I'm certainly going to latch on

16   to the Court's question without further testimony here today and

17   further evidence as to if, in fact, Mr. DeCoster made those

18   statements at Wal-Mart that he knew that they were false.  The

19   government carries that burden.  I know this Court is very

20   particular with respect to the evidence that is produced or not

21   produced.  And I don't think the Court simply has enough

22   evidence at this point in time to make a finding that

23   Mr. DeCoster, if he did make those statements, were, in fact --

24   there's sufficient evidence to conclude that they were false.  I

25   agree --

1    THE COURT:  Do you think I have enough information to

2  make a finding that he should have known they were false?

3  Assuming I agree with you that there's not sufficient evidence

4  in the sentencing record that I could find that he knew they

5  were false, could I find that he should have known they were

6  false because he's been identified as the chief operating

7  officer?  How could the chief operating officer not know that

8  there was a flock program and the other -- the SQ --

9    MR. DORNAN:  Well, I guess, Judge, it would -- I would

10  go back to the apparent confusion as to what presentation was

11  going to be presented.  I don't know that it's outside the realm

12  of possibility, Judge, that maybe the wrong presentation was

13  even grabbed but that this was a matter that was in flux.

14    So I guess the best evidence is what Mr. DeCoster sent

15  to Mr. Crawford as far as being the absence of that information

16  in there.  I think the Court can place significant evidence or

17  significant weight on that as far as not making a finding with

18  respect to recklessness or should have known.

19    THE COURT:  Well, let me ask you this.  Paragraph 6 of

20  the stipulation says that had she been called as a witness

21  Alison Marshall who's identified in paragraph 4 as a clerical

22  worker for Quality Egg, she knew it was false.  So the clerical

23  worker knows these statements are false, but the chief operating

24  officer doesn't?  Pardon me for being skeptical.  How does that

25  work?

1          MR. DORNAN:  Well, you know, it's hard for me.  I'm

2     making an argument here, Judge, you know, first and foremost

3     they didn't make them, so I have to stand on that.

4          But I guess it would go to, Judge, the amount of time

5     and again the -- what was paid attention to with respect to that

6     particular presentation.  I don't think you have any evidence

7     that Mr. DeCoster, if he did make those statements,

8     intentionally misled.  Could they be -- should he have known or

9     could they have considered a reckless omission?  I guess you

10    sure could.  But I don't think that that's the sort of

11    aggravating circumstance with respect to what Mr. DeCoster pled

12    to as a responsible corporate officer of something that would

13    have occurred more --

14         THE COURT:  Well, that's a different question.  In

15    case you forgot, my question was how does a clerical worker know

16    but the chief operating officer doesn't?

17         MR. DORNAN:  Judge, I guess the only thing I would say

18    would be I don't know that a clerical worker's memory with

19    respect to what was discussed there would be --

20         THE COURT:  Yeah, the only way to find that out would

21    have been had you not entered into a stipulation, the witness

22    was called live subject to cross-examination and the

23    confrontation clause.  But for whatever reason you elected not

24    to do that.  So that's not really an answer to my question as to

25    how a secretary would know these statements are false but a

1    chief operating officer would not know.

2             MR. DORNAN:  What I've given you, Judge, is the best

3    explanation that I can provide to you right now.

4             THE COURT:  And, Mr. Dornan, that's all you can do, so

5    I appreciate that.

6             Why don't we hear from the victim.  And, Mr. Deegan,

7    have you instructed him that he can just use the initials of his

8    son if he doesn't want to use his name consistent with our . . .

9             MR. DEEGAN:  Your Honor, he's aware now.  Thank you.

10            THE COURT:  Okay.  Thank you.  Why don't you just step

11   up to the podium.  Are you comfortable there, sir?

12            MR. TUCKER:  Yes, sir.

13            THE COURT:  Okay.

14            MR. TUCKER:  Yes, Your Honor.

15            THE COURT:  Okay.  And could -- welcome, and thank you

16   for coming.  Would you just tell us all your name and then I'll

17   turn it over to you.

18            MR. TUCKER:  My name is Jason Tucker.

19            THE COURT:  Thank you, Mr. Tucker.

20            MR. TUCKER:  Thank you, first of all, for letting me

21   be here to speak on my son's behalf.

22            I wanted to come here and just speak from my heart,

23   and it -- there's just too much, too much thought, so I had to

24   make some notes.

25            THE COURT:  I appreciate that.  Thank you.

1          MR. TUCKER:  I've written some things down here just

2     to kind of stay on track.

3          You know, my son is not only one of the greatest loves

4     of my life but my best friend.  In all honesty, I cannot begin

5     to imagine what I would do without him in my life.  And we

6     almost lost him at three years old to Salmonella, bone, and

7     blood infection.  He was in the ICU at Children's Medical

8     Hospital for eight days, quarantined for a portion of that.

9          While there, he received the heaviest dose of IV

10    antibiotics a three-year-old of his weight was allowed.  This

11    was followed by six weeks of oral antibiotics, again, the

12    strongest possible.  Although we never left his side, he

13    almost -- he was almost unrecognizable to us.

14         What a lot of people don't know is the link between

15    high fevers, the use of antibiotics in infants and young

16    children, and horrible enamel defects in adult teeth that come

17    in later.  We ourselves never knew that until the pedia -- his

18    pediatric dentist explained it to us.

19         We're told he'll have to have stainless steel crowns

20    on many of his teeth as children are too tough for porcelain on

21    their teeth.  Later we can look at full dental implants.

22         You know, he's Mr. Popular.  We constantly just

23    receive calls from parents and from friends wanting him to come

24    over, play dates and sleepovers.  They always want him around,

25    all the birthday parties and everything else.  And, I mean, he

1   does so much in Scouting, raises money for the Scouts and leads

2   hikes.  I mean, he's eight years old.  He's just -- he's

3   awesome.

4          I mean, the parents want him over as much as the

5   children.  You know, they're just impressed with how honest he

6   is and how -- just how sweet and kind and tender.  And, you

7   know, he's an amazing artist, piano player, soccer.  He gardens.

8   Everybody looks up to him.

9          And now at eight years old I'm watching him cover up

10  his smile with his mouth, you know, because his adult teeth are

11  coming in.  And he's covering his smile up, you know.  I'm

12  seeing him avoid conversation.  He's keeping his head down as he

13  knows the answer to a question asked.  Instead of answering it,

14  I'm watching the most brilliant young man become self-conscious

15  of his teeth at eight years old.

16         He's the type of child that can make such a difference

17  in the world, and I watch him do it in small steps every day.

18  His strengths and beliefs are admirable, and I could not be any

19  prouder than I am.  I don't know anyone of any age so

20  considerate of others' feelings, so quick to see the answer to a

21  problem, so quick to help anyone with a chance that arises.  And

22  it's not a choice.  It's just what he does.  It's what he is.

23         And when we talk about the future, he wishes to be an

24  architect or an archeologist.  He wants to help people, people

25  that go without.  He talks about soup kitchens.  I don't know

1   any eight-year-old that knows what a soup kitchen is.  As smart

2   and popular as he is, it truly breaks my heart knowing that each

3   tooth he has and all that follows will be capped in stainless

4   steel.

5          As hard as we try to downplay it in front of him what

6   is happening, he knows.  And I'm watching this brilliant little

7   man retreat inward.  And it breaks my heart, and I pray that he

8   continues to be -- continues being the strong young man who

9   walks proudly with his head held high.  I also pray that the

10  children in his path to adulthood can find some kindness around

11  him.

12         It would take someone with his kind heart and spirit,

13  someone exactly like him to look past his smile and see the real

14  beauty that is my son.  If the world was full of children with

15  compassion, my worries would not be as they are, but it is, and

16  his future is compromised.  I hope just -- just touching -- just

17  scratching on the surface today will make some sort of

18  difference.  And thank you for letting me share -- thank you.

19         THE COURT:  Mr. Tucker, thank you.  May I ask you a

20  question?

21         MR. TUCKER:  Yes.

22         THE COURT:  I don't want to even know the city you

23  came from, but how far did you come to share this with us?

24         MR. TUCKER:  Dallas, Dallas, Texas.

25         THE COURT:  Dallas, Texas.  Would you do me a favor --

1          MR. TUCKER:  Yes.

2          THE COURT:  -- if you can accommodate it?

3          MR. TUCKER:  Pardon?

4          THE COURT:  If you can accommodate my favor?

5          MR. TUCKER:  Yes.

6          THE COURT:  Would you tell your son what an

7    extraordinary young man he is.

8          MR. TUCKER:  I will.  I look forward to it.

9          THE COURT:  I didn't meet him, but I felt like I have.

10   I felt like I've met him through you.

11         MR. TUCKER:  He's amazing.  He's amazing.

12         THE COURT:  And thank you so much.

13         MR. TUCKER:  Amazing.  Thank you.

14         THE COURT:  Thank you so much for coming.  I'm sorry

15   that you had to sit through all the legal mumbo jumbo and wait

16   so long.

17         MR. TUCKER:  No.

18         THE COURT:  But it means a lot to me that you were

19   willing to come here and take time out of your busy life and

20   tell us about your son and how the Salmonella affected him.

21         MR. TUCKER:  Thank you for having me.  Thank you.

22         THE COURT:  Thank you for coming.

23         I just wanted to ask.  I assume Mr. Deegan would know,

24   but are there any other people in the courtroom who are victims

25   or victim representatives?  If there are, you can come forward

1 and speak.

2          Okay.

3          MR. DEEGAN:  Thank you, Your Honor.  None that we know

4 of.

5          THE COURT:  Okay.  Thank you.  Here's what I'd like to

6 do now.  I'd like to take the allocutions, and then I'd like to

7 take a little late lunch break so I can think about all of this,

8 and the record will essentially be closed, and then I'll come

9 back and pronounce sentence.

10          So we'll start with the -- Mr. Green, I don't know

11 what you want to do with the corporation.  I don't think they

12 have a right of allocution, but if Mr. DeCoster wants to

13 allocute on behalf of the corporation, he can.  If we can

14 combine them, that's fine.  Whatever your pleasure.

15          MR. GREEN:  Your Honor, I think that through the

16 questions that you've asked this morning and the directions that

17 you've led the conversation and the discussions that there's

18 very little that I could add to what I've already said about the

19 corporation, simply to make one final point --

20          THE COURT:  Yes.

21          MR. GREEN:  -- that I think I made earlier but to just

22 recast it if I may, and that is that the two gentlemen that I

23 think probably bear most of the responsibility for what happened

24 at this company are not in this courtroom, at least not in this

25 courtroom today.

1　　　　　THE COURT:  Well, not yet, at least one of them.

2　Right.

3　　　　　MR. GREEN:  Yeah.

4　　　　　THE COURT:  He's coming.  I think it's September.

5　　　　　MR. GREEN:  We understand that.  And so that the

6　corporation is here principally in the role as a vicariously

7　liable defendant for the acts of their misconduct.  And I've

8　tried to explain in the last few minutes what this company did

9　when they learned about this outbreak.  And the story we just

10　listened to is tragic and sad indeed, and the company is

11　extremely sorry that this outbreak occurred.  I mean,

12　Mr. DeCoster probably have --

13　　　　　THE COURT:  No, the company isn't sorry because the

14　company doesn't have feelings.

15　　　　　MR. GREEN:  Well, the company -- to the extent that I

16　embody those who were at the top tier of the company, they are

17　saddened by this event.

18　　　　　THE COURT:  Oh.  There's no doubt in my mind that both

19　Peter and Austin DeCoster are saddened by what we just heard.

20　　　　　MR. GREEN:  So that -- that's my remarks, sir, on

21　behalf of the company.  And basically on behalf of Mr. DeCoster

22　when that -- when that time arrives --

23　　　　　THE COURT:  That time is now.

24　　　　　MR. GREEN:  Okay.

25　　　　　THE COURT:  Okay?

1    MR. GREEN:  I -- if you'll allow me to just go back

2  and repeat again a portion of what I said earlier, and that is

3  that through the process of winnowing the facts here and

4  statement of facts that all of these other episodes of

5  misconduct were not ones that were consciously known to

6  Mr. DeCoster.  He is here in his role as captain of the ship and

7  that this outbreak occurred on his watch, and he acknowledges

8  that.

9    Mr. DeCoster, do you want to come forward and say

10  anything to His Honor?  May he approach, Your Honor?

11    THE COURT:  You may, Mr. DeCoster.  And I just wanted

12  to give you the following information.  You have a right to say

13  anything to me you want to that I can consider in sentencing.

14  But you don't have to say anything.  You have an absolute right

15  under the Fifth Amendment of the United States Constitution to

16  remain silent.  If you decide not to say anything, I will not

17  hold that against you in any way.  But if you'd like to say

18  something, I can consider it.  Sometimes it helps defendants.

19  Sometimes it hurts defendants.  And sometimes it has no impact

20  on my sentence.  But if you'd like to say something, I'd be

21  happy to hear what you have to say.

22    DEFENDANT AUSTIN DECOSTER:  Well, I'd like to say

23  something, but I have a problem hearing.  I don't know.  Maybe

24  I'll cause the Court too much time, aggravation, and what have

25  you if I do talk.  You have to put up with it if I do.

1      THE COURT:  I'll be glad to put up with it.

2      DEFENDANT AUSTIN DECOSTER:  Will you?

3      THE COURT:  Yes.

4      DEFENDANT AUSTIN DECOSTER:  I'd like to talk then.

5      THE COURT:  Okay.  Thank you.

6      DEFENDANT AUSTIN DECOSTER:  On this bribe, it's an

7  absolute fact that I knew nothing about the bribe; okay?  The

8  government's pursued this, okay, and like Mr. Green said, I

9  don't want to -- I'm not trying to be mean about it, but they've

10  pursued it and pursued it.  I knew absolutely nothing about it.

11  I learned it from Jan Mohrfeld down at Bill's office and --

12  maybe a year and a half to two and a half -- at least a year and

13  a half later.  That's one thing.

14      The other thing is I feel that we did a lot as far as

15  SE went.  I feel that we really tried hard on the SE.  We hired

16  Hofacre.  Dr. Hofacre is a very smart man, takes little time to

17  get right to the issues.  And we did what he told us to do.  We

18  would have a meeting, and we would go to the meeting, and we

19  would listen to what he told us to do.  And then as best as we

20  could, we went out and tried to execute it.  We went out and we

21  tried to execute it; okay?

22      We never tested any of our -- we never -- let me see

23  what I'm try -- we never -- well, first of all, by law we didn't

24  have to do this.  But what good operator wouldn't take care of

25  his chickens properly if he knew something?  You'd agree with

1    that I'd think, Your Honor.  Yeah.

2            THE COURT:  I would.

3            DEFENDANT AUSTIN DECOSTER:  Yes.  So the point is when

4    he would tell us to do something, we would go get it executed as

5    best as we could.  I'm not saying that we always did everything

6    right; okay?  We started vaccinating our chickens up in Maine.

7            This is going to take a while.  Is that okay?

8            THE COURT:  That's okay.  I'm all ears.

9            DEFENDANT AUSTIN DECOSTER:  Okay.  We started

10   vaccinating our chickens up in Maine in approximately March -- I

11   believe it was '08.  And we was having troubles in Maine with

12   SE, environment -- environmentals.  We was called over to the

13   state house.  We went over.  We seen the commissioner of

14   agriculture, and we saw -- and we saw Dr. Hoenig.  Dr. Hoenig

15   said we've gotta do something because this environmentals were

16   spreading; okay?

17           So they suggested we start vaccinating.  So we did

18   vaccinate.  And then when we first started, we didn't vaccinate

19   properly.  The crews didn't do the work properly.  So Dr. Hoenig

20   came up with a way, and I believe Hofacre was helping him.

21           And another thing, the state wanted me to hire a

22   veterinarian; okay?  So that's why we hired Dr. Hofacre, the

23   state meaning Dr. Hoenig.  We hired him.  We started vaccinating

24   the chickens or said that we didn't vaccinate them properly to

25   start with.  The crews didn't do the work right.

1    So they developed a way to test the chickens.  We

2  tested 60 of them out of so many.  And then the test would tell

3  us what percentage of the chickens -- he has this little book he

4  had there.  It was a statistical book.  And he claimed that he

5  could prove this because of this book as a doctor, Dr. Hofacre.

6    So we tested so many chickens.  The chickens would

7  tell us then what kind of a job qualitywise we did in

8  vaccinating the whole flock.  And if we didn't get them 80

9  percent, if we didn't vaccinate the chickens 80 percent, then we

10  had to go back and revaccinate the whole flock.  Are you

11  following me, Your Honor?

12    THE COURT:  I am.

13    DEFENDANT AUSTIN DECOSTER:  Yeah.  We had to go back

14  and vaccinate the whole flock.

15    So that's down the road a ways.  Now we start in

16  March.  I don't know just when we got infected.  But after a

17  while -- and this is serious business too because we vaccinated

18  a hundred chickens down in -- no, we vaccinated brooders 5 and 6

19  we called them, and Dr. Opitz went down and tested those

20  chickens, and we found not one of those chickens had been

21  vaccinated even though the whole house -- even though both

22  houses had been vaccinated.  He tested them.  Not one of the

23  chickens had been vaccinated.  Do you follow me?

24    THE COURT:  I do.

25    DEFENDANT AUSTIN DECOSTER:  Yeah.  So that was part of

1    really getting this thing perfected.  Well, like I said, we

2    started vaccinating in March and took several months getting

3    this stuff perfected.  And I'm going to say -- go from March

4    around to March again, then go from March to November.  I think

5    we had another positive in Maine in the 50s.  And before that,

6    before we started vaccinating them, the SE and positives had --

7    they had expanded up into the 40s, complex we call the 40s.  The

8    complex was the 50s.  So we had one positive test in the 50s,

9    and I think it was March to March and to November, then no more

10   ever positives in Maine.

11          So what we did is approximately -- approximately about

12   a year later or even a little later when we find out the vaccine

13   works so good in Maine, we started a vaccine in Iowa.

14          Now, the government at this time never would admit the

15   vaccination was the proper thing to do with the problem -- with

16   taking care of the problem.  But we seen after that it's the

17   only thing to do.  So we started vaccinating in Iowa once.  We

18   started vaccinating the chickens in Iowa once.  In Maine we

19   vaccinated twice.  If you ask me why didn't we do it twice in

20   Iowa, I don't know.  I can't remember.  I'm speaking truth here.

21          So after we vaccinated once in Iowa -- and I'm going

22   to say we started about Julyish -- around February we started

23   checking to see if the vaccine is working.  It wasn't working

24   very good.  So I told one of our people we gotta vaccinate them

25   twice like we did in Maine.  That's the only thing to do.

1    So we started vaccinating twice in February -- I think

2    it's February, came around into the spring like, say, Aprilish,

3    still wasn't working good enough, but it was an improvement.

4    You could see it was an improvement.

5    So then when the government says some of the things

6    they say, I think they're misinformed.  The stories that they

7    got are not correct.  And so we started vaccinating twice, and

8    then July 9 is when the egg rule came in; okay?  But before that

9    we had already started twice.  We would have been -- Your Honor,

10   Judge, we would have been able to solve all our problems in Iowa

11   just like Maine if we -- we run out of time.

12   Now, you said this was a theory this morning he was

13   telling you about this perfect storm.  I think you're right.

14   But Doc Hofacre -- we vaccinated in our hatcheries.  We stopped

15   vaccinating one way and started another vaccinating in the

16   hatchery.  And it seemed like our chickens had very low

17   immunity, died a lot, didn't do good, got a lot of

18   laryngotracheitis, nothing to do with eggs, but it's a lot to do

19   with the health of the chickens.

20   So when he said it was the perfect storm, that's what

21   he meant, Dr. Hofacre.  I think he meant by vaccinations that we

22   was using was hurting the immune system of the chickens so that

23   the vaccine that we was using wasn't as effective.

24   So, Your Honor, I don't know what to tell you because

25   when I was here in your court ten years ago, I feel you was --

1  treated me extremely good, very good.  Jerry Crawford was my

2  lawyer.  And you treated me very good.  I'm very sorry that I'm

3  back here.  It cost us our business.  It cost these people --

4  you know, these people got sick, and, Your Honor, I don't know

5  what you think about praying, but I prayed for these people a

6  lot.  I gave them a lot of money.  I prayed for them a lot.

7  I'll tell you some of the things I prayed for them.  I prayed

8  for them to -- that they'd get healed, that they'd get well,

9  that they wouldn't be sick.  I prayed that God would bless them

10  and help them, and I was serious with God.  You know, Your

11  Honor, I'm standing before God now.  God's the one I'm worried

12  about.  You can throw me in jail, Your Honor, but that's all you

13  can do to me.  I gotta meet up with God one day, so trust me, I

14  am telling you what I prayed for; okay, Your Honor?

15          THE COURT:  I believe you.

16          DEFENDANT AUSTIN DECOSTER:  Thank you.  Okay.

17          THE COURT:  And she's a lot more powerful than I am.

18          DEFENDANT AUSTIN DECOSTER:  Huh?

19          THE COURT:  I said she's a -- she, meaning God, is a

20  lot more powerful than I am.  I'm fully aware of that.

21          DEFENDANT AUSTIN DECOSTER:  Yeah.  Yeah.  Anyway,

22  okay.  Let's see.  I prayed for them.  I made that clear; right?

23          THE COURT:  You did.

24          DEFENDANT AUSTIN DECOSTER:  And I'm very sorry.  I'm

25  almost calling you a preacher here.  I don't know why.  But,

1   Your Honor, I am very sorry, and I don't know if we did a very

2   good job presenting our stuff here to you.  But . . .

3         THE COURT:  No, you did a great -- the lawyers did a

4   great job.

5         DEFENDANT AUSTIN DECOSTER:  Yeah.

6         THE COURT:  You're very, very well represented.  They

7   filed -- they raised this incredible constitutional argument,

8   did a great job briefing, and filed more exhibits.  That's one

9   of the reasons why I spent so much time on this case.  I had a

10  lot to read and study, and it's because your lawyers did an

11  excellent job on your behalf.

12        DEFENDANT AUSTIN DECOSTER:  Okay, Your Honor.

13  Whatever you do with me, I still think you're a great judge.

14        THE COURT:  Well, thank you.

15        DEFENDANT AUSTIN DECOSTER:  I mean that seriously.

16  Thank you.

17        THE COURT:  Thank you, Mr. DeCoster.

18        Peter DeCoster, would you like to say something?

19  Yeah, you can just come up.  I need to give you the same -- my

20  little warning.  You have a right not to say anything.  If you

21  exercise your right to remain silent protected by the Sixth --

22  Fifth Amendment of the United States Constitution, I will not

23  hold it against you in any way.  You don't have to say anything.

24  But if you'd like to say something, I'd be happy to hear what

25  you have to say.

1    DEFENDANT PETER DECOSTER:  I would, Your Honor.  And

2  thank you for letting me speak.  I guess probably the thing

3  that's had the most impact on me in dealing with this whole

4  thing is reading these victim impact statements.  You know, and

5  I guess I don't really know why they fill these reports out.

6  But I was able to get them and read through them.  And, you

7  know, just what the people had to go through and then, you know,

8  Mr. Tucker and his boy -- I got a -- I got a nine-year-old boy

9  right now, so he would have been young at this time period, and

10  I was getting eggs out of the plants from the same flocks.  I

11  mean, there's no way that I would have any interest in people

12  outside that we're selling product to but as well as my own

13  family.  I mean, they -- they were kind of the test, so to

14  speak, because we were all eating the same eggs.

15    And so I guess I have a lot of empathy for the -- for

16  like Mr. Tucker especially, you know, because I probably know

17  his story the best because I read the -- I remember the victim

18  impact statement that his wife had filled out.  So, I mean, I'm

19  deeply sorry for especially the children that got sick but

20  everybody that got sick.  I mean, I've had food poisoning.  It's

21  no fun.  I mean, nobody -- you know, middle of the night, you

22  know, even just a child getting a cold, you know, or flu,

23  they're up, throw up in the middle of the night or they have to

24  go to the bathroom, and, you know, you sit up with them.  You

25  know, I've done that with my kids, and I just -- I can't imagine

1  what he's gone through and his -- I mean, other than I'm sorry.

2  I mean, I don't know what else I can -- I mean, you feel very

3  inadequate when you're dealing with a situation like that.

4         And it goes back to when we got called before

5  Congress, you know.  They had -- there were some victims there.

6  I remember this one older lady.  I don't know how much older

7  than I she was, but she might have been 70.  And she had got

8  really sick having eggs at a restaurant.  And then there's

9  another younger lady that maybe she was 30 and she got very

10 sick.  And just, you know, listening to these people, you know,

11 had -- you just never want that to happen to people.  I mean, no

12 desire.

13        And that's -- and I guess that's probably why back

14 when FDA had called us about the Minnesota restaurant that

15 appeared to have some kind of food poisoning, you know, I'd want

16 to get those eggs tested right away because if it was truly the

17 eggs, we'd want to get it stopped as soon as possible.

18        So, I mean, I'm not going to sit here and make excuses

19 about anything that we should or shouldn't have done in the

20 past, Your Honor.  It's not helping these people, you know, the

21 victims.  And I am truly sorry to each and every one of them and

22 also to the vendors, the people we sold the product to, and, you

23 know, all that we put them through as far as having to recall

24 the product and deal with the product and then having the, you

25 know, reputation of all they had eggs that had to get recalled.

1    Maybe people would have switched grocery stores.  I don't know.

2    But it's -- I guess I view it as more about the victims and what

3    they had to go through than what we've had to go through here.

4    So thank you, Your Honor.

5              THE COURT:  Thank you, Mr. DeCoster.

6              I think we'll take a recess till two o'clock, and then

7    I'll come back, see if the lawyers have anything else they want

8    to add which I always do, and then I'll go ahead and start

9    imposing sentences.  I'll start with the corporation first, and

10   we could do Peter and then Austin or the other way around.  I

11   don't really care.  We'll be in recess till 2.  Thank you.

12             (Lunch recess at 1:11 p.m.)

13             THE COURT:  Thank you.  Please be seated.

14             Mr. Deegan, I think we overlooked Mr. Parisi's

15   presentation.  You indicated at one point that he was going to

16   argue the constitutionality?

17             MR. DEEGAN:  Your Honor --

18             THE COURT:  And then you did and so --

19             MR. DEEGAN:  And that's fine, Your Honor.  We're going

20   to stand on our brief on that.

21             THE COURT:  Okay.  I didn't want to cut him short if

22   he wanted to say something.

23             MR. PARISI:  I appreciate that, Your Honor, but we'll

24   rest on the brief.

25             THE COURT:  Okay.  Thank you.  Okay.  Is there

1  anything else that either -- any of the lawyers, excuse me,

2  would like to add at this point?  Mr. Dornan?

3          MR. DORNAN:  No, Your Honor.

4          THE COURT:  Anything from you, Mr. Green?

5          MR. GREEN:  No, Your Honor.

6          THE COURT:  Mr. Deegan?

7          MR. DEEGAN:  Nothing from the government, Your Honor.

8          THE COURT:  Okay.  Why don't we take the corporation

9  first.  What is the status of the corporation, Mr. Green?  Is it

10  in existence?

11          DEFENDANT AUSTIN DECOSTER:  It exists, but it's

12  bankrupt.

13          MR. GREEN:  Apparently it's still a structured, but

14  it's bankrupt.

15          THE COURT:  I think Mr. DeCoster is probably using

16  bankrupt in the colloquial term, that it has no money.  The

17  corporation hasn't filed for bankruptcy.

18          DEFENDANT AUSTIN DECOSTER:  No.  I'm sorry.

19          THE COURT:  No, that's okay.  That's okay.

20          DEFENDANT AUSTIN DECOSTER:  I agree with you, Your

21  Honor.

22          THE COURT:  Okay.  With regard to Quality Egg, LLC,

23  we've already discussed the potential fine range.  I'm -- I'm

24  comfortable with the parties' agreement on the fine.  It might

25  not be exactly what I would have done in the absence of an

1   agreement, but this was a bargained-for agreement. Sounds like

2   it was a lot of bargaining by parties with equal standing and

3   representation and zealous advocacy. And it's certainly

4   extremely reasonable by any judgment. So whether I would have

5   gone a little bit higher, a little bit lower really isn't the

6   question. It was a bargained-for agreement. It's reasonable.

7   And I've always tried to adopt bargained-for agreements that are

8   reasonable in sentencing.

9        So it's my judgment that the corporation pay the fine

10   of $6,790,000, and I note that that's already been paid in full

11   and that the corporation also pay a special assessment of $400

12   on Counts 1 and 2 and $125 on Count 3, and that was also paid a

13   year ago on June 3 -- almost a year ago, on June 3, 2014.

14        I was going to put the corporation on probation for

15   the maximum which is five years, but given the representation

16   that it's not really functioning, I'm going to go along with

17   what probation recommended, that the corporation will be put on

18   probation for three years. I'm also going to order that the

19   corporation make restitution in the agreed-upon amount of

20   $83,008.19 pursuant to the exhibit and that restitution be joint

21   and several with the individual defendants.

22        Has the restitution been paid? That's probably going

23   to take a while because you have the various people you have to

24   pay it to. And I'll just order that the restitution be paid

25   pursuant to the exhibit.

1          MR. GREEN:  I think that's satisfactory, Your Honor.

2          THE COURT:  Okay.  Thank you.  And the corporation

3    forfeits the property set forth in the preliminary order of

4    forfeiture that I entered on November 18 of last year.

5          I want to advise the corporation you have a right to

6    appeal the sentence that I've imposed.  If the corporation

7    decides to appeal, they need to file a written notice of appeal

8    no later than 14 days from the date the judgment is filed.  If

9    the corporation can't afford to pay for a lawyer or for the

10   costs of an appeal, a lawyer will be appointed to represent the

11   corporation.

12         Anything further with regard to the corporation?

13         MR. DEEGAN:  Nothing, Your Honor.

14         MR. GREEN:  No, sir.

15         THE COURT:  Okay.  Thank you.

16         With regard to the two individual defendants, any

17   volunteers to go first?

18         MR. GREEN:  We're standing here, Your Honor.

19         THE COURT:  You're standing there, Mr. DeCoster.

20   Okay.  I'll go ahead and sentence first, but I'll tell you

21   what.  With regard to the individual defendants, I'm going to do

22   something that I have never done before.  And that is I'm going

23   to read into the record a redacted portion of the presentence

24   report taking out some names because it's forming a foundation

25   for my analysis of the Title 18, 3553(a) factors.  And I'm not

going to include everything in the presentence report, but I

have a substantial amount of information that I'm going to read

into the record.  And so it might be easier for you to be

seated, and then when it comes time to analyze some of the other

factors -- and you can actually -- I don't require defendants to

stand up.  You can just remain seated.  But I'm going to read

into the record some paragraphs of the presentence report, and

it's identical for both defendants.  So this applies to both

Peter and Austin Jack DeCoster.  And I'm going to give them some

subtitles.

Quality Egg provided false information and documents.

During every AIB audit between 2007 and 2010, Quality Egg and an

individual that I've redacted made significant

misrepresentations including material omissions to two AIB

auditors with regard to Quality Egg's food safety and sanitation

practices and procedures.

With respect to the documentation required for every

audit, Quality Egg directed the manufacture and falsification of

documents required for the audit with the intent that the

auditors and USFoods would rely on the fabricated documents.  On

the days leading up to each audit, blank -- that's the redacted

person, neither one of which is the individual defendant --

identified numerous documents that were supposed to have been

completed monthly, weekly, or daily that were missing from

Quality Egg's files.  Many of those documents then appeared in

1    the files on the day the auditor was to review them.  On the

2    days leading up to the audit, blank, redacted, gave Quality Egg

3    employees blank, signed forms and instructed them to fill in the

4    missing information.  Among the forms that were manufactured and

5    completed late at the direction of blank and others at Quality

6    Egg were preoperative sanitation reports, daily clean-up forms,

7    pest control reports, daily maintenance reports, and visitor

8    logs.

9        Both through documents and through oral

10   representations, blank and Quality Egg misled the AIB auditors

11   about the pest control measures that were in place in the

12   processing plants and layer barns.  Blank and Quality Egg

13   represented to AIB auditors during the annual audits that

14   Quality Egg had a pest control program in place for plants 3 and

15   6 during the entire period between 2007 and 2010.  In fact,

16   Quality Egg's retention of a pest control company was sporadic

17   over this time period.  For various time periods between July

18   2006 and August 2010, Quality Egg had no pest control services

19   to deal with rodents or insects in the processing plants and had

20   no outside pest control services at all to deal with rodents in

21   the layer barns.

22       Paragraph 32, blank and Quality Egg also misled the

23   AIB auditors about the Salmonella prevention strategies and

24   measures used by Quality Egg for plants 3 and 6 with the intent

25   that the auditors and USFoods would rely on those

1   misrepresentations. The USFoods addenda that the AIB auditors

2   completed required Quality Egg's plants to have in place, quote,

3   product testing protocols and appropriate intervention

4   technologies to reduce or limit the amount of Salmonella found

5   in fresh eggshells and that such measures be included in Quality

6   Egg's HACCP plan. For each AIB audit between 2007 and 2010,

7   blank and Quality Egg provided the AIB inspector with documents

8   that indicated Quality Egg performed flock testing to identify

9   and control Salmonella. In fact, no such flock testing was ever

10   done.

11       For the August 2009 AIB audits for plant 3 and 6,

12   blank and Quality Egg made further misrepresentations reflected

13   in the USAFoods addenda that Quality Egg had a Salmonella

14   program in place for layer and pullet barns. Moreover, blank

15   and Quality Egg did not take preventive measures or employ

16   strategies to reduce or limit Salmonella in eggs -- in Quality

17   Egg's table eggs when they received positive results from the

18   sporadic SE environmental testing and necropsies that Quality

19   Egg did perform.

20       With regard to Quality Egg bribing a U.S.A. official,

21   I'm just going to read a portion of the presentence report.

22   Again, all -- the blanks are individuals other than the two

23   individual defendants. Blank knowing and intending that such

24   cash would be used by blank to bribe a U.S.D.A. inspector.

25   Specifically, blank instructed Quality Egg's chief financial

1    officer to give blank $300 from Quality Egg's petty cash fund,

2    and blank provided the bribe to the inspector in an attempt to

3    corruptly influence the inspector with regard to an official

4    act, that is, to exercise his authority to release pallets of

5    retained eggs for sale by Quality Egg without reprocessing them

6    as required by law and U.S.D.A. standards.  On at least one

7    additional occasion in 2010, blank and blank provided a bribe to

8    the same inspector for the same purpose.  The inspector is now

9    deceased.

10        In providing the bribes, blank and blank were each

11    acting within the scope of employment at Quality Egg and were

12    acting with intent to benefit Quality Egg.

13        Paragraph 48, the prosecutor's investigation has

14    revealed no evidence that prior to the bribe made on or about

15    April 10, 2010, either Peter or Austin DeCoster had knowledge

16    that the bribe was going to occur.

17        In a section Quality Egg changed the Julian dates and

18    package of eggs and sold misbranded eggs in interstate commerce,

19    I'm just going to read a couple of paragraphs.  Begin -- on

20    paragraph 54, beginning no later than January 1, 2006, and

21    continuing until approximately August 12, 2010, Quality Egg

22    personnel under the direction and with the approval of blank

23    shipped some eggs in interstate commerce to various wholesale

24    customers with deliberately mislabelled processing dates and

25    expiration dates.  In fact, some of the eggs were older than

1  indicated by the dates on the egg cases.  Some of the eggs were

2  also shipped with no labeling so that in some instances labeling

3  with inaccurate processing and expiration dates could be sent to

4  wholesalers and affixed to the cases at their destination.

5          Paragraph 56 from the presentence reports of the two

6  individual defendants, there were a number of ways under the

7  direction and approval of blank Quality Egg mislabelled older

8  eggs with newer processing and expiration dates prior to

9  shipping the eggs to customers in California, Arizona, and other

10  states.  Sometimes Quality Egg personnel did not put any

11  processing or corresponding expiration dates on the eggs when

12  they were processed.  The eggs would be kept in storage for

13  several days and up to several weeks.  Then just prior to

14  shipping the eggs, Quality Egg personnel labelled the eggs with

15  processing dates that were false, in that the dates were more

16  recent than the dates the eggs were actually -- had been

17  processed with correspondingly false expiration dates.

18          In other instances, Quality Egg personnel relabelled

19  older eggs with processing dates that were false, in that the

20  dates were more recent than the dates on the eggs that had

21  actually been processed with corresponding false expiration

22  dates.  Quality Egg personnel did this by removing the original

23  labeling and affixing new, false labeling to the eggs and also

24  by placing new, false labeling over existing labeling on the egg

25  cases.

1    In other instances, Quality Egg personnel sent new

2  labeling with processing dates that were false, in that the

3  dates were more recent than the dates that the eggs had actually

4  been processed with corresponding false expiration dates with

5  the drivers of the trucks in which the eggs were shipped so that

6  the wholesale customer could apply the new labeling at the

7  destination.

8    Through these mislabeling practices, Quality Egg

9  personnel, including blank, intended to mislead at least state

10  regulators and retail egg customers regarding the age of the

11  eggs.  These mislabeling practices had the effect of misleading

12  state regulators and retail egg customers regarding the age of

13  these eggs.

14    Paragraph 59, the mislabeling of eggs at Quality Egg

15  with inaccurate dates was a common practice and was well known

16  among several Quality Egg employees.  It was an ongoing practice

17  before blank became involved in Quality Egg sales in 2002.

18    Moving on to another category, Quality Egg failed to

19  meet FDA regulatory standards, between August 12, 2010, and

20  August 30, 2010, the FDA conducted a regulatory inspection of

21  the following Quality Egg facilities:  Layers 1, 2, 3, 4, and 6

22  and the feed mill.  Many egregious unsanitary conditions were

23  observed.  Items noted were live and dead rodents, parentheses

24  mice, parentheses, and frogs found in the laying areas, feed

25  areas, conveyor belts and outside of the buildings; skeletal

1    remains of a chicken on a conveyor belt; numerous holes in the

2    wall and baseboards in the feed and laying buildings; missing

3    vent covers; rodent traps were broken, did not have bait in

4    them; and some traps still had dead rodents in them; manure

5    piled to the rafters in one building which was below the laying

6    hens; a room was so filled with manure that it pushed the screen

7    out the door, allowing rodents to access the building; and live

8    and dead beetles and flies throughout the chicken barns.

9            Paragraph 67, based upon the inspection, the FDA

10   issued a form 483 inspectional observations report, parentheses,

11   483 report, and subsequently issued a more detailed

12   establishment inspection report.  The following observations

13   were included in the 483 report:  "A," DeCoster, meaning the

14   company, not any individuals, failed to implement and follow its

15   written SE prevention plan by failing to effectively implement

16   various aspects of its egg bio-security plan related to dogs,

17   cats, rodents and other wild animals and manure management; B,

18   DeCoster, meaning the company, failed to take steps to ensure

19   that there was no introduction or transfer of SE which is the

20   Salmonella into or among poultry houses including with regard to

21   inadequate doorway accesses, protective clothing, cleaning and

22   sanitation of equipment, uncaged chickens using manure eight

23   feet high to access the laying area, and a door being blocked by

24   excess manure; C, DeCoster, then meaning the company, failed to

25   achieve satisfactory rodent and pest control; D, DeCoster, again

1  meaning the company, failed to adequately document the

2  monitoring of rodent and other pest control measures; E,

3  DeCoster, meaning the company, failed to adequately document

4  compliance with bio-security measures.

5          Now, I read those provisions of the, in my view,

6  unobjected-to portions of the presentence report.  I say in my

7  view because of that footnote number 1 in document 89.  You

8  know, I haven't ever heard any of the defendants, the

9  corporation or the two individual defendants, object in this

10  sentencing proceeding or after the filing of your document 89

11  withdrawing your objections that those paragraphs were in any

12  way objectionable to you.  I guess you don't think they're

13  relevant.  I do.  So whether it constitutes relevant conduct or

14  the history and characteristics of how the defendants ran a

15  company, I think they're highly relevant to sentencing.  And I

16  think all of those examples are beyond substantially

17  aggravating.  They're incredibly aggravating.

18          And that's what the defendant argued in their

19  sentencing brief.  I was just a little bit more specific by

20  referring to specific paragraphs that in my view are unobjected

21  to in the presentence report because I'm just looking at the

22  table of contents of the government's brief as a shorthand.

23  Believe me, I've read and reread all of the briefs and

24  everything else filed in this case.  But the government said the

25  nature, circumstances, and seriousness of the offense, A, the --

1   which is a new one, the seriousness of the harm caused by the

2   outbreak.  I find that to be aggravating.  This was a very

3   serious outbreak.  It affected over 1,900 people, and those are

4   only the people that reported it.  I don't recall the exact

5   percentage, but it is in the sentencing record.  It's in either

6   a document from experts or somewhere I read it -- and I only

7   read things in the sentencing report -- in the sentencing

8   record -- but I think it's maybe the Center for Disease Control

9   or some government agency estimates that for every single person

10  who files a formal notice of Salmonella poisoning, I don't

11  remember the exact number, but there are many, many more who

12  actually get Salmonella poisoning that never report it.  So

13  1,900 is an incredibly conservative estimate.  So there was

14  serious harm caused by this outbreak.

15          And if you don't find the number of people that were

16  harmed to be serious, all you had to do is listen to the victim

17  parent who test -- he didn't testify, but he gave his victim

18  impact statement.  And if anybody thinks Jason Tucker's son has

19  not been caused harm really beyond the wildest imagination when

20  you read the victim impact statement, hearing it from

21  Mr. Tucker, if he was the only victim, I would find it to be

22  incredibly aggravating.  But he's one of many, many, many

23  others.

24          Subsections B and C of the government's brief were

25  Salmonella contamination of Quality Egg and subsection C is poor

1   food safety practices at Quality Egg.  And those were the

2   examples that I read from the presentence report.  And believe

3   me, I left more out than I read in because I didn't want to keep

4   you all here for another couple hours.

5           Now, it is true that other than the single incident

6   that I found with regard to Peter DeCoster, it is true that

7   there is no evidence that Austin Jack DeCoster or Peter DeCoster

8   had actual knowledge of all of the horrendous sanitary

9   conditions related to and unobjected to in the presentence

10  report.  But how you could be a chief operating officer and

11  somebody who's been described as very hands-on in terms of

12  Austin Jack DeCoster, it's shocking to me that somebody could

13  run a company like this and not know about it.

14          But I'm giving you the benefit of the doubt because

15  there is no evidence that you knew about it.  You darn well

16  should have known about it.  I don't know how you could be chief

17  operating officer and know that there's this massive

18  circumventing of food safety regulations.  I guess it's

19  possible.  But it just doesn't -- doesn't seem right to me, and

20  as Mr. Green said, using his analogy, you two were the captain

21  of the ship.  And the ship went down.  But it went down because

22  you allowed your employees to engage in this, to me, a culture

23  of rampant violations of safety regulations.

24          So those are what I see as the aggravating factors.  I

25  think there are mitigating factors in this case too.  They're a

1    little bit different for each defendant, although some are the
2    same.
3           Austin Jack DeCoster, talk about a self-made man.
4    Boy, if you looked up self-made man in the encyclopedia, your
5    picture should be next to it, Austin Jack DeCoster.  I mean, you
6    started with nothing.  And from what I can tell, nobody ever
7    gave you anything.  You earned it the hard way, and you became
8    fabulously wealthy.  And I don't begrudge you that.  I admire
9    the fact -- and you worked hard.  You worked incredibly hard.
10   And that's a mitigating factor.  Heck, I think you're still
11   probably working.  You're 80 years old.  You could have retired
12   years ago, but you stuck with it through all this kind of messy
13   stuff.  That's a mitigating factor.
14          You've both been very good in doing charitable work.
15   And, you know, I was giving your lawyers a hard time about the
16   percentages.  I just like to give lawyers a hard time once in a
17   while.  But Mr. Green was absolutely right, and Mr. Dornan.  You
18   both have done extraordinary things.  And Mr. Dornan pointed out
19   in the brief that Peter DeCoster not only has done extraordinary
20   charitable work, but he did it at substantial personal safety
21   risk.  I mean, it's one thing to give somebody some money.  It's
22   another thing to travel to these distant lands and engage in the
23   work yourself.  So that is commendable.
24          And while I have sentenced a few white-collar
25   defendants before, I've never seen anybody that went to the

1 effort not just to give money because if you have a lot it's

2 easy to give money. And as Chief Judge Reade pointed out in

3 another case, it's really easy to give away your money when you

4 stole it from other people which isn't the case here, but it's

5 true of so many white-collar defendants. I mean, they actually

6 have the audacity to come into court and say look at our

7 charitable good work when, in fact, they stole the money from

8 somebody else which is exactly why they're in federal court. So

9 that's not your case there.

10 So I think that is mitigating. And I think in Peter's

11 case it's even more mitigating because you put yourself at risk.

12 In other words, you put your money -- your mouth where your

13 money was. You put your feet where your money was. You went to

14 these far-off distant lands, and you've each helped innumerable

15 people to have a better life.

16 With regard to Austin Jack DeCoster, you know, I think

17 the age is mitigating. You're 80 years. I haven't sentenced --

18 I think I've sentenced a handful of people in their 70s. If

19 I've sentenced somebody in their 80 -- who's 80, I don't recall

20 it. It's mitigating. You're less likely to recidivate. It's

21 generally mitigating. How mitigating, I don't find it extremely

22 mitigating.

23 I don't find your health issues to actually be really

24 mitigating at all. You're in better health than most

25 80-year-olds, and there's nothing about your current health

1    status that I find mitigating.  You're doing a great job of

2    managing your health concerns.

3         I don't actually find the l -- I know both lawyers on

4    the defense side argued this.  I don't find the lack of

5    knowledge to be mitigating because Congress didn't find it to be

6    mitigating.  And the sentencing commission didn't find it to be

7    mitigating.  And what I mean by that is had Congress wanted to

8    mitigate the punishment where there was no actual knowledge like

9    in this case, they could have done that.

10        But Congress chose just the opposite that.  Congress

11   said we're going to impose a sentence of -- potential sentence

12   of zero to one year even when there is no knowledge.  And the

13   sentencing commission did the same thing.  Sentencing commission

14   is really good about putting in enhancements for aggravating

15   factors, so if the sentencing commission wanted to make this --

16   wanted to make actual knowledge an aggravating factor, they

17   could have, or the absence of knowledge a mitigating factor, the

18   sentencing commission could have.  They've done it in

19   innumerable ways for other crimes.  But they didn't.

20        So I don't see the lack of knowledge as mitigating.  I

21   think if you have knowledge, it would potentially be

22   aggravating, but I don't see it as mitigating in this case for

23   the reasons I just indicated.

24        With regard to your constitutional argument, I think

25   you did a great job raising it except for the Apprendi/Alleyne

1  thing I think was a little bit silly, and I think we -- you

2  might not like my term silly, but it was silly because if you're

3  right on your constitutional argument, there is no Alleyne or

4  Apprendi issue in the case.  It just totally disappears.

5          You may well be right, Mr. Green.  And, Mr. Hopson,

6  you did an excellent job briefing it.  But I don't think you

7  are.  The Eighth Circuit may very well agree with you.  More

8  power to you when you take it there.  But I don't find there's

9  any constitutional impediment to imposing a sentence of

10 incarceration.  And I'm going to file a pretty lengthy opinion

11 indicating why.

12          But I just want to tell you this.  I did that in

13 response to the motion that you filed.  I started working on it

14 right away.  It had nothing to do with what the ultimate

15 sentence would have been.  I could have come to the conclusion

16 of giving probation.  I still would have had to have researched

17 that issue because I needed to know the answer to it.  And

18 because I know myself and I know I wasn't going to make a

19 decision until I actually got in the courtroom to impose the

20 sentence, I analyzed your arguments to the best of my ability,

21 and I just conclude otherwise.

22          I think you've got a really kind of novel argument and

23 wish you well on appeal with it.  And you may get some relief

24 from the Eighth Circuit, but I'm not going to bore you with all

25 the reasons why.  But I just don't think you're right.

1          I'm open to the possibility that you could be, but my

2   call is that you're not.  So that removes any barrier to

3   incarceration if I were to decide that that was appropriate.

4          So I think I've outlined -- oh, and with Austin Jack,

5   I do find it aggravating that he's back in front of me again ten

6   years later, but I don't find it substantially aggravating.  I

7   agree with you, Mr. Green, that you don't want me to give it any

8   weight.  I'm giving it a little bit of weight, but I'm not sure

9   it actually has -- it would only have a teeny little impact on

10  what my actual sentence would be.

11         So here's the hard part.  I've outlined what I see as

12  the aggravating factors.  I've outlined what I see as the

13  mitigating factors.  I think the aggravating factors are

14  powerful.  I think the mitigating factors are significant.  So I

15  have to balance those.

16         And Judge Calabresi who's a senior judge on what?  The

17  Second Circuit Court of Appeals or the First Circuit?  I always

18  get confused.  He was the former dean at Yale.  He wrote a

19  one-page law review article, shortest law review article in the

20  history of law review articles, and it was a tribute to another

21  judge.  And he said that what judges do is we weigh that which

22  cannot be measured.  We weigh that which cannot be measured.

23  And that's the best description I've ever heard of balancing the

24  Title 18, 3553(a) factors.  You can't put them on a scale and

25  say this is worth two coupons for probation and this is worth

1    one month of incarceration.  It doesn't work that way.  You have
2    to look at all of the factors.  You balance them as best you
3    can.  Every judge I know does the best job they can at
4    sentencing.  Every judge I know takes sentencing super
5    seriously.  We wouldn't all arrive at the same opinion.  I think
6    many judges would look at these factors and do something
7    different than what I'm going to do.

8           Some would be harsher.  So that ought to be good news.
9    I'm not going to sentence at the statutory maximum, although I
10   think given the aggravating factors in the case, I'd be well
11   within my discretion to sentence at the statutory maximum.  On
12   the other hand, I'm not going to impose probation.

13          I thought about it, and when we took our last break, I
14   was still thinking about it.  But I'm not -- but I don't think
15   that would be -- well, let me say this.  It wouldn't be an
16   unreasonable sentence because I think anything within the
17   statutory range for the facts of this case would be a reasonable
18   sentence which is maybe why the government didn't make a
19   recommendation.  I don't know.  Sometimes they recommend.
20   Sometimes they don't.

21          I'm going to impose the same sentence for both
22   defendants.  While I think Austin Jack DeCoster's prior
23   conviction is one way to distinguish Peter DeCoster, Peter
24   DeCoster in many respects was more hands-on because he was the
25   chief operating officer.

1     On the other hand, I was more impressed by his travel

2   to distant lands to help people.  And, you know, he didn't do it

3   staying at Hyatt Regencies.  Did it the hard way, living with

4   the people he was helping.

5     So for Peter DeCoster and Austin Jack DeCoster, in

6   balancing the 3553(a) factors that I've talked about, it's my

7   judgment that you're hereby committed to the custody of the

8   Bureau of Prisons to be imprisoned for three months followed by

9   a one-year term of supervised release.

10     While you're on supervised release, you'll have the

11  standard conditions of supervision including you can't violate

12  any state, local, or federal law and other standard conditions

13  set forth in the judgment.  I think I've previously noted I

14  guess with regard to the corporation you've all paid -- I'm

15  going to impose the hundred dollar -- I'm sorry, hundred

16  thousand dollar fine which has already been paid, special

17  assessment of $25 which has already been paid.

18     Is there a facility you'd like me to recommend?  I

19  think at three months BOP will probably pick a county jail would

20  be my guess.

21          MR. DORNAN:  At Clarion, Your Honor, which is in Iowa.

22          THE COURT:  Okay.  See, does the BOP have a contract?

23          MR. DORNAN:  I don't know.

24          THE COURT:  Okay.  Well, I'll just say -- well, I'm

25  just going to leave it to the BOP.  But I am expressly

1   indicating to the Bureau of Prisons that I don't believe either

2   defendant should serve their time in a halfway house which is a

3   residential reentry center but in a either Bureau of Prisons

4   facility which would be the totally minimum security facility or

5   in a county jail if the BOP doesn't do the Bureau of Prisons

6   facility.

7           But I'm going to give each of you the privilege of

8   self-reporting.  And here's how that works.  The Bureau of

9   Prisons will notify the U.S. marshals.  They'll notify your

10  lawyers.  You'll be notified about where and when to report.  If

11  you don't report at the time and place designated, that's a --

12  and it's willful, that's a separate -- that's actually a felony

13  offense that could subject you to a 60-month sentence that would

14  be consecutive to the 3 months that I imposed and an additional

15  fine of up to a quarter of a million dollars.

16          I'm going to order that you be released pending

17  appeal.  I'm not actually going to stay my judgment because I

18  don't have to stay it.  There's actually a provision of release

19  which comes into play.  I just looked it up over the noon hour.

20  I recalled it from my old days as a magistrate judge.  It is

21  Title 18, section 3143(b), subsection (a) and (b), release of --

22  release or detention pending appeal by the defendant.  I'm

23  assuming you're going to be filing a notice of appeal.  This

24  talks about who has filed an appeal, but I assume you're going

25  to be filing one.  You should.  I would if I were you.

1    But I have to find by clear and convincing evidence

2 that you're not likely to flee or pose a danger to the safety of

3 any other persons or the community.  I find that.  I also have

4 to find that an appeal would not be for purposes of delay.  I'm

5 willing to find that.  I also have to find that an appeal would

6 raise a substantial question of law likely to result in

7 reversal, a sentence that does not include a term of

8 imprisonment, or a reduced sentence of imprisonment less than

9 the total time served plus the duration of the appeal process.

10 So I'm finding all three.

11    So it has the effect of staying my ruling.  You won't

12 have to report to serve this sentence if at all until after

13 you've exhausted your appeals because I may be wrong about my

14 ability to have you incarcerated.  And the last thing in the

15 world I would want would be for you to serve that time and then

16 find out later on that I had goofed because you can't get your

17 period of incarceration back.  So it has the effect of staying

18 my ruling, but because a stay isn't actually authorized by a

19 statute and this is, I'm doing it this way.

20    You each have a right to appeal.  You can exercise

21 your right to appeal by filing a written notice of appeal with

22 the clerk of our court no later than 14 days from the date your

23 judgment is filed.  If you can't afford to pay for a lawyer, pay

24 for the costs of an appeal, those costs will be paid on your

25 behalf.

1          Is there any need to stagger the terms?  It's not like

2    you're taking care of the same small children.  And I don't

3    really understand who's really working and who isn't.

4          MR. GREEN:  Would Your Honor indulge me to talk with

5    my client for just a moment?

6          THE COURT:  Sure.

7          MR. GREEN:  Your Honor, I'm wondering if you would be

8    good enough -- and I don't have the name of the facility on the

9    tip of my tongue but to recommend a facility near where -- or

10   near as possible to where --

11         THE COURT:  In Maine, close to Maine?  Yeah, I'll be

12   hap --

13         MR. GREEN:  So his wife can --

14         THE COURT:  Visit.

15         MR. GREEN:  -- have contact with his wife.

16         THE COURT:  Yeah, I'll be happy to recommend either a

17   local facility as close to his home as possible that the Bureau

18   of Prisons has a contract with -- it has to be somebody that the

19   BOP contracts with -- or a federal facility as close to Maine as

20   possible consistent with Austin Jack's security and custody

21   classification which I'm sure will be as low as there possibly

22   is, and it would be a prison camp.  And do you want me -- I'm

23   just going to -- yeah, okay.  Mr. Dornan?

24         MR. DORNAN:  You asked about their work relationship.

25         THE COURT:  Yeah.

1          MR. DORNAN:  They are involved in a project in Ohio

2    which is a large construction project.

3          THE COURT:  Tell me it's not an egg processing plant.

4          MR. DORNAN:  Well, they're not involved in the egg

5    production part.  They're just involved in the construction

6    aspect of it.  But they do both communicate with the individuals

7    who are doing the construction.  If one of them was

8    incarcerated -- if both of them were incarcerated --

9          THE COURT:  At the same time it would make it more

10   difficult.

11         MR. DORNAN:  -- it would present a problem.

12         THE COURT:  Okay.  I'll be glad to stagger it then.

13         MR. DORNAN:  Thank you, Your Honor.

14         MR. GREEN:  I misspoke.  Mr. DeCoster through me

15   requests that he be permitted to serve his sentence near his

16   home in Iowa where his wife will reside.

17         THE COURT:  Okay.

18         MR. GREEN:  That would be near Clar -- I don't know

19   anything about Clarion.

20         THE COURT:  Yeah.  You don't know your -- you haven't

21   mastered Iowa geography yet, Mr. Green?

22         MR. GREEN:  No, not yet, although I'm a Minnesota --

23         THE COURT:  Well, you just take -- you go out the

24   door.  You get on the metro.  You take it to -- the red line to

25   Clarion, and you get off, and you're right there.  It's really

1    not too difficult.

2           Miss Sturdevant, do you know where the closest

3    facility is off the top of your head?

4           MS. STURDEVANT:  As far as county jails, they will

5    contract on a one-on-one basis, so we would have to get J and Cs

6    to them, so I don't know which one would accept it.  We've used

7    Fort Dodge in the past.

8           THE COURT:  Yeah, okay.  Well, I'll just recommend --

9    is that what you want, Mr. Dornan, too?  I don't actually know

10   where your client lives so . . .

11          MR. DORNAN:  He does live in Clarion, Judge.

12          THE COURT:  Okay.  So here's what I'll do.  I'll

13   recommend a facility that the Bureau of Prisons has a contract

14   with as close to Clarion, Iowa, as possible.  That's going to be

15   closer than the nearest minimum security facility which is in

16   Yankton, South Dakota, which is a good 90 minutes from here

17   going west.  So I'll recommend a local facility.

18          And I'm going to recommend that -- because of his age

19   that Austin Jack DeCoster serves his term first and then once

20   he's out that Peter would then have 30 days to report to the

21   facility that he's designated to, and that would help with the

22   construction project in Ohio.

23          MR. DORNAN:  Judge, on second thought, because it's

24   unclear as to where the facility would be, Mr. DeCoster would

25   prefer Yankton.

1          THE COURT:  Oh, he would prefer Yankton, okay.

2          MR. DORNAN:  Yes.

3          THE COURT:  Okay.  Then I'll recommend for Peter

4    DeCoster that he serve his time at the facility in Yankton.  I'm

5    not actually sure that on a sentence this low that the BOP will

6    actually designate Yankton.  They might designate a local

7    facility.  But whatever facility gets designated, you'll both,

8    as I indicated, have the privilege of self-reporting.

9          Is there anything further on behalf of Peter DeCoster,

10   Mr. Dornan?

11         MR. DORNAN:  No, Your Honor.

12         THE COURT:  Okay.  Thank you for your representation.

13         Mr. Green, anything further on behalf of Austin Jack

14   DeCoster?

15         MR. GREEN:  No, sir.

16         THE COURT:  Okay.  Thank you and your team for your

17   representation.

18         Mr. Deegan, anything on behalf of the United States

19   that I may have forgotten?

20         MR. DEEGAN:  I don't know that the Court forgot this.

21   There was the issue of restitution.  We agreed with the

22   individual defendants in the plea agreements that it could be

23   apportioned only against Quality Egg if Quality Egg had the

24   funds to pay it, so it's up to the Court's discretion whether or

25   not it would need to be imposed against the --

1          THE COURT:  Well, because I don't know what Quality

2     Egg has, I ordered Quality Egg to pay it.  I ordered it joint

3     and several.  So I'm going to order each defendant to pay it

4     joint and several.  If Quality Egg has the funds to pay it,

5     that's fine.  But the restitution will be pursuant to the

6     stipulated restitution in Exhibit 8.

7          Anything else?

8          MR. DEEGAN:  No, Your Honor.  Thank you.

9          THE COURT:  Miss Sturdevant, anything else I've

10    forgotten?

11         MS. STURDEVANT:  No, Your Honor.

12         THE COURT:  Okay.  Good luck to both of you, and we'll

13    be in recess.  Thank you.

14         (The foregoing sentencing was

15          concluded at 2:53 p.m.)

16

17

18

19

20                    CERTIFICATE

21         I certify that the foregoing is a correct transcript

22    from the record of proceedings in the above-entitled matter.

23

24

25     S/Shelly Semmler                    4-25-15
       Shelly Semmler, RMR, CRR              Date